## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSN
## MILWAUKEE DIVISION

| | | |
|---|---|---|
| JOHN HUBER, in his individual capacity and as Personal Representative of the ESTATE OF ANTHONY HUBER, | ) ) ) ) | JURY TRIAL DEMANDED |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DAVID G. BETH, in his individual and official capacity as Kenosha County Sheriff, DANIEL G. MISKINIS, in his individual and official capacity as the former Chief of Police for the Kenosha Police Department, ERIC LARSEN, in his official capacity as the acting Chief of Police for the Kenosha Police Department, JOHN DOE POLICE OFFICERS of the Kenosha Police Department and Kenosha County Sheriff's Department, CITY OF KENOSHA, and COUNTY OF KENOSHA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## **COMPLAINT**

NOW COMES Plaintiff, JOHN HUBER, in his individual capacity and as Personal Representative of the ESTATE OF ANTHONY HUBER, by counsel, Loevy & Loevy, and complains against DAVID G. BETH, in his individual and official capacity as Kenosha County Sheriff, DANIEL G. MISKINIS, in his individual and official capacity as the former Chief of Police for the Kenosha Police Department, ERIC LARSEN, in his official capacity as the acting Chief of Police for the Kenosha Police Department, and JOHN DOE POLICE OFFICERS of the Kenosha Police

1

Department and Kenosha County Sheriff's Department, CITY OF KENOSHA, and COUNTY OF KENOSHA, as follows:

## INTRODUCTION

1. This case involves the tragic death of Anthony Huber, a beloved son and community member, who was shot and killed while committing an act of remarkable heroism.

2. On August 25, 2020, in Kenosha, Wisconsin, Huber was participating in protests against police violence, which were sparked by the police shooting of Jacob Blake two days earlier. Mr. Blake was a Black man who had been shot in the back seven times by an officer in the Kenosha Police Department, and Huber was among many who peacefully protested the shooting and Kenosha's pattern of racist and violent behavior by police officers and other officials.

3. During the course of the protests, private citizens took up arms and patrolled the streets of Kenosha, acting as law enforcement agents. Many of them had posted racist messages and threatened violence on social media before descending upon Kenosha. They made their plans known to law enforcement officials.

4. These armed individuals were not Kenosha business owners whose property had been damaged, nor were they hired by any of those businesses to come protect their property.

5. One of these armed individuals was 17-year-old Kyle Rittenhouse. He crossed into Wisconsin from Illinois, carrying an assault rifle on the streets of

2

Kenosha, in open violation of the law.

6. Astonishingly, the Kenosha Police Department, Kenosha County Sheriff's Department, and their supervising officials and police officers, did not treat Rittenhouse or any of the other armed individuals patrolling the streets as a threat to the safety of themselves or the citizens they were sworn to protect.

7. Instead, Defendants deputized these armed individuals, conspired with them, and ratified their actions by letting them patrol the streets, armed with deadly weapons, to mete out justice as they saw fit. In addition, Defendants thanked Rittenhouse and other armed individuals, gave them water, and allowed them to openly defy the emergency curfew order that was in place. Defendants even made plans to funnel the protestors toward the armed individuals "deal with them."

8. As a result of Defendants' actions, Rittenhouse fired his assault rifle indiscriminately a number of times at citizens on the street. He shot and killed two men, seriously injured a third, and narrowly missed a fourth. At the time Rittenhouse encountered Anthony Huber, Rittenhouse had already shot at two men and killed one of them.

9. Anthony Huber is a hero. He attempted to disarm Rittenhouse, end the gunfire, stop the bloodshed, and protect his fellow citizens. Tragically, Anthony died when Rittenhouse shot him in the chest as Anthony tried to pull the assault rifle from Rittenhouse's hands.

10. The conduct of the Kenosha Police Department, Kenosha County Sheriff's Department, and its supervisors and police officers, directly caused

3

Anthony Huber's death. Anthony's father, John Huber, and his mother, Karen Bloom, now seek justice for death of their son.

## NATURE OF THE ACTION

11.     This is a civil action arising under 42 U.S.C. §§ 1983, 1985, and 1986, and under state law, for deprivation of Plaintiff's constitutional, statutory, and state-law rights.

## JURISDICTION AND VENUE

12.     Jurisdiction of this Court is invoked pursuant 28 U.S.C. §§1331 and 1343(a).

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims.

14.     Venue is proper in this District, pursuant to 28 U.S.C. §1391, and because all of the conduct complained of herein occurred in this District.

## PARTIES

15.     Plaintiff, JOHN HUBER is the father of Anthony Huber, deceased. ("Anthony"). He sues in his individual capacity and as Personal Representative of the ESTATE OF ANTHONY HUBER ("Estate").

16.     Defendant DAVID G. BETH was the duly elected Sheriff of Kenosha County, Wisconsin. Defendant Beth had the authority to make and enforce policies of the Kenosha County Sheriff's Department.

17.     Defendant DANIEL G. MISKINIS was the Chief of Police for the

Kenosha Police Department. Defendant Miskinis had the authority to make and enforce policies of the Kenosha Police Department.

18. Defendant ERIC LARSEN is the current Chief of Police for the Kenosha Police Department. He is sued in his official capacity only.

19. Defendants JOHN DOE POLICE OFFICERS are unknown law enforcement officers employed by Defendant Kenosha Police Department and/or Defendant Kenosha County Sheriff's Department.

20. Defendant City of Kenosha is a Wisconsin municipal corporation, which operates the Kenosha Police Department ("KPD"), which in turn sets city-wide policies for the conduct of police officers employed by the City of Kenosha.

21. Defendant County of Kenosha is a governmental entity within the State of Wisconsin, an arm of which is the Kenosha County Sheriff's Department ("KCSD"), which in turn sets policies for the conduct of sheriff's deputies employed by the Kenosha County Sheriff's Department.

## FACTS

### Kenosha Police Shoot Jacob Blake, Sparking Protests

22. On August 23, 2020, in Kenosha, Wisconsin, KPD officer Rusten Sheskey shot Jacob Blake in the back seven times without justification.

23. Neighbors and other concerned residents of Kenosha demonstrated in protest against the shooting of Jacob Blake. Demonstrators initially gathered at the site where Mr. Blake was shot. When video of the KPD's shooting of Blake was released, it rightly sparked public outrage. That evening hundreds of additional

demonstrators gathered in downtown Kenosha to protest.

24. Officers from the KPD and the KCSD were dispatched to monitor the demonstrations, police the actions of individuals present, and disperse the crowds.

25. The KPD and KCSD officers at the scene were antagonistic toward the demonstrators, who were voicing their outrage at the racist and systemic violence conducted by the very officers who were policing the demonstrations.

26. An emergency overnight curfew of 10:15 p.m. was put in place. The curfew was aimed at protestors and not actually directed at, or enforced against, others in the City violating the order.

27. Officers from the Kenosha Police Department and the Kenosha County Sheriff's Department fired tear gas and rubber bullets into the crowds to break up the demonstrations, and they arrested a number of demonstrators.

28. On Monday, August 24, 2020, the demonstrations continued. Defendant Beth put in place an 8 p.m. curfew. Again, the curfew was aimed at protestors.

29. That curfew remained in effect on August 25, 2020.

**Defendants Know Armed Individuals Plan to Patrol Kenosha and Have Threatened Harm to Citizens**

30. The demonstrations continued on August 25, 2020.

31. That evening, armed individuals descended on Kenosha. They could be seen patrolling the streets in and around the demonstrations, brandishing weapons, threatening residents, and pointing weapons at peaceful demonstrators without provocation.

6

32.     The armed individuals had arrived in part based on a Facebook post by Kevin Mathewson on behalf of a militia group he formed called the Kenosha Guard. Mathewson put out a call on Facebook for "patriots willing to take up arms and defend our City tonight against the evil thugs." He received hundreds of online responses, including many hundreds of people indicating that they would be attending.

33.     The responders to Mathewson's post made clear that they intended to patrol the demonstration armed, and with the intent to kill. Responses included the following:

      a.  "Counter protest? Nah. I fully plan to kill looters and rioters tonight. I have my suppressor on my AR [Assault Rifle], these fools won't even know what hit them."

      b.  "It's about time. Now it's time to switch to real bullets and put a stop to these impetuous children rioting."

      c.  "Use hollow points, they expand on contact."

      d.  "Armed and ready. Shoot to kill tonight."

34.     Defendants knew about the plans and intentions of the armed individuals, including the social media posts, and the plans and intentions of the pro-militia armed individuals that descended on downtown Kenosha.

35.     Mathewson is a former Kenosha alderman, was known to the Defendants, and speaks regularly with Defendant Miskinis.

36.     Mathewson, calling himself the Commander of the Kenosha Guard,

emailed Defendant Miskinis and Joseph Nosalik, KPD's Public Information Officer. The email stated, "Chief Miskinis: As you know, I am the Commander of the Kenosha Guard, a local militia. We are mobilizing tonight and have about 3,000 RSVP's. We have volunteers that will be in Uptown, downtown, and at the entrances to other neighborhoods." Matthewson also posted the email as an open letter to the Kenosha Chief of Police on social media.

37.    The email and social media post made clear that these "volunteers" would not be there to protect their own homes or businesses, and that they had not been hired by any local business to secure property. Instead, they intended to patrol the streets, acting as armed law enforcement officials.

38.    Neither Defendant Miskinis nor Defendant Beth made any attempt to dissuade Mathewson or any another other armed individuals from showing up in Kenosha to patrol the streets.

39.    Defendants Miskinis and Beth acknowledged that the KPD and KCSD were aware that pro-militia, armed individuals intended to patrol and then did patrol downtown Kenosha.

### Rittenhouse Shoots Anthony Huber and Two Others

40.    Among the armed individuals who arrived in Kenosha on August 25 was Kyle Rittenhouse.

41.    Rittenhouse was a 17 year old from Antioch, Illinois.

42.    By his appearance, Rittenhouse was obviously a minor.

43.    Rittenhouse possessed a Smith & Wesson AR-15 style .223 rifle, with a magazine holding 30 rounds of ammunition. This weapon was developed in the late

8

1950s as a weapon of war.

44.     Rittenhouse was brandishing his gun openly and conspicuously, strapping it over his shoulder using a tactical sling designed to position the rifle at the center of his chest for rapid elevation and positioning. The rifle was visible at all times across his body or in his hands.

45.      Rittenhouse was in clear violation of the law, which prohibits a minor from possessing or displaying such a gun.

46.     Numerous KPD and KCSD officers saw Rittenhouse before and after the shootings that night. Despite being in clear violation of Wisconsin law, Rittenhouse was not asked for identification, was not questioned, was never detained, and was not disarmed.

47.     Instead, Defendants allowed Rittenhouse to patrol the streets of downtown Kenosha with his deadly assault rifle, they invited him in, deputized him, conspired with him, and ratified his actions.

48.     As a result of Defendants' actions, within the zone Defendants controlled, Rittenhouse shot at four Kenosha-area residents, killing two of them and seriously injuring a third.

49.     At around 11 p.m., without provocation, Rittenhouse pointed his gun at an unarmed demonstrator heading to his car to go home.

50.     Around 11:45 p.m., Rittenhouse shot Joseph Rosenbaum in the parking lot of an auto dealership. Rosenbaum was killed.

51.     Instead of seeking medical attention, or any other form of aid,

Rittenhouse called his friend Dominic Black, told Black that he had just killed someone, and then ran.

52.  Rittenhouse ran from the scene of the Rosenbaum shooting with his assault rifle in his hands, holding it in a ready position. People were yelling that Rittenhouse had just shot someone.

53.  Rittenhouse stumbled and fell to the ground, and several citizens approached him in an attempt to disarm him.

54.  Anthony Huber was one of those individuals. Anthony approached Rittenhouse to disarm him, stop the shooting, and save the lives of others.

55.  Anthony Huber was a hero.

56.  As Anthony was reaching for Rittenhouse's rifle to pull it away, Rittenhouse shot him in the chest:



57.     After Anthony was shot, Gage Grosskreutz approached Rittenhouse with his hands up, pleading with him to stop his shooting rampage. Rittenhouse shot at Grosskreutz from point-blank range, hitting him in the arm. Thankfully, Grosskreutz survived.

58.     But the shot that Rittenhouse fired at Anthony's chest was fatal.

**Defendants Authorize Rittenhouse's Shootings**

59.     Defendants did nothing to stop Rittenhouse's illegal conduct. They did not arrest him for illegally carrying a gun. They did not disarm him. They did not limit his movement in any way. They did not question him. They did not stop him from shooting individuals after he started. They did not arrest him, detain him, or question him even after he had killed two people.

60.     Instead, Defendants deputized Rittenhouse and other armed individuals, conspired with them, and ratified their actions by allowing them to patrol the streets armed illegally with deadly weapons and shoot and kill innocent citizens.

61.     Among other things, Defendants directed their curfew order only at people protesting Defendants' own police violence, and not at Rittenhouse and others, who were supporters of law enforcement.

62.     Rittenhouse and others were subject to a different set of rules and were allowed to move about freely in areas controlled by Defendants.

63.     For example, at 9:57 p.m., a Kenosha Police Sergeant sent a message to all officers through the Department's internal messaging system noting the

presence of armed individuals patrolling the streets in violation of the curfew order.

64. Rather than take any steps to detain, dissuade, or disarm these armed individuals, a KPD Sergeant made clear that they were not to be detained, dissuaded, or disarmed, calling the armed individuals in blatant violation of the curfew order "very friendly."

65. Likewise, at 11:26 p.m., callers reported that members of the armed individuals had "slashed tires" in a nearby area. But, the Defendants did nothing in response to this conduct, let alone arrest the perpetrators.

66. Instead, at approximately 11:30 p.m., about fifteen minutes before Rittenhouse shot Rosenbaum, Huber and Grosskreutz, KPD and KCSD officers were talking to Rittenhouse and the other armed individuals who had congregated in the parking lot of a private business.

67. Despite the fact that the armed individuals were in violation of the curfew order, the officers and deputies communicated their full support and appreciation for Rittenhouse and others.

68. In video footage taken at the scene, officers can even be heard asking armed individuals if they needed water. Rittenhouse can be seen telling the officers that they did need water, which officers gave them.

69. Rittenhouse walked right up to the police vehicles. Despite his obviously tender age, he was not asked for identification to demonstrate that he could lawfully possess an assault rifle.

70. The officers not only provided armed individuals with water, but they

voiced their support and appreciation for the actions of Rittenhouse and others, saying: "We appreciate you guys, we really do."

71.     Needless to say, KPD and KCSD officers did not offer assistance or appreciation to any protestors. At the same time the officers were handing out assistance and praise to the armed individuals, including Rittenhouse, they can be heard over loudspeakers in their armored vehicles ordering the protestors to disperse: "This is the last warning. You will disperse." And: "This area is closed you are trespassing, leave now."

72.     No such warnings or threats were made to the armed individuals.

73.     The KPD and KCSD officers deliberately orchestrated these circumstances. A clear message was sent that perceived protestors were required to disperse, while armed individuals who supported law enforcement could roam free and assist the officers. These events directly led to Anthony Huber's death.

74.     Before the fatal shootings, one of the armed individuals was interviewed. He said the following: "You know what the cops told us today? They were like, 'We're gonna push 'em down by you, 'cause you can deal with them, and then we're gonna leave.'"

75.     And that is exactly what happened. Defendants ordered the protestors to move south, funneling them into a confined area, where they were met by the violence perpetrated by Rittenhouse and the other armed individuals.

76.     At all times, Defendants, Rittenhouse, and others knew and understood what Defendants meant when they told heavily armed private citizens

to "deal with" the protestors. In this manner, Defendants, Rittenhouse, and others arrived at a plan to collectively use force and state authority against the protestors.

77.     For example, Rittenhouse's own lawyers have stated that the police "maneuvered a mass of individuals down the street towards the auto shops" where the armed individuals had gathered.

78.     As a result, Defendants invited, deputized, authorized, conspired with, and ratified the actions of Rittenhouse, a boy illegally in possession of an assault rifle, who roamed the street in violation of an emergency curfew order, shooting innocent civilians, killing two, seriously injuring a third, and narrowly missing a fourth.

79.     To make matters worse, when Huber and Grosskreutz were shot, police officers from both the KPD and KCSD were at the scene. Protestors yelled to the officers that Rittenhouse had just shot people. Remarkably, the officers did nothing to stop Rittenhouse, let alone question him, or arrest him. Instead, officers spoke to Rittenhouse and then let him walk away.

80.     The only reason Defendants allowed Rittenhouse to walk away after shooting three people was because he was white and because he was affiliated with the armed individuals, who had Defendants' explicit support.

81.     Long after he had left the scene and the state, Rittenhouse was finally arrested and charged with murder and other crimes by the Kenosha County District Attorney's Office.

82.     By inviting, deputizing, conspiring with, and ratifying the actions of

14

armed individuals, who were empowered to patrol the streets of Kenosha, Defendants created an extremely and obviously dangerous and deadly environment, which led directly and foreseeably to the shootings of Anthony Huber and others.

83. Defendants' open support of and coordination with the armed individuals in the minutes and hours before the shootings deprived Anthony Huber and the other protestors of the basic protections typically provided by police. It was a license for the armed individuals to wreak havoc and inflict injury.

84. Rittenhouse's own lawyers have blamed the shootings on Defendants, highlighting Defendants' "abject failure to ensure basic law and order to citizens."

85. Defendants have continued their disparate treatment of Black people, even after the deaths of Huber and Rosenbaum. For example, Defendant Miskinis has refused to publicly condemn the crimes of Rittenhouse or the other armed individuals, and instead has ratified that misconduct. Indeed, he has defended the armed individuals as citizens exercising their constitutional rights. The protestors received the opposite treatment from Defendant Miskinis.

86. Moreover, in his first press conference after the shooting, Defendant Miskinis refused to make any statements condemning or even dissuading the armed individuals, even when he was specifically asked if he wanted armed vigilante groups to be present again the next night of protests.

## Racial Discrimination and Viewpoint Discrimination

87. If Kyle Rittenhouse were Black, Defendants would have acted much differently.

15

88.     If a Black person had approached police with an assault rifle, offering to patrol the streets with the police, he most likely would have been shot dead.

89.     If a Black child had shot three citizens with an assault rifle and was seen walking away from the scene of the shooting with the assault rifle in hand, while other citizens yelled he was an active shooter, he would have been shot dead.

90.     In none of these circumstances would Defendants have permitted the individual to roam the streets, illegally and heavily armed, shoot civilians, and then walk past a dozen officers, talk to them, and simply go home.

91.     One need not look any further than the very event that gave rise to the protest at which Anthony Huber was killed: although Jacob Blake was not at the site of a shooting, possessed no gun, brandished no weapon, had not shot or hurt anyone, and was climbing into his own car with two children, Blake was shot in the back seven times by officers employed by Defendant KPD.

92.     By contrast, Rittenhouse was walking away from the scene of a double homicide with an assault rifle in his arms, and he was permitted to simply walk away.

93.     Jacob Blake is Black. Kyle Rittenhouse is White.

94.     Moreover, the demonstrators were a diverse group of citizens protesting police violence against Black people, which included many Black-Americans and other people of color. They were protesting, in part, the racial discrimination of Defendants KPD and KCSD, and their officers, as exemplified by the shooting of Jacob Blake.

16

95.    The armed individuals were all White.

96.    Similarly, the protestors were advocating a viewpoint critical of the police, including Defendants KPD and KCSD. The armed individuals espoused a viewpoint that was avowedly pro-police.

97.    The difference in treatment of the two groups was stark. The White, pro-police armed individuals were allowed by Defendants to patrol the streets with weapons of war, participating in the police action, and threatening and inflicting violence on innocence civilians; while the diverse group of protestors criticizing police actions were ordered to disperse because they were violating the curfew order. No such orders were given to the pro-police individuals, who were in violation of the curfew as well.

98.    The protestors were also treated differently than the armed individuals in terms of who was subject to arrest. In the days after the protests began, more than 150 protestors were arrested for allegedly violating the curfew order. Not a single one of the armed individuals was arrested by Defendants for violating the same curfew order.

99.    Many of the armed individuals with whom the Defendant departments had allied themselves were avowed racists.

100.    Among the armed individuals present at the protests was Ryan Balch, a member of the Boogaloo Bois who could be seen patrolling the streets with Rittenhouse. The Boogaloo Bois are a right-wing militia group whose adherents include neo-Nazis and white supremacists. According to Balch, as many as 32

17

members of the Boogaloo Bois were in Kenosha patrolling the streets.

101.    In the months after he killed Anthony Huber, Rittenhouse was seen in a bar in his hometown flashing an "OK" sign, a symbol of white supremacy/white power.



*Systemic Racial Discrimination in the Kenosha Police Department and Kenosha County Sheriff's Department*

102.    Defendant KPD's support of, and coordination with, the armed individuals was a product of its systemic, racially discriminatory policies and practices.

103.    The KPD has just eight Black police officers, out of a force of more than 200 officers. It has never had a Black person in top leadership positions, including police chief, assistant chief, or police inspector.

104.    Christopher Carter, a former Black police officer in the KPD who

retired in 2011, has said he was consistently subject to racist aggression, including being called a "n*****," was discriminated against during his time at the KPD, and witnessed racist policing practices toward civilians.

105.   In a recent article in the Washington Post, six current and former officers "described a department at odds with people of color, both inside and outside its ranks, with some officers routinely using racist language and excessive force."  One of the former officers stated, "You have officers there who openly admit to pulling someone over because they're Black and driving a nice car. And these are officers who train new officers."

106.   Just eleven days before Jacob Blake was shot, a woman was arrested for filming police officers engaging in threats and physical abuse during the arrest of a Black man. Her video footage captured a KPD officer punching a man in the ribs twice after he had already been handcuffed. When she was ordered to disperse, she responded, "We're not moving until we know he's safe!" An officer responded, "Do you want to get shot?"

107.   For his part, Defendant Beth has his own history of racially discrimination conduct as the Kenosha County Sheriff. In 2018, two Black woman and three Black men were apprehended after a shoplifting incident and a high-speed chase. The youngest individual arrested was 16 years old. In comments after the arrest, Defendant Beth stated that it was time to "stop being politically correct," and that "these people have to be warehoused."

# LEGAL CLAIMS

## COUNT I:
### 42 U.S.C. §1983
### CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS

108.    Each paragraph of this Complaint is incorporated as if restated fully herein.

109.    Defendants acting in concert with each other and other co-conspirators—including Rittenhouse, Mathewson, members of the Kenosha Guard and other non-party armed individuals—reached an agreement among themselves to deprive Huber of his constitutional rights, all as described in the various paragraphs of this Complaint.

110.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Huber of these rights.

111.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

112.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Huber and others.

113.    As a direct and proximate result of the illicit prior agreement referenced above, Huber's rights were violated and he suffered injuries, including emotional distress and death.

114.    Plaintiff's' injuries were caused by the actions and decisions of Defendants Beth and Miskinis, acting in their individual and official, policymaking

20

capacities; Larsen, acting in his official capacity; and by employees and contractors of the Kenosha Police Department and Kenosha County Sheriff's Department, including the John Doe Police Officers, who acted at the direction of Defendants Beth and Miskinis; and the City of Kenosha and County of Kenosha.

115. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and the Kenosha Police Department, and the County of Kenosha and the Kenosha County Sheriff's Department, in the manner more fully described below in Count VII.

**COUNT II:**
**42 U.S.C. §1985(3)**
**CONSPIRACY TO OBSTRUCT JUSTICE BASED ON INVIDIOUS DISCRIMINATION**

116. Each paragraph of this Complaint is incorporated as if restated fully herein.

117. Defendants are "persons" as that term is used in 42 U.S.C. §1985.

118. Defendants, acting in concert with each other and other co-conspirators—including Rittenhouse, Mathewson, members of the Kenosha Guard and other non-party armed individuals—reached an agreement among themselves to deprive Huber of his constitutional rights and equal protection of the laws, all as described in the various paragraphs of this Complaint.

119. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Huber of these rights.

120. In furtherance of the conspiracy, each of the co-conspirators committed

21

overt acts and was an otherwise willful participant in joint activity.

121. The conspiracy between Defendants and the other co-conspirators set forth above, and the actions taken in furtherance thereof, were motivated by racial animus.

122. Specifically, working in concert with these others, Defendants targeted individuals of color and individuals allied with them in protest against racial discrimination, including Huber, by creating a dangerous environment in which injury to Huber and others was highly likely. They did this by permitting the all-white armed individuals—many of whom had openly espoused racist and violent intentions—to taunt, threaten and monitor the diverse group of protestors, by permitting the all-White armed individuals to patrol the streets like deputized police officers, by offering the all-White armed individuals assistance and praise while simultaneously ordering protestors to disperse, and by ultimately corralling the protestors and funneling them toward the all-white armed individuals to "deal with them." Moreover, in the week or so after the protests began, more than 150 members of the racially diverse group of protestors were arrested for violating Defendants' curfew order. Not a single one of the all-white armed individuals was arrested for violating the same curfew order.

123. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Huber and others.

124. As a direct and proximate result of the illicit prior agreement

22

referenced above, Huber's rights were violated and he suffered injuries, including emotional distress and death.

125.    Plaintiff's' injuries were caused by the actions and decisions of Defendants Beth and Miskinis, acting in their individual and official, policymaking capacities; Larsen, acting in his official capacity; and by employees and contractors of the Kenosha Police Department and Kenosha County Sheriff's Department, including the John Doe Police Officers, who acted at the direction of Defendants Beth and Miskinis; and the City of Kenosha and County of Kenosha.

126.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and the Kenosha Police Department, and the County of Kenosha and the Kenosha County Sheriff's Department, in the manner more fully described below in Count VII.

**COUNT III:**
**42 U.S.C. § 1983, 42 U.S.C. §1985(2)**
**EQUAL PROTECTION**

127.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

128.    In the manner described in this Complaint, Defendants denied Huber equal protection of the law in violation of the Fourteenth Amendment of the United States Constitution.

129.    Defendants' conduct was motivated by racial animus and constituted purposeful discrimination, and it also affected Huber and the racially diverse group of protestors in a grossly disproportionate manner as compared to similarly situated

23

White individuals.

130. Specifically, working in concert with these others, Defendants targeted individuals of color and individuals allied with them in protest against racial discrimination, including Huber, by creating a dangerous environment in which injury to Huber and others was highly likely. They did this by permitting the all-white armed individuals—many of whom had openly espoused racist and violent intentions—to taunt, threaten and monitor the diverse group of protestors, by permitting the all-White armed individuals to patrol the streets like deputized police officers, by offering the all-White armed individuals assistance and praise while simultaneously ordering protestors to disperse, and by ultimately corralling the protestors and funneling them toward the all-white armed individuals to "deal with them." Moreover, in the week or so after the protests began, more than 150 members of the racially diverse group of protestors were arrested for violating Defendants' curfew order. Not a single one of the all-White armed individuals was arrested for violating the same curfew order.

131. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Huber and others.

132. As a direct and proximate result of the conduct referenced above, Huber's was deprived of equal protection of the laws, and he suffered injuries, including emotional distress and death.

133. The misconduct described in this Count was undertaken pursuant to

24

the policies and practices of the City of Kenosha and the Kenosha Police Department, and the County of Kenosha and the Kenosha County Sheriff's Department, in the manner more fully described below in Count VII.

**COUNT IV:**
**42 U.S.C. §1983**
**FIRST AMENDMENT RETALIATION**

134.    Each paragraph of this Complaint is incorporated as if restated fully herein.

135.    In the manner described in this Complaint, Defendants subjected Huber and the other protestors to discriminatory and retaliatory treatment based on their opinions critical of police violence, in violation of the First Amendment of the United States Constitution.

136.    Huber and the other protestors participated in rallies and demonstrations in downtown Kenosha advocating a viewpoint critical of the police, including Defendants KPD and KCSD, similar to the national and worldwide protests against police violence that began in the summer of 2020. Such conduct is protected by the First Amendment of the United States Constitution.

137.    The armed individuals espoused a viewpoint that was avowedly "pro-police."

138.    Defendants subject Huber and other peaceful protestors to discrimination and retaliation because of their viewpoints critical of police. They did this by permitting "pro-police" armed individuals to taunt, threaten and monitor the diverse group of protestors without consequence, by permitting the "pro-police"

armed individuals to patrol the streets like deputized police officers, by offering the "pro-police" armed individuals assistance and praise while simultaneously ordering protestors to disperse, and by ultimately corralling the protestors and funneling them toward the "pro-police" armed individuals to "deal with them." Moreover, in the week or so after the protests began, more than 150 members of the protestors voicing criticism of racist and violent police conduct were arrested for violating Defendants' curfew order. Not a single one of the "pro-police" armed individuals was arrested for violating the same curfew order.

139.    The protected speech of Huber and the other protestors, and the viewpoint critical of police that they expressed, was a motivating factor in Defendants' disparate, discriminatory and retaliatory treatment of the protestors.

140.    The Defendants' retaliatory actions in response to Huber and the other protestors' protected speech have had a chilling effect that acts as a deterrent to free speech.

141.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Huber and others.

142.    As a direct and proximate result of the conduct referenced above, Huber's First Amendment rights were violated, and he suffered injuries, including emotional distress and death.

143.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and the Kenosha Police

Department, and the County of Kenosha and the Kenosha County Sheriff's Department, in the manner more fully described below in Count VII.

**COUNT V:**
**42 U.S.C. §1983**
**DEPRIVATION OF DUE PROCESS**

144.   Each paragraph of this Complaint is incorporated as if restated fully herein.

145.   In the manner described in this Complaint, Defendants allowed Rittenhouse and other illegally armed individuals to patrol the streets of downtown Kenosha with deadly weapons, inviting those individuals to use police powers, deputizing them, conspiring with them, and ratifying their actions.

146.   Defendants even informed Rittenhouse and these armed individuals that they would funnel demonstrators toward them to be dealt with.

147.   The misconduct described in this Count increased the danger faced by Huber and other peaceful demonstrators who were present.

148.   In addition, the misconduct described in this Count shocked the conscience and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Huber and others.

149.   As a direct and proximate result of the conduct referenced above, Rittenhouse shot and killed Huber.

150.   The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and the Kenosha Police Department, and the County of Kenosha and the Kenosha County Sheriff's

Department, in the manner more fully described below in Count VII.

## COUNT VI:
### 42 U.S.C. §1986
### FAILURE TO INTERVENE

151.    Each paragraph of this Complaint is incorporated as if restated fully herein.

152.    In the manner described in this Complaint, Defendants had knowledge that conspiratorial wrongs were about to be committed.

153.    Each of the Defendants had the power to prevent or aid in preventing the commission of those wrongs.

154.    Defendants neglected to prevent or aid in preventing these wrongful acts where the wrongful acts were committed and could have been prevented by reasonable diligence.

155.    As a direct and proximate result of the conduct referenced above, Huber's constitutional rights were violated, and he suffered injuries, including emotional distress and death.

156.    As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent them in court proceedings and incurred expenses associated with these proceedings and prosecuting the instant case.

## COUNT VII:
### 42 U.S.C. §1983
### Municipal Liability/*Monell* Policy Claim

157.    Each paragraph of this Complaint is incorporated as if restated fully herein.

158.  As described more fully herein, Defendants City of Kenosha and County of Kenosha are themselves liable for the violation of Huber's constitutional rights.

159.  Plaintiff's injuries were caused by the policies, practices, and customs of Defendants City of Kenosha and County of Kenosha, as well as by the actions of policy-making officials for Defendants City of Kenosha and County of Kenosha.

160.  At all times relevant to the events described above and for a period of time prior and subsequent thereto, Defendants City of Kenosha and County of Kenosha failed to promulgate proper or adequate rules, regulations, policies, and procedures to ensure the protection of equal protection, first amendment and other constitutional rights of protestors and other individuals engaged in demonstrations and rallies on issues of public interest; to protect protestors and other individuals engaged in demonstrations and rallies on issues of public interest, including from counter-protestors and other individuals whose actions and presence is likely to create danger and result in violence; to ensure the equal enforcement (or non-enforcement) of curfew orders; to ensure decision-making free of racial discrimination as related to the monitoring and supervision of protests and demonstrations; to ensure decision-making free of viewpoint discrimination as related to the monitoring and supervision of protests and demonstrations; to protect the free speech rights of all persons regardless of race or viewpoint; and to protect against the likely violence attributable to the presence and threats of armed individuals deputizing themselves with police duties. In addition or alternatively,

29

Defendants City of Kenosha and County of Kenosha failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Kenosha Police Department and the Kenosha County Sheriff's Department, with respect to the foregoing topics.

161. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the City of Kenosha and County of Kenosha, including the Defendants.

162. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendants City of Kenosha and County of Kenosha had notice of widespread practices by officers and agents of the Kenosha Police Department and Kenosha County Sheriff's Department to discriminate and retaliate against racial minorities and their allies, and against protestors challenging discriminatory and violent conduct by police officers including members of the Kenosha Police Department and Kenosha County Sheriff's Department; and to favor the views of "pro-police" groups such as the Kenosha Guard and the other armed individuals; and to subject favored and unfavored groups to different treatment.

163. These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Kenosha and County of Kenosha directly encouraged and were thereby the moving force behind the very type of misconduct at issue.

164. The above widespread practices and customs, so well settled as to

30

constitute *de facto* policies of the City of Kenosha and County of Kenosha, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

165.   In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and County of Kenosha in that the constitutional violations committed against Huber were committed with the knowledge or approval of persons with final policymaking authority for the City of Kenosha and County of Kenosha or were actually committed by persons with such final policymaking authority.

166.   Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Kenosha and County of Kenosha, including but not limited to Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VIII:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

167.   Each paragraph of this Complaint is incorporated as if restated fully herein.

168.   In the manner described in this Complaint, Defendants engaged in extreme and outrageous conduct.

169.   Defendants' actions set forth above were rooted in an abuse of power or authority.

31

170.    Defendants' actions set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and death, and with reckless disregard of that probability.

171.    Defendants' actions set forth above were undertaken with malice, willfulness, and reckless indifference to the rights of others.

172.    Defendants' conduct intentionally or recklessly caused severe emotional distress to another.

## COUNT IX:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

173.    Each paragraph of this Complaint is incorporated as if restated fully herein.

174.    In the manner described in this Complaint, Defendants were negligent.

175.    Plaintiff was impacted by the incidents related to Defendants' negligence.

176.    Plaintiff suffered serious emotional distress of the type that a reasonable person would expect to occur.

177.    As a direct and proximate result of the conduct referenced above, Huber suffered injuries, including emotional distress and death.

## COUNT X:
## NEGLIGENCE

178.    Each paragraph of this Complaint is incorporated as if restated fully herein.

179.    Defendants had a duty to Huber and the other protestors to act with

32

ordinary care and prudence so as not to cause harm or injury to Huber.

180. By engaging in the manner described in this Complaint, Defendants failed to act with ordinary care and breached their duty of care owed to Huber.

181. As a direct and proximate result of the conduct referenced above, Huber suffered injuries, including emotional distress and death.

## COUNT XI:
## NEGLIGENT HIRING, SUPERVISION AND TRAINING

182. Each paragraph of this Complaint is incorporated as if restated fully herein.

183. Huber suffered damages from foreseeable misconduct of employees and agents supervised by Defendants.

184. The Defendants' employees in supervisory roles had a duty to properly supervise officers and to oversee their treatment of Huber and other protestors.

185. Defendants blatantly disregarded the high probability that, by permitting their officers and agents to deputize and conspire with armed individuals, Huber would suffer injuries including death. Defendants were therefore negligent in their non-discretionary duties to supervise individual officers in their agencies.

186. As a direct and proximate result of the negligent supervision described above, Huber suffered injuries, including emotional distress and death.

## COUNT XII:
## SURVIVAL

187. Each of the Paragraphs of this Complaint is incorporated as if fully

stated herein.

188.   In the manner described in this Complaint, Defendants' committed unlawful conduct as a result of which Kyle Rittenhouse fatally shot Anthony Huber. Between having been shot and when he ultimately passed, Huber suffered "other damage" to his person pursuant to Wis. Stat. § 895.01(1)(am).

189.   The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

190.   As a result of these actions, Huber suffered severe injuries, including physical pain, emotional distress, and ultimately death.

## COUNT XIII:
## WRONGFUL DEATH

191.   Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

192.   In the manner described in this Complaint, Defendants intentionally and unjustifiably caused the death of Anthony Huber, and Huber therefore had a valid claim for damages against the Defendants at the time of his death.

193.   As a consequence, Huber's parents—John and Karen Bloom—have suffered, and continue to suffer, significant emotional distress and harm, including but not limited to the loss off society and companionship with Huber.

194.   Plaintiff is the personal representative of the Estate of Anthony Huber, and the proper party to pursue wrongful death damages.

195.   The described in this Count was intentional and undertaken with

34

malice, willfulness, and reckless indifference to the rights of others.

**COUNT XIV:**
**RESPONDEAT SUPERIOR**

196.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

197.    In committing the acts alleged in the preceding paragraphs, Defendants Miskinis, Beth and John Doe Police Officers were members of the City of Kenosha and County of Kenosha, acting at all relevant times within the scope of their employment and under color of law.

198.    Defendants City of Kenosha and County of Kenosha are liable as principals for all torts committed by their agents.

**COUNT XV:**
**INDEMNIFICATION**

199.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

200.    Wisconsin law, Wisc. Stat. §895.46, requires public entities to pay any tort judgment for damages for which employees are liable within the scope of their employment activities.

201.    During all times relevant to this complaint, Defendants Miskinis, Beth and John Doe Police Officers were employees of the City of Kenosha and County of Kenosha, respectively, who acted within the scope of their employment in committing the acts described herein.

## DAMAGES

202.   Under 42 U.S.C. §§1983, 1985 and 1986, and supplemental state law claims, Plaintiff is entitled to an award of compensatory damages against the Defendants.

203.   In the wrongful acts or omissions described in this complaint, defendant acted with fraud, oppression, and malice.

204.   By reason of Defendants' acts or omissions described in this complaint, Plaintiff is entitled to recover punitive and exemplary damages.

205.   Under 42 U.S.C. §1988, if Plaintiff is the prevailing party in this litigation, then he will be entitled to receive an award of reasonable attorneys' fees, non-taxable expenses and costs.


WHEREFORE, Plaintiff, JOHN HUBER, in his individual capacity and as Personal Representative of the ESTATE OF ANTHONY HUBER, prays for judgment under 42 U.S.C. §§1983, 1985, and 1986, and supplemental state law claims, against Defendants DAVID G. BETH, DANIEL G. MISKINIS, ERIC LARSEN, JOHN DOE POLICE OFFICERS of the Kenosha Police Department and Kenosha County Sheriff's Department, CITY OF KENOSHA, and COUNTY OF KENOSHA, for compensatory and punitive damages in a fair and reasonable amount, reasonable attorneys' fees, non-taxable expenses, costs, and such other relief as may be just under the circumstances and consistent with the purpose of 42 U.S.C. §§ 1983, 1985, and 1986.

36

Respectfully submitted,

/s/Anand Swaminathan
*One of Plaintiff's Attorneys*

Jon Loevy
Elizabeth Wang
Anand Swaminathan
Steve Art
David B. Owens
**LOEVY & LOEVY**
311 N. Aberdeen, Third Fl
Chicago, IL 60607
(312) 243-5900

37

## JURY TRIAL DEMAND

Pursuant to FED. R. CIV. P. 38, Plaintiff demands trial by jury in this action of all issues so triable.

Respectfully submitted,

/s/Anand Swaminathan
*One of Plaintiff's Attorneys*

Jon Loevy
Elizabeth Wang
Anand Swaminathan
Steve Art
David B. Owens
**LOEVY & LOEVY**
311 N. Aberdeen, Third Fl
Chicago, IL 60607
(312) 243-5900