# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

JOHN HUBER, in his individual capacity
and as Personal Representative of the
ESTATE OF ANTHONY HUBER,

       Plaintiff,

                                   Case No. 21-CV-969

   v.

DAVID G. BETH, et al.,

       Defendants.

## DAVID G. BETH AND KENOSHA COUNTY'S BRIEF IN SUPPORT OF MOTION TO DISMISS

Defendants, David G. Beth and Kenosha County, by their attorneys, Crivello Carlson, S.C., submit this brief in support of their Motion to Dismiss. Sheriff Beth and Kenosha County ("County Defendants") respectfully request that the Court enter an Order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing all of Plaintiff's federal civil rights claims and state law claims. Each claim should be dismissed for failure to state a claim upon which relief may be granted and/or due to the applicability of qualified immunity, discretionary immunity, and/or statutory immunity under Wis. Stat. § 893.80(4). Additionally, the action should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(7) for failure to join Kyle Rittenhouse, a necessary party.

# INTRODUCTION[1]

Plaintiff brings this lawsuit against the City of Kenosha and Kenosha County as a result of the death of Anthony Huber at the hands of a private citizen, Kyle Rittenhouse, on the evening of August 25, 2020 in the City of Kenosha, Wisconsin. (*See generally*, Dkt. No. 1.) On that date, Mr. Huber was demonstrating against police violence with a racially diverse group of protesters in downtown Kenosha. (*Id.*, ¶ 2, 122.) The protests began after a City of Kenosha police officer shot Jacob Blake, who is Black, on August 23, 2020. (*Id.*, ¶ 2.) As a result of the ongoing protests, an emergency curfew was put in place requiring crowds to disburse by 8:00 p.m. (*Id.*, ¶ 28-29.) Law enforcement officers from the City of Kenosha Police Department ("KPD") and the Kenosha County Sheriff's Department ("KCSD") were dispatched to monitor the demonstrations, police the actions of the individuals present, and disperse the crowds. (*Id.*, ¶ 24.)

Also on August 25, 2020, a number of white, armed private citizens traveled to downtown Kenosha in response to the demonstrations that had taken place on August 23 and 24 and that were continuing on August 25. (*Id.*, ¶ 31, 95.) Some of these armed individuals apparently intended to "defend" the City of Kenosha from the demonstrators, who they called "evil thugs." (*Id.*, ¶ 32.) Similarly, some of these armed individuals were members of a militia group called "the Kenosha Guard" that intended to "patrol the streets" of downtown Kenosha. (*Id.*, ¶ 37.) The armed individuals were

---

[1] The facts set forth herein are accepted as true solely for purposes of this motion. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). They are not otherwise admitted in any way by the County Defendants.

"avowedly pro-police." (*Id.*, ¶ 96.) One of the armed individuals who arrived in the City

of Kenosha on August 25, 2020 was Kyle Rittenhouse[2]. (*Id.*, ¶ 40.)

Mr. Rittenhouse openly carried a Smith & Wesson AR-15 style .223 rifle as he

walked the streets of downtown Kenosha on the night of August 25. (*Id.*, ¶ 43-44.) As

the evening progressed, Mr. Rittenhouse used his gun on multiple occasions. (*Id.*, ¶ 49-

50.) At 11:45 p.m., Mr. Rittenhouse shot and killed Joseph Rosenbaum in the parking lot

of an auto dealership. (*Id.*, ¶ 50.) As Mr. Rittenhouse ran from the scene of the killing, he

stumbled and fell to the ground. (*Id.*, ¶ 53.) At that point, several citizens, including Mr.

Huber, approached Mr. Rittenhouse and attempted to disarm him and save the lives of

others. (*Id.*, ¶ 53-54.) As Mr. Huber reached for Mr. Rittenhouse's weapon to pull it

away, Mr. Rittenhouse fatally shot him in the chest. (*Id.*, ¶ 56, 58.)

Mr. Huber's father and Mr. Huber's Estate now seek to hold multiple

governmental actors liable for Mr. Rittenhouse's killing of Mr. Huber. (Dkt. No. 1, ¶ 10.)

In part, Plaintiff alleges that the law enforcement officers present on the night of August

25, 2020 intentionally allowed Mr. Rittenhouse to patrol the streets of Kenosha. Plaintiff

alleges that the named Defendants "invited [Mr. Rittenhouse] in, deputized[3] him,

---

[2] To the extent that it may be relevant, the Complaint does not specifically allege that Mr. Rittenhouse was a member of any militia group or the Kenosha Guard.

[3] Because the allegation of deputization is made so frequently in the Complaint, the County Defendants note that the facts as pled in the Complaint do not establish that the County Defendants "deputized" any individuals on August 23-25, 2020. A sheriff's ability to deputize, or depute, is a statutorily created power. Pursuant to Wis. Stat. § 59.26(2), a sheriff may appoint as many deputies as he or she considers proper. However, such appointments must be in writing and be filed and recorded in the office of the clerk of circuit court pursuant to Wis. Stat. § 59.26(6). Further, a sheriff may depute other persons to

3

conspired with him, and ratified his actions." (*Id.*, ¶ 47.) Plaintiff asserts that KPD and

KCSD "did nothing to stop Rittenhouse's illegal conduct." (*Id.*, ¶59.) According to

Plaintiff, Mr. Rittenhouse "and others" were "subject to a different set of rules and were

allowed to move about freely in areas controlled by Defendants." (*Id.*, ¶ 62.) Plaintiff

further alleges that the KPD and KCSD officers "deliberately orchestrated these

circumstances. A clear message was sent that perceived protestors were required to

disperse, while armed individuals who supported law enforcement could roam free

and assist the officers. These events directly led to Anthony Huber's death." (*Id.*, ¶ 73.)

## ANALYSIS

I.     **STANDARD OF REVIEW UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) AND FOR QUALIFIED IMMUNITY.**

Federal Rule of Civil Procedure 12(b)(6) requires that a complaint contain

allegations that "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 533, 570 (2007)). "In

reviewing the sufficiency of a complaint under the plausibility standard announced in

*Twombly* and *Iqbal*, [the court should] accept the well-pleaded facts in the complaint as

---

perform particular acts, but such deputations must be in writing under Wis. Stat. § 59.26(5). While Wis. Stat. § 59.26(8)(d) uses the term "honorary deputies," that term refers to a title conferred only as a compliment and carries no official duties or authority. *See* 37 Op.Atty.Gen. 381 (1948). Finally, the Kenosha County Ordinances set forth specific eligibility requirements for any deputy and require the Kenosha County Civil Service Commission to certify eligibility before a person may be deputed by the sheriff. *See* Kenosha County Municipal Ordinances, § 4.01(3). Because the Complaint does not allege that the "deputized" individuals were certified by the Civil Service Commission or deputed in writing, it fails to sufficiently allege that the County Defendants deputized (or deputed) anyone on the dates in question. Therefore, the Court should disregard any allegations of deputization.

4

true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (*citing Iqbal*, 556 U.S. at 681-682). A court should essentially parse out the conclusory allegations and "determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *Iqbal*, 556 U.S. at 681.

The question of qualified immunity may also be decided via a motion to dismiss by examining the defendant's conduct, "<u>as alleged in the complaint</u> … for objective legal reasonableness." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (emphasis in the original). The protections of qualified immunity are meant to provide an affirmative defense in response to a lawsuit as well as immunity from the burdens of litigation itself, such as complying with the duties presented by discovery requests and trial. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). For this reason, the Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 fn. 6 (1987) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("Until th[e] threshold immunity question is resolved, discovery should not be allowed.")). The Supreme Court reasoned that "even such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'" *Mitchell*, 472 U.S. at 526 (*quoting Harlow*, 457 U.S. at 817).

Importantly, evidence concerning a defendant's subjective intent is "simply irrelevant" to the analysis of qualified immunity. *Crawford-El v. Britton*, 523 U.S. 574, 588

(1998); *see also Harlow*, 457 U.S. at 817. The *Harlow* rule rejects any inquiry into the state of mind, favoring instead an inquiry into the "objective reasonableness" of the official's conduct in light of clearly established law. *Davis v. Scherer*, 468 U.S. 183, 191 (1984). For this reason, an analysis of qualified immunity based on the facts as alleged in the Complaint is appropriate at this early stage of the proceedings.

## II. COUNTS II, III, AND VI FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED BECAUSE ANTHONY HUBER WAS NOT A MEMBER OF A PROTECTED CLASS.

### A. To State A Claim for Conspiracy Under 42 U.S.C. § 1985(3), the Plaintiff Must be a Member of a Protected Class.

In Count II, Plaintiff alleges that the defendants "targeted individuals of color and individuals allied with them" as those individuals protested against racial discrimination. (Dkt. No. 1, ¶ 122.) Plaintiff states that Mr. Huber was one of these persons "allied with" the protestors of color. (*Id*.) As evidence of the County Defendants targeting protestors based on their race, Plaintiff asserts that law enforcement officers "permit[ed] the all-white armed individuals" to "taunt, threaten, and monitor the diverse group of protestors" and "permit[ed] the all-White armed individuals to patrol the streets like deputized police officers…" (*Id*.) As further evidence of racially based treatment, the Complaint states that more than 150 protestors were arrested for curfew violations but not a single militia member was arrested for such a violation. (*Id*.) Based on these alleged actions, Plaintiff claims that Defendants conspired with the armed

6

individuals to deprive Mr. Huber of his constitutional rights in violation of 42 U.S.C. § 1985(3).

To prevail on a claim under 42 U.S.C. § 1985(3), a plaintiff must allege and prove that the conspiracy was motivated by some racial animus. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). Courts, including the Supreme Court, have hesitantly extended the application of § 1985(3) to protected classes beyond the protected class of race. *See Bray*, 506 U.S. at 269. Nevertheless, to the extent that a claim could be based on some other class-based invidiously discriminatory animus, the "class" must be "something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Id.*

Thus, the animus element of a claim under § 1985(3) is not met when the actor is only maliciously motivated. The animus must focus on the plaintiff by reason of his membership in that class. *See Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 382 (7th Cir. 1992); *see also Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 721 (9th Cir. 1981) (holding that antipolice bias does not constitute the kind of class-based invidiously discriminatory animus envisioned and prohibited by § 1985(3)). Plaintiff does not allege that Mr. Huber was a member of any protected class; instead, at most, he alleges that Mr. Huber was "allied with" a "diverse group of citizens" who were united by their viewpoint: "protesting police violence against Black people." (Dkt. No. 1, ¶ 94.) But § 1985(3) is not concerned with viewpoint discrimination. It creates a cause

7

of action based on membership in a protected class, and no court has ever held that a person becomes a member of a protected class solely by virtue of his advocacy for or on behalf of that protected class. Therefore, Plaintiff's claim of conspiracy under 42 U.S.C. § 1985(3) fails as a matter of law.

### B. To State an Equal Protection Claim Under 42 U.S.C. § 1983 or 42 U.S.C. § 1985(2), Plaintiff Must be a Member of a Protected Class.

In Count III, Plaintiff asserts that Defendants denied Mr. Huber equal protection of the law in violation of the Fourteenth Amendment by "target[ing] individuals of color and individuals allied with them in protest against racial discrimination, including Huber…" (Dkt. No. 1, ¶ 130.) As an initial matter, the Equal Protection Clause "does not entitle a person to adequate, or indeed to any, police protection." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). And Mr. Huber has not alleged that the County Defendants "withdrew all protection" as would be required for an allegation of unequal police protection. *See id.* (citing *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995); *Forseth v. Village of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000); and *Levenstein v. Salafsky*, 164 F.3d 345, 352 (7th Cir. 1998)).

Regardless, to state an equal protection claim under § 1983, a plaintiff must show that the defendant "acted with a nefarious discriminatory purpose and discriminated against her based on her membership in a definable class." *D.S. v. E. Porter County Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (emphasis added). Again, Plaintiff's only allegation is that Mr. Huber was allied with a "diverse group" of protestors who were

8

demonstrating against class-based discrimination. As a matter of law, these allegations fail to state an equal protection claim under the Fourteenth Amendment.

Further, Plaintiff cannot proceed with his § 1983 claim using the "class-of-one" theory. This type of equal protection claim "is not a garden-variety equal protection challenge; such challenges are 'typically ... concerned with governmental classifications that affect some <u>groups</u> of citizens differently from others.'" *U.S. v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008)) (emphasis in original).

> Therefore, individuals pursuing equal protection challenges ordinarily allege that they have been arbitrarily classified as members of an <u>identifiable group</u>. In contrast, a class-of-one equal protection challenge asserts that <u>an individual has been irrationally singled out, without regard for any group affiliation</u>, for discriminatory treatment. A class-of-one equal protection claim is cognizable where an individual alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.

*Id.* (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)) (internal citations and quotations omitted) (emphasis added).

Plaintiff asserts that the County Defendants' conduct "was motivated by racial animus" and affected Mr. Huber and other protestors "in a grossly disproportionate manner as compared to similarly situated White individuals." (Dkt. No. 1, ¶ 129.) But through these allegations, Plaintiff is not asserting that Mr. Huber was <u>an individual</u> who was irrationally singled out, without regard for any group affiliation, for discriminatory treatment. Rather, Mr. Huber was a member of a larger group that was

9

allegedly treated in a discriminatory manner <u>because of their group affiliation</u>. His membership in this group is fatal to a class-of-one claim, because he cannot show that he was treated differently than others similarly situated. Indeed, he alleges that he was treated the same as similarly situated individuals: other protestors. Because Mr. Huber was not a member of a protected class and was not singled out for differential treatment, he cannot proceed on an equal protection claim under 42 U.S.C. § 1983.

Plaintiff also cites to 42 U.S.C. § 1985(2) as a basis for his equal protection claim. That statute states in relevant part: "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws," the person injured may recover damages. 42 U.S.C. § 1985(2). Courts have interpreted this portion of the statute as applying to "conspiracies to obstruct the course of justice in state courts." *Kush v. Rutledge*, 460 U.S. 719, 725 (1983). Specifically, the language is interpreted to prohibit interference with state officers, state courts, and state elections. *Id*. at 726. But Plaintiff has not alleged that any of the County Defendants' actions had any connection to state court proceedings or that the acts of the County Defendants were intended to interfere with the actions of other state officers.

Additionally, even if the Complaint could be read to assert some kind of interference with the "due course of justice," a plaintiff must still establish the same

10

racial or class-based invidiously discriminatory animus as is required to state a claim under 42 U.S.C. § 1985(3), and the plaintiff must be a member of a protected class. *See*, *e.g.*, *Love v. Bolinger*, 927 F.Supp. 1131, 1140 (S.D. Ind. 1996); *Griffin*, 403 U.S. at 102; *Portsman v. County of Santa Clara*, 995 F.2d 898, 909 (9th Cir. 1993). Therefore, because Plaintiff has not alleged any obstruction of justice and because Mr. Huber was not a member of a protected class, Count III fails as a matter of law.

      **C.**     **Plaintiff Failed to State a Claim Under 42 U.S.C. § 1986 for Failure to Intervene Because he Failed to State a Claim Under 42 U.S.C. §§ 1985(2) or (3).**

Under 42 U.S.C. § 1986 ("Action for Neglect to Prevent"), anyone "who, having knowledge that any of the wrongs conspired to be done, <u>and mentioned in section 1985 of this title</u>, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented…" 42 U.S.C. § 1986 (emphasis added). Liability under this statute is derivative of liability under 42 U.S.C. §§ 1985(2) and (3). *Grimes v. Smith*, 776 F.2d 1359, 1363 (7th Cir. 1985). In other words, without an underlying violation of §§ 1985(2) or (3), there is no violation of § 1986.

As discussed above, both subsections of § 1985 require that the plaintiff be a member of a protected class in order to state a claim upon which relief may be granted. Regardless of whether Plaintiff is allowed to proceed on his equal protection claim in

Count III under 42 U.S.C. § 1983, Count VI arising under § 1986 requires a colorable claim under § 1985. Because Plaintiff has not and cannot allege that Mr. Huber was a member of a protected class, his § 1985 claims fail and results in the failure of the derivative claim in Count VI.

**III.  PLAINTIFF FAILS TO STATE A CLAIM OF FIRST AMENDMENT RETALIATION BECAUSE HE HAS NOT PLED THE NECESSARY CHAIN OF CAUSATION BETWEEN THE ALLEGED RETALIATORY ANIMUS AND MR. HUBER'S DEATH.**

Even if the Court believes that Plaintiff adequately asserted state action taken under the color of law by Mr. Rittenhouse for purposes of the First Amendment by virtue of Plaintiff's conspiracy claims, Plaintiff has failed to allege a sufficient causal connection between the County Defendants' retaliatory animus and Mr. Huber's subsequent injury at the hands of Mr. Rittenhouse. *See Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019). In *Crawford–El v. Britton*, the Supreme Court explained that "…proof of an improper motive is not sufficient to establish a constitutional violation—there must also be evidence of causation." *See* 523 U.S. 574, 593 (1998).

Certainly, a claim may exist under the First Amendment where one state actor's retaliatory animus causes another state actor to injure a plaintiff, as is the case in claims of retaliatory prosecution made against a state actor other than the prosecutor. *See Hartman v. Moore*, 547 U.S. 250, 259 (2006). However, no court has recognized a First Amendment retaliation claim involving a third party (Mr. Rittenhouse) existing outside of the confines of "successful retaliatory inducement" claims of retaliatory employment

action, retaliatory criminal prosecution, retaliatory arrest, and retaliatory civil prosecution. *See McBeth v. Himes*, 598 F.3d 708, 719-720 (10th Cir. 2010); *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289-1299 (11th Cir. 2019) (examining development of such claims through *Nieves v. Bartlett*). Because no court has held that a First Amendment retaliation claim may exist where a state actor induces a private citizen to act, this Court should dismiss the claim under Rule 12(b)(6).

Regardless, even assuming that Plaintiff's specific type of influence-based retaliation claim may proceed, courts have uniformly concluded that the plaintiff in influence-based retaliation cases involving actions of a third party must allege facts that if taken as true would establish a sufficient connection between the defendant's retaliatory animus and the perpetrator's actions causing the injury.

> It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must <u>cause</u> the injury. Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves*, 139 S.Ct. at 1722 (citing *Hartman*, 547 U.S. at 259) (emphasis in original).

In the present case, Plaintiff does not allege that the County Defendants killed Mr. Huber. Instead, he argues that the County Defendants' retaliatory animus caused someone else to kill Mr. Huber. Under these circumstances, the chain of causation is "more complex" because the causal connection required "is not merely between the retaliatory animus of one person and that person's own injurious action, but between the retaliatory animus of one person and the action of another." *Hartman*, 547 U.S. at

13

262. Evidence of law enforcement's animus does not necessarily show that law enforcement induced the actions of others. *Id.* at 263. In *Hartman*, the Supreme Court examined this requirement in the context of retaliatory prosecution. As the Court explained, some sort of allegation is needed to "bridge the gap" between the defendant's motive and the perpetrator's action. *See id.* at 263. The same is true in the present case, because Plaintiff has not alleged that the County Defendants took any direct action against Mr. Huber at all.

With this requirement in mind, Plaintiff has not sufficiently pled that the County Defendants' alleged retaliatory animus caused Mr. Rittenhouse to kill Mr. Huber. According to the Complaint, Defendants subjected Mr. Huber and other protestors to retaliatory treatment by 1) permitting "pro police" armed individuals to taunt, threaten and monitor the protestors without consequence; 2) permitting the "pro police" armed individuals to patrol the streets; 3) by offering the "pro police" armed individuals assistance and praise while ordering protestors to disperse; and 4) corralling and funneling protestors toward the "pro police" armed individuals to "deal with them." (Dkt. No. 1, ¶ 138.) Importantly, these allegations pertain to armed individuals generally. But there is no allegation that Mr. Rittenhouse was one of the armed individuals toward whom Defendants funneled protestors. Nor is there any allegation that Mr. Huber was one of the protestors who was being funneled toward the armed individuals. Even if Defendants took these actions based on a retaliatory motive, there

is no contention that sufficiently connects those acts with Mr. Rittenhouse's decision to kill Mr. Huber.

Instead, at most, the Complaint alleges that the County Defendants allowed Mr. Rittenhouse to patrol the streets with his weapon. (*Id.*, ¶ 47.) But allowing or even causing Mr. Rittenhouse to patrol the streets because of some retaliatory animus is not the same as causing Mr. Rittenhouse to kill Mr. Huber. The facts as pled in the Complaint confirm this. Mr. Rittenhouse was fleeing the scene after shooting Joseph Rosenbaum and fell to the ground where several citizens attempted to disarm him. (*Id.*, ¶ 52-53.) As Mr. Huber reached for Mr. Rittenhouse's rifle, Mr. Rittenhouse shot him in the chest. (*Id.*, ¶ 56.) There is no assertion that Mr. Rittenhouse's actions in this specific series of events leading to the alleged injury—Mr. Huber's death—were caused by the County Defendants' retaliatory animus.

Even taking every fact as true and every inference in Plaintiff's favor, the facts as pled do not assert that Mr. Rittenhouse shot Mr. Huber as a result of the retaliatory motive of the County Defendants. Because Plaintiff has not pled sufficient facts to establish the necessary chain of causation to proceed on his First Amendment claim, Count IV should be dismissed.

## IV. PLAINTIFF FAILED TO ALLEGE FACTS THAT COULD ESTABLISH THAT DEFENDANTS' ACTIONS PROXIMATELY CAUSED MR. RITTENHOUSE TO KILL MR. HUBER.

In addition to the specific causation issue applicable to Plaintiff's First Amendment claim of retaliation, all of Plaintiff's claims suffer from similar deficiencies

15

in pleading causation. According to the Supreme Court, "[i]t is 'textbook tort law" that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation." *Comcast Corp. v. Nat'l Assoc. of African American-Owned Media*, 140 S.Ct. 1009, 1014 (2020) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013)). Under this standard,

> [A] plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred. This ancient and simple "but for" common law causation test, we have held, supplies the "default" or "background" rule against which Congress is normally presumed to have legislated when creating its own new causes of action.

*Id*. This requirement includes claims asserted under federal antidiscrimination laws. *See id*.; *see also Whitlock v. Brueggemann*, 682 F.3d 567, 582-583 (7th Cir. 2012). Plaintiff's inability to meet this foundational element extends to each of the claims asserted in the Complaint and therefore all claims should be dismissed.

The absence of causation is perhaps best illustrated in the context of Plaintiff's due process claim in Count V, in which Plaintiff asserts that the County Defendants "allowed Rittenhouse and other illegally armed individuals to patrol the streets of downtown Kenosha with deadly weapons, inviting those individuals to use police powers, deputizing them, conspiring with them, and ratifying their actions." (Dkt. No. 1, ¶ 145.) Defendants allegedly informed the armed individuals that "they would funnel demonstrators toward them to be dealt with" and thereby "increased the danger face by Huber and other peaceful demonstrators who were present." (*Id*., ¶ 146-147.) Through

16

this alleged conduct, Plaintiff asserts that Defendants violated Mr. Huber's due process rights and caused his death. (*Id*.)

As an initial matter, the Supreme Court held in *DeShaney v. Winnebago County Department of Social Services* that the Due Process Clause of the Fourteenth Amendment does not "impose an affirmative obligation on the State" to protect individuals from harm by private actors. *DeShaney v. Winnebago County Dep't. of Soc. Serv.*, 489 U.S. 189, 195-196 (1989)). The purpose of Due Process Clause of the Fourteenth Amendment "was to protect the people from the State, not to ensure that the State protected them from each other." *Id*. at 196. "Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id*.

> If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*Id*. at 196-197.

Despite this holding, some courts of appeals—including the Seventh Circuit—have since inferred an exception to the rule: "the substantive component of the Due Process Clause imposes upon the state a duty to protect individuals against dangers the state itself creates under the state-created danger doctrine." *King ex rel. King v. E. St.*

*Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007). The Seventh Circuit identified "three principles that must govern our analysis" when this exception to the rule is raised. *King*, 496 F.3d at 817-818. Generally stated, a duty to protect an individual arises when 1) the state, by its affirmative acts, increases a danger faced by an individual; 2) the failure on the part of the state to protect the individual from such danger must be the proximate cause of the injury to the individual; and 3) the state's failure to protect the individual must shock the conscious. *Id.* at 818.

### A. Plaintiff Does Not Allege That Defendants Caused Mr. Huber's Death by Monopolizing Any Avenues or Relief or Constricting Mr. Huber's Access to Self-Help.

The Seventh Circuit has explained that the limited exception to *DeShaney*'s rule of non-liability does not apply where the government "does not monopolize the avenues of relief." *Archie v. City of Racine*, 847 F.2d 1211, 1222 (7th Cir. 1988) (en banc). For example, in *Sandage v. Board of Commissioners of Vanderburgh County*, 548 F.3d 595 (7th Cir. 2008), the court rejected a due process claim where the police failed to act on a murder victim's harassment claim against the eventual murderer. "Our plaintiffs' decedents were not safe before the defendants failed to revoke Moore's work release. They were in danger—from Moore—and the defendants had done nothing to restrict the victims' 'avenues of self-help.'" *Sandage*, 548 F.3d at 598.

A similar conclusion was reached in *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169 (7th Cir. 1997), where the court rejected a state-created danger claim against police officers by the estate of a drunk bar patron who was killed after the police refused to

18

allow his friends to drive him home. Instead, police dropped Stevens off at a gas station so that he could call a cab. Heavily intoxicated, Stevens walked away and was fatally struck by a car approximately 1.5 miles from the gas station later that evening. In pursuing a § 1983 due process claim, the estate argued that "once the officers 'took over Stevens' freedom to act,' reasonable alternatives existed—transport Stevens to a hospital, a detox center, his residence, the city jail, or even hand him over to the tribal police—other than dropping him off at a gas station." *Stevens*, 105 F.3d at 1177. Thus, they argued that the police were liable under the state-created danger exception to *DeShaney*.

The Seventh Circuit disagreed and explained that even when the facts were considered in the light most favorable to the estate, *DeShaney* did not permit recovery due to the lack of any "special relationship" between police and Stevens and due to the lack of a sufficient causal connection.

> "But-for" causation cannot be laid on the shoulders of the police officers in this manner. Various other factors contributed to this tragedy, primarily Stevens' intoxication. … To recover under this theory, the estate must demonstrate that the state greatly increased the danger to Stevens <u>while constricting access to self-help; it must cut off all avenues of aid without providing a reasonable alternative</u>. Only then may a constitutional injury have occurred. … Assuming the estate is correct that Officers Laux and Buckley prevented Stevens' friends from driving him home, the question is whether having precluded one reasonable alternative, the officers gave Stevens another…. Officers Laux and Buckley listed for Stevens his choices for leaving, each reasonable, and allowed him to choose. He voluntarily accepted one alternative.

19

105 F.3d at 1177–78 (internal citations omitted) (emphasis added); *see also Brown v. Reyes*, 815 F.Supp.2d 1018, 1024 (N.D. Ill. 2011) (explaining that allegations that law enforcement created "amorphous zone of danger" were insufficient to allow inference of proximate cause of third-party assailant's attack on victim).

In the present case, under even the most liberal reading of the Complaint, Plaintiff cannot establish "but-for" causation between the alleged actions of the County Defendants and Mr. Huber's death. Plaintiff asserts that protests began in downtown Kenosha on August 23, 2020 and a curfew was put into place that same day requiring protestors to disperse by 10:15 p.m. (Dkt. No. 1, ¶ 26.) By August 25, 2020, the night that Mr. Huber was killed, that curfew had been moved up to 8:00 p.m. (*Id.*, ¶ 28.) Plaintiff specifically asserts that the curfew "was aimed at protestors," of which Mr. Huber was one. (*Id.*, ¶ 2, 28.) This curfew was not a secret; rather, Plaintiff confirms that protestors were ordered by law enforcement over loudspeakers: "This is the last warning. You will disperse. This area is closed you are trespassing, leave now." (*Id.*, ¶ 71.) The orders were apparently made at approximately 11:30 p.m., about fifteen minutes before Mr. Rittenhouse killed Mr. Huber. (*Id.*, ¶ 66-68, 71.)

Based on these facts as pled, Mr. Huber's presence on the streets of Kenosha and his specific interaction with Mr. Rittenhouse were apparently voluntary, and there are no allegations that any law enforcement officer was involved in any way. Rather than complying with the curfew and orders to disperse, Mr. Huber remained on the scene of the protests. At the same time, Mr. Rittenhouse "was brandishing his gun openly and

20

conspicuously, strapping it over his shoulder using a tactical sling designed to position the rifle at the center of his chest for rapid elevation and positioning. The rifle was visible at all times across his body or in his hands." (Dkt. No. 1, ¶ 44.) At about 11:45 p.m., Mr. Rittenhouse used his gun to shoot Joseph Rosenbaum. (*Id.*, ¶ 50.) Mr. Rittenhouse then ran from the scene with his rifle in his hands, "holding it in a ready position." (*Id.*, ¶ 52.) People yelled that Mr. Rittenhouse had just shot someone, and in response "several citizens approached him in an attempt to disarm him." (*Id.*, ¶ 52-53.) Mr. Huber was one of those citizens. He decided to approach and reach for Mr. Rittenhouse's rifle to disarm him but was fatally shot. (*Id.*, ¶ 54-56.)

Just as in the *Stevens* case, causation "cannot be laid on the shoulders of the police officers in this manner." *Stevens*, 105 F.3d at 1177. Several other intervening factors contributed to this tragedy. *See id*. Regardless of whether law enforcement treated the diverse group of protestors differently by enforcing the curfew against them and not the armed individuals; regardless of whether law enforcement "allowed" armed individuals to roam the streets freely, posing a threat to protestors; and regardless of whether law enforcement actions were impermissibly motivated by race, protected class status, or viewpoint; Mr. Huber could have chosen not to disarm Mr. Rittenhouse. Mr. Huber could have left and was in fact told to do so.

There is no allegation that Defendants monopolized any avenues of relief or constricted Mr. Huber's access to self-help. There is not even an allegation that the County Defendants' actions caused Mr. Huber to stay on the scene or caused him to

21

attempt to disarm Mr. Rittenhouse. Rather, Defendants provided (and in fact ordered) a reasonable alternative by establishing and enforcing a curfew. The Complaint does not allege that law enforcement officers did anything to prevent Mr. Huber from leaving the scene or otherwise complying with orders to disperse. But Mr. Huber chose to remain on scene despite the 8:00 p.m. curfew, and Mr. Huber chose to try to disarm Mr. Rittenhouse despite knowing he had just shot another person and was armed. Therefore, Plaintiff cannot establish proximate causation between the alleged actions of the County Defendants and Mr. Huber's death, and he fails to state a claim upon which relief may be granted.

**B. Plaintiff Does Not Allege Facts Establishing That Defendants Created or Increased Any Danger That Caused Mr. Huber Injury.**

Even without examining the issue of whether the County Defendants monopolized avenues of relief, Plaintiff's claims would still fail at the pleading stage. Here, the Court must examine the specific allegations about the County Defendants' actions as they pertain to any threat to Mr. Huber. *See Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009) (holding that dangers to the public at large are insufficient for constitutional purposes); *see also Martinez v. California*, 444 U.S. 277, 285 (1980) (declining to hold state actors liable because the plaintiff's injury was "too remote a consequence" when the danger was to the public at large as opposed to the plaintiff in particular).

The Court must disregard the generalized allegations that provide context but that do not specifically relate to Mr. Huber. For example, Plaintiff makes general statements about disparate enforcement of the curfew. But the Complaint does not allege that Mr. Huber was cited for violating the curfew or that the disparate enforcement was specifically connected with or caused Mr. Huber and Mr. Rittenhouse's encounter. The Complaint includes general allegations about law enforcement "funneling" protestors into an area where they were met with violence, but the Complaint does not allege that Mr. Huber was one of these funneled protestors. Nor does the Complaint assert that Mr. Rittenhouse was one of the armed individuals awaiting the funneled protestors. Ultimately, Plaintiff does not claim that the alleged act of funneling demonstrators toward armed individuals caused Mr. Huber and Mr. Rittenhouse to meet—or more specifically, that it caused Mr. Rittenhouse to kill Mr. Huber—when that result would not have otherwise occurred.

At its core, Plaintiff's entire argument is that law enforcement should have disarmed and/or arrested Mr. Rittenhouse earlier in the night and that had they done so, Mr. Huber would be alive. (*See* Dkt. No. 1, ¶ 59.) But a failure to arrest someone does not give rise to a cause of action under 42 U.S.C. § 1983. *See Losinski v. County of Trempealeau*, 946 F.2d 544, 551 (7th Cir. 1991) (citing *DeShaney*, 489 U.S. at 201-202). When the generalized contextual allegations are stripped away and the pleadings are examined carefully, it becomes clear that the County Defendants' failure to arrest Mr. Rittenhouse did not <u>increase</u> the danger to Mr. Huber. Rather, the County Defendants'

failure to arrest Mr. Rittenhouse resulted in a failure to reduce or eliminate the danger already faced by Mr. Huber by virtue of his presence in downtown Kenosha on August 25, 2020. As a matter of law, a failure to reduce or eliminate an existing danger fails to state a claim upon which relief may be granted. *See DeShaney*, 489 U.S. at 195-197.

C. **Because a Claim of Conspiracy Under 42 U.S.C. § 1983 is Derivative, Plaintiff has Failed to State a Claim Upon Which Relief May be Granted.**

The foregoing causation analysis is specific to the state-created danger claim asserted in County V, but it is the County Defendants' position that Plaintiff's inability to establish proximate cause based on the facts as alleged is fatal to all of his claims. The County Defendants have also shown independent bases for dismissals of Counts II, III, IV, and VI in addition to the lack of causation. This leaves Count I, in which Plaintiff alleges conspiracy under 42 U.S.C. § 1983. However, conspiracy is not an independent basis of liability in § 1983 actions. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). Rather, in order to proceed on a claim of conspiracy, Plaintiff must establish an underlying constitutional injury. *Kelley v. Myler*, 149 F.3d 641, 648 (7th Cir. 1998).

Regardless of whether Plaintiff has adequately pled an express or implied agreement amongst Defendants to deprive Mr. Huber of his constitutional rights, Plaintiff has failed to allege any underlying constitutional violation upon which relief could be granted. Therefore, Plaintiff's claim of conspiracy under § 1983 necessarily fails and Count I should also be dismissed.

24

## V. PLAINTIFF'S *MONELL* CLAIMS FAIL FOR LACK OF AN ACTIONABLE UNDERLYING CLAIM OF CONSTITUTIONAL VIOLATION.

In Count VII, Plaintiff alleges a *Monell* claim against Kenosha County deriving from the first five of his federal civil rights claims. (Dkt. No. 1, ¶ 159-160.) For the reasons set forth above, each of Plaintiff's federal civil rights claims fails. A municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee. *See Gaetjens v. City of Loves Park*, 4 F.4th 487, 495-496 (7th Cir. 2021). Therefore, Plaintiff's claims against Kenosha County arising under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) also fail and must be dismissed.

## VI. THE COUNTY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR PLAINTIFF'S CLAIM OF DUE PROCESS VIOLATION BASED ON AN ALLEGED STATE-CREATED DANGER.

Should the Court determine that Plaintiff adequately pled Count V alleging a violation of the Due Process Clause as a result of a state-created danger, the County Defendants are nevertheless entitled to qualified immunity. Under the qualified immunity doctrine, "government officials performing discretionary functions are immune from suit if their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Borello v. Allison*, 446 F.3d 742, 746 (quoting *Anderson*, 483 U.S. at 638-39). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997). "Although the

25

privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." *Mannola v. Farrow*, 476 F.3d 453, 357 (7th Cir. 2007).

In determining whether the County Defendants are entitled to qualified immunity, the trial court conducts a two-step inquiry. First, this Court must determine whether the disputed conduct violated a constitutional right. *Borello*, 446 F.3d at 746. Second, this Court must determine whether the right was "clearly established" at the time of the alleged conduct. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Whether the law was "clearly established" turns on the "objective legal reasonableness of the action" given the contemporaneous legal rules. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The Supreme Court instructs that the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Harlow*, 457 U.S. at 815. The inquiry is narrow and assesses whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Saucier*, 533 U.S. at 201; *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987) ("[T]he test for immunity [is] whether the law was clear in relation to the specific facts confronting the public official when he acted."). Thus, a defendant government official is entitled to qualified immunity for unconstitutional conduct so long as there could be a reasonable, albeit mistaken, belief about the legality of his or her conduct. *Saucier*, 533 U.S. at 205-06 (2001); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[I]f [officials] of reasonable competence could disagree on this issue, immunity should be recognized.").

26

Recent decisions released by the Seventh Circuit in 2019 establish that the law pertaining to claims arising from a state-created danger was not clearly established as of August 25, 2020 and the County Defendants are entitled to qualified immunity. Although many courts have applied this exception to *DeShaney* for years, courts have recently begun to reexamine whether such an exception actually exists.

On September 18, 2019, the Seventh Circuit released *Weiland v. Loomis*, 938 F.3d 917 (7th Cir. 2019) in which it cast serious doubt on the reach and even the existence of the state-created danger exception to *DeShaney* that it had previously embraced. In *Weiland*, hospital patients sued a county and corrections officers alleging substantive due process violations arising out of injuries suffered during a county inmate's hostage standoff at the hospital. One of the defendant correctional officers filed a motion to dismiss based on qualified immunity. He relied on *DeShaney*—holding that the government has no constitutional duty to protect the public from private predators—and pointed out that it was the inmate who had inflicted the plaintiff's injuries. The district court disagreed and focused on the state-created danger exception to *DeShaney*. It determined that the correctional officer was liable for increasing the risk to other hospital patients through his various actions (e.g. removing the inmate's shackles, running away from the situation). The district court said that the state-created danger exception was "clearly established," so qualified immunity was denied.

Upon appeal, the Seventh Circuit disagreed.

27

The problem with this reasoning is that it starts and ends at a high level of generality. The "state-created danger exception" to *DeShaney* does not tell any public employee what to do, or avoid, in any situation. <u>It is a principle, not a rule</u>. And it is a principle of liability, not a doctrine (either a standard or a rule) <u>concerning primary conduct</u>. For that one must look elsewhere, but the district judge did not do so.

*Weiland*, 938 F.3d at 919 (emphasis added). The Court of Appeals pointed out that the district court had wrongly understood the state-created danger exception "as equivalent to a constitutional rule prohibiting any act, by any public official, that increases private danger." *Id*. The court continued, "If that were so, however, *DeShaney* itself is wrongly decided." *Id*. It then pointed out all the ways that the defendants' primary conduct in the *DeShaney* case <u>indisputably</u> increased the danger faced by the plaintiff, Joshua DeShaney.

> … [B]ut the Supreme Court nonetheless held that the Due Process Clause of the Fourteenth Amendment does not require a state to protect its residents from private violence. Other courts cannot create an "exception" to *DeShaney* that contradicts this principle, and as a result <u>we cannot treat the "state-created danger exception" as a rule of primary conduct forbidding any acts by public officials that increase private dangers</u>.

*Id*. at 919 (emphasis added).

Additionally, the *Weiland* Court was critical of a decision recognizing the state-create danger exception issued by the Seventh Circuit just one month earlier: *Johnson v. Rimmer*, 936 F.3d 695 (7th Cir. 2019). The *Weiland* Court disapprovingly noted that *Johnson* had "elaborated and turned [the exception] into a three-part test." *Id*. at 920. It pointed out that none of those three elements "has its provenance in *DeShaney*." *Id*. Instead, the justices who decided *DeShaney* "hinted that the Constitution <u>might</u> support

28

liability when a state has a duty that 'arises **not** from the State's knowledge of the individual's predicament or from its expressions of intent to help him, **but from the limitation which it has imposed on his freedom to act on his own behalf**.'" *Id.* at 921 (quoting *DeShaney*, 489 U.S. at 200) (underline emphasis in original, bolded emphasis added).

Under the *Weiland* Court's interpretation, the exception (if it exists) would only be triggered when the state actor has taken some act that "disable[s] or undermine[s] self-help or sources of private assistance." *Id.* But even this conclusion on the more limited question of self-help only further obfuscated the analysis. In 1997, the *Stevens* Court held that in order to trigger the state-created danger principle, the plaintiff must allege that the defendant increased the danger and must also plead a "special relationship" with the defendant. *Stevens*, 105 F.3d at 1176-1177. This "special relationship" could be custodial or could be established by alleging that the defendant cut off other avenues of aid. *Id.* at 1177. However, the Seventh Circuit subsequently retreated from that aspect of the "special relationship" analysis the following year. *See Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998) (holding that "a state can be held to have violated due process by placing a person in a position of heightened danger without cutting off other avenues of aid."). Yet the *Weiland* Court focused on avenues of self-help and approvingly cited multiple cases, one of which post-dated *Monfils*, that found liability where the state had disabled or undermined self-help or sources of

29

private assistance outside of the custodial context. *See Weiland*, 938 F.3d at 921 (citing *Paine v. Cason*, 678 F.3d 500, 510–11 (7th Cir. 2012)).

The *Weiland* Court concluded by noting the different "approaches" employed by other circuits and recognized that substantial questions were being raised as to whether the state-created danger exception as interpreted "can be reconciled with *DeShaney*…" *Id*. at 921 (citing *Estate of Romain v. Grosse Pointe Farms*, 935 F.3d 485 (6th Cir. 2019)). Ultimately, the Seventh Circuit confirmed the unsettled nature of the case law but left the issue undecided:

> Every once in a while, a court should step back and ask whether local jurisprudence matches the instructions from higher authority. … *Estate of Romain* did not need to decide whether the Sixth Circuit's approach should be revised, just as we do not need to decide whether *Johnson* and *King* are compatible with *Paine*, *Reed*, and *DeShaney*. These subjects should be presented for consideration in some future case, when the outcome may turn on the difference.

*Id*. But that was not the end of the debate.

As further evidence of the lack of clarity pertaining to the state-created danger principle, the Seventh Circuit released a decision just one week later in *Estate of Her v. Hoeppner*, 939 F.3d 872 (7th Cir. 2019) that did not cite to, let alone discuss, *Johnson v. Rimmer* or *Weiland v. Loomis* at all. The *Her* decision applied the same three-part test set forth in *King ex rel. King v. East St. Louis School District 189* that the *Weiland* Court had just criticized, even though it never formally identified it as such. It also referred to the "special relationship" concept as being tied to the state's custody of a person, despite its rejection of that narrower definition one week earlier in *Weiland*. *See id*. at 876.

30

Regardless, the *Her* Court did not provide any further clarification regarding whether or how a state-created danger exception can be reconciled with *DeShaney*.

Such was the state of the law as of August 25, 2020 when Mr. Huber traveled to downtown Kenosha to join the protests. At best, jurisprudence interpreting the concept of the state-created danger exception, writ large, was unsettled. And more importantly, when examining the "clearly established" inquiry "in light of the specific context of the case, not as a broad general proposition" as is required for qualified immunity, any right was not sufficiently clear such that a reasonable official in the County Defendants' position "would understand that what he is doing violates the right." *See Saucier*, 533 U.S. at 201; *Weiland*, 938 F.3d at 919-920. Did a three-part inquiry govern the contours of the exception, or was it antithetical to *DeShaney*? And if a three-part test was still considered appropriate, did it require consideration of whether the state had a "special relationship" with the claimant? If so, must that relationship be tied to custodial duties arising in contexts such as incarceration? Or does a colorable claim require that the state cut off alternative avenues of aid?

As for the specific context of the case, the Complaint provides some limited details about the unfolding unrest during which Mr. Huber was killed. But even when viewed in the light most favorable to Plaintiff, there exists no "controlling case or robust collection of persuasive authority that extends the state-created danger exception to cases where an alleged harm was inflicted by a government employee acting in the

course of his office or analogous to the set of facts presented here…" *Doxtator v. O'Brien*, ---F.Supp.3d --- 2021 WL 2004676, * 15 (E.D. Wis. 2021).

According to the Complaint, protests began on August 23, 2020, which Plaintiff characterizes as "public outrage" over law enforcement violence toward Black people. (Dkt. No. 1, ¶ 23.) The demonstrators' numbers swelled, and Plaintiff alleges that there were "hundreds of protestors" present. (*Id.*) On August 23, 2020, the protests had already intensified to the point that an emergency curfew was put in place of 10:15 p.m. (*Id.*, ¶ 26.) The tenor of the situation further deteriorated by August 24, 2020 when the emergency curfew was moved to 8:00 p.m. (*Id.*, ¶ 28.) Despite the curfew, crowds continued to gather. (*Id.*, ¶ 27.) Law enforcement officers made arrests, used tear gas, and fired rubber bullets in an attempt to control the situation or clear the area. (*Id.*, ¶ 27.) Nevertheless, by August 25, 2020, "armed individuals descended on Kenosha… brandishing weapons, threatening residents, and pointing weapons at peaceful demonstrators without provocation." (*Id.*, ¶ 31.) There were reports of slashed tires and property damage. (*Id.*, ¶ 4, 65.)

The Complaint alleges that upwards of 3,000 armed people came to Kenosha and spread out across multiple locations on the date in question. (*Id.*, ¶ 36.) Plaintiff describes law enforcement officers, who were now using armored vehicles, attempting to disperse crowds after the 8:00 p.m. curfew by announcing via loudspeakers, "This is the last warning. You will disperse. This area is closed you are trespassing, leave now." (*Id.*, ¶ 71.) But crowds of both demonstrators, including Mr. Huber, and "heavily

32

armed" vigilantes remained. (*Id.*, ¶ 61, 76.) At least some of the people who remained on the streets despite the curfew were apparently members of right-wing militia groups and neo-Nazis, espousing hateful rhetoric and white supremacy. (*Id.*, ¶ 99-100.) Unarmed individuals attempted to disarm armed individuals. (*Id.*, ¶ 53-54.) According to a quote attributed to Mr. Rittenhouse's attorney, the scene was so chaotic that "basic law and order" no longer existed. (*Id.*, ¶ 84.)

None of the cases examining the concept of the state created danger exception provide guidance on whether or how it would apply to the situation facing law enforcement on the evening of August 25, 2020. Mr. Huber's due process rights in the context of a state-created danger were not sufficiently clear to the County Defendants in this context. As such, there could be a reasonable, albeit mistaken, belief about the legality of the County Defendants' conduct in determining whether to arrest certain people, whether to disarm any armed individuals, and in decisions related to controlling and maneuvering crowds. (*See* Dkt. No. 1, ¶ 145-146.) Therefore, the County Defendants are entitled to qualified immunity for Count V. *See Malley*, 475 U.S. at 341.

## VII.   PLAINTIFF'S STATE LAW CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

### A.   Public Policy Precludes Recovery on All State Law Claims

In addition to the various defenses set forth below, each of Plaintiff's state law claims should be dismissed based on public policy considerations. Under Wisconsin law, courts may invoke one or more of six recognized public policy factors to preclude

33

tort liability despite the existence of cause-in-fact, because the cause of the plaintiff's injuries is not legally sufficient to allow recovery. *See Fandrey ex rel. Connell v. Am. Fam. Mut. Ins. Co.*, 2004 WI 62, ¶ 9-10, 272 Wis. 2d 46; *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 829 (7th Cir. 2021). Liability may be precluded even if all the elements for a claim of negligence are proved, or liability for negligent conduct is assumed by the court. *Hoida, Inc. v. M&I Midstate Bank*, 2006 WI 69, ¶ 24, 291 Wis.2d 283. These public policy factors may preclude liability even where a statute authorizes it, and the application of public policy to preclude liability is not limited to negligence claims. *See Fandrey*, 2004 WI 62 at ¶ 8 and ¶ 17-18.

The public policy factors to be considered are whether 1) the injury is too remote from the negligence; 2) recovery is too wholly out of proportion to the culpability of the negligent tort-feasor; 3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; 4) allowing recovery would place too unreasonable a burden upon the tortfeasor; 5) allowing recovery would be too likely to open the way to fraudulent claims; or 6) allowing recovery would enter a field that has no sensible or just stopping point. *Hoida*, 2006 WI 69 at ¶ 41. Whether one or more factors bars recovery is a question of law solely for judicial determination. *Fandrey*, 2004 WI 62, ¶ 12.

In the present case, each of the policy factors supports dismissal of Plaintiff's state law claims against the County Defendants. Examining the specific allegations about the County Defendants as they pertain to Mr. Huber, the County Defendants did

34

not take any particularized actions to, against, or with respect to him at all. Instead, Plaintiff focuses on generalized allegations about the milieu created by what law enforcement did not do: they did not dissuade or prevent thousands of armed individuals from descending upon Kenosha, they did not arrest Mr. Rittenhouse earlier in the evening, they did not offer assistance or appreciation to protestors, and they did not immediately arrest Mr. Rittenhouse after he shot Mr. Huber.

On their face, these allegations fail to provide sufficient detail to put any given defendant on notice of what he or she did or failed to do that allegedly gives rise to his or her liability. *See* Fed. R. Civ. P. 8(a)(2); *see also Thomson v. Washington*, 362 F.3d 969, 970-71 (7th Cir. 2004) (a complaint must put the defendant on notice of the claims and the grounds they rest upon, along with "some indication . . . of time and place."). There is no indication in Plaintiff's allegations of "who did what to him, when and where they did it and, if he knows, why the did it." *See Juarez v. Kenosha Sheriff's Dep't.*, 2020 WL 5982881, *6 (E.D. Wis. Oct. 8, 2020).

But even if the Court determines that the allegations are sufficiently specific, their generalized nature and lack of a discernable connection to Mr. Huber demonstrate that public policy should preclude the imposition of liability. Law enforcement's failure to arrest a single armed individual amongst more than 3,000 armed individuals and hundreds of protestors in a chaotic and unfolding situation, even if negligent, is too remote from Mr. Huber's death as he attempted to disarm Mr. Rittenhouse. Allowing recovery for the failure to arrest that one armed individual or to clear the streets prior to

35

Mr. Huber's death, even if negligent, is wholly out of proportion to the culpability of whichever officer(s) had the opportunity but did not take it.

Certainly, allowing recovery against law enforcement for Mr. Rittenhouse's killing of Mr. Huber would place too unreasonable a burden upon law enforcement, especially in the context of a fluid, unpredictable, and deteriorating situation involving thousands of people spread across the downtown area of a large city. It would penalize law enforcement for the situation to which they were responding, rather than their specific actions or interactions with Mr. Huber. And allowing recovery under these circumstances would require officers to identify and eliminate every potential threat or even prevent such threats from materializing in the first place in order to avoid liability, even where—as here—the injured person fails to exercise ordinary care for his own safety. *See Jankee v. Clark County*, 2000 WI 64, ¶ 53, 235 Wis.2d 700 (every person has a duty to exercise ordinary care for his own safety). In turn, allowing recovery would enter a field that has no sensible or just stopping point with hindsight as its overzealous guide. Any person injured by a private citizen could hold law enforcement liable for not doing something differently at some earlier juncture. And based on the allegations in this case, law enforcement could even be held liable for not arresting Mr. Huber for a curfew violation or otherwise removing him from the situation at some point prior to his injury.

Here, law enforcement attempted to enforce the curfew and ordered protestors to leave. Mr. Huber did not leave or otherwise exercise ordinary care for his own safety.

36

Instead, he remained on the scene of what Plaintiff describes as a chaotic and violent situation. When Mr. Huber heard that Mr. Rittenhouse had just shot someone and saw that Mr. Rittenhouse was still armed, Mr. Huber chose to approach and try to disarm him. Under these circumstances, allowing Plaintiff to recover under Wisconsin law against the County Defendants for Mr. Rittenhouse's subsequent killing of Mr. Huber would be directly contrary to well-established public policy. Therefore, all of Plaintiff's state law claims should be dismissed.

### B. Plaintiff Failed to Allege an Actionable Claim of Intentional Infliction of Emotional Distress.

In Count VIII, Plaintiff alleges that Defendants engaged in extreme and outrageous conduct. (Dkt. No. 1, ¶ 168.) However, Plaintiff alleges only that this conduct caused "severe emotional distress <u>to another</u>." (*Id.*, ¶ 172 (emphasis added).) While this may seem like a minor detail, Plaintiff has failed to allege that Mr. Huber suffered severe emotional distress as would be required for his estate to recover for intentional infliction of emotional distress. Therefore, Plaintiff has failed to state a claim upon which relief may be granted.

### C. The County Defendants are Entitled to Discretionary Immunity Under Wis. Stat. § 893.80(4) for Plaintiff's Claims of Negligence; Negligent Infliction of Emotional Distress; and Negligent Hiring, Supervision, and Training.

Under Wisconsin law, both public officers or employees and the governmental entities that employ them "enjoy immunity from liability for injuries resulting from the performance of any discretionary act within the scope of their governmental

37

employment." *Wilson v. City of Milwaukee*, 138 F.Supp.2d 1126, 1130 (E.D. Wis. 2001) (quoting *Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis.2d 81, 88, 596 N.W.2d 417 (1999)). The discretionary immunity analysis assumes negligence and "focus[es] instead on whether the municipal action (or inaction) upon which liability is premised is entitled to immunity under the statute, and if so, whether one of the judicially-created exceptions to immunity applies." *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 17, 253 Wis. 2d 323.

A discretionary act involves the "exercise of judgment in the application of a rule to specific facts." *Willow Creek Ranch, LLC v. Town of Shelby*, 2000 WI 56, ¶ 25, 235 Wis.2d 409. Immunity does not attach to ministerial duties, which are "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister v. Board of Regents*, 72 Wis.2d 282, 301, 240 N.W.2d 610 (1976).

For purposes of this immunity, the manner in which law enforcement officials carry out their responsibilities is discretionary. *See Estate of Perry v. Wenzel*, 185 F.Supp.3d 1087, 1099-1100 (E.D. Wis. 2017) (*rev'd on other grounds*, 872 F.3d 439 (7th Cir. 2017). "[T]he nature of law enforcement involves the use of discretion in response to evolving circumstances. 'For these reasons, it is clear that law enforcement officials must retain the discretion to determine, at all times, how best to carry out their responsibilities.'" *Id.* (quoting *Barillari v. City of Milwaukee*, 194 Wis.2d 247, 260, 533 N.W.2d 759 (1995)). Similarly, decisions by law enforcement officers concerning

38

whether and how to arrest someone are purely discretionary. *Wilson*, 138 F.Supp.2d at 1130 ("Clearly, such decisions call for the exercise of judgment or discretion rather than the mere performance of a prescribed task."); *see also Johnson v. City of Milwaukee*, 41 F.Supp.2d 917, 931 (E.D.Wis.1999) and *Phillips v. City of Milwaukee*, 928 F.Supp. 817, 829 (E.D.Wis. 1996), *aff'd*, 123 F.3d 586 (7th Cir. 1997).  There is an exception to discretionary immunity for conduct that is malicious, willful, and intentional. *Willow Creek Ranch*, 2000 WI 56 at ¶ 26. However, where—as here—the plaintiff's stated cause of action sounds in negligence, the exception does not apply.  *Wilson*, 138 F.Supp.2d at 1133.

The only other exceptions to discretionary immunity are for medical discretion, which is inapplicable to the present case, and for duties to address a "known danger." *Willow Creek Ranch*, 2000 WI 56 at ¶ 26.  The "known danger" exception states that a public officer may face liability when he or she is aware of a danger that is of such quality that it "require[es] a particularized action with a self-evident time, mode and occasion." *Heuser ex rel. Jacobs v. Cmty. Ins. Corp.*, 2009 WI App 151, ¶ 23, 321 Wis.2d 729. However, when the allegations of the Complaint are read in the light most favorable to Plaintiff, this exception is not triggered. Even if a duty to act was created by the situation generally, it did not require a particularized action. The manner in which law enforcement responded remained inherently discretionary.

 For the known danger exception to apply, "the danger must be compelling enough that a self-evident, particularized, and nondiscretionary municipal action is required." *C.L. v. Olson*, 143 Wis. 2d 701, 717, 422 N.W.2d 614 (1988). A mere duty to act

39

does not equate to a duty to take a particularized, nondiscretionary action. In the present case, assuming arguendo that law enforcement had a duty to act, the County Defendants nevertheless retained their inherent discretion to determine how best to carry out their responsibilities in responding to it. As the Wisconsin Supreme Court explained, "…the nature of law enforcement requires moment-to-moment decision making and crisis management which, in turn, requires that the police department have the latitude to decide how to best utilize law enforcement resources." *Barillari*, 194 Wis.2d at 260 (rejecting application of known danger exception to immunity).

This is particularly true in the present case, where law enforcement was dealing with widespread chaos occurring over a large and uncontained geographical area. Even if the County Defendants were aware of a generalized threat to protestors on August 25, 2020, they could not predict that Mr. Rittenhouse would kill Mr. Huber specifically such that some particularized action was required. *See id.* at 260-261. As such, they retained their discretion in determining how best to address any perceived threat.

> We look to our police departments to enforce our laws and to maintain order in what is becoming an increasingly dangerous society. Routinely, police face critical situations, many of which have the potential for violence. On a typical day, any given law enforcement officer may be arresting and questioning suspects, interviewing and counseling victims, talking to witnesses, rescuing children, and investigating criminal activity. In the course of their work, police must often try to console and reassure people who are distraught and fearful. <u>Faced with escalating violence, they must continuously use their discretion to set priorities and decide how best to handle specific incidents</u>. Police officers must be free to perform their responsibilities, using their experience, training, and good judgment, without also fearing that they or their employer could be held liable for damages from their allegedly negligent discretionary decisions.

40

*Id.* at 261-262 (emphasis added).

Plaintiff concedes that law enforcement officers responded to the critical situation on August 25, 2020 by imposing a curfew. (Dkt. No. 1, ¶28-29.) In fact, Plaintiff contends that law enforcement disproportionately sought to enforce that curfew against protestors—including Mr. Huber—and demanded that they leave the scene immediately. (*Id.*, ¶ 61, 71.) This is not a situation where law enforcement stood by and did nothing. *See Lodl*, 2002 WI 71 at ¶¶ 19, 42, 46-48. Rather, Plaintiff simply disagrees with the discretionary decisions made by law enforcement that evening. But this is not enough to invoke the exception to immunity. *See Heuser*, 2009 WI App 151 at ¶ 33 (explaining that officer will enjoy immunity even if the particular measures he enacted were insufficient to prevent harm).

While there are far fewer allegations pertaining to the claim for negligent hiring, supervision, and training, this claim is also subject to discretionary immunity. Plaintiff makes no specific claims about hiring or training at all, and therefore he has failed to plead facts showing that any exception to discretionary immunity would apply to those actions. As to supervision, Plaintiff only asserts that the County Defendants were negligent in their supervision duties. (Dkt. No. 1, ¶ 185.) Plaintiff refers to these supervisory duties as "non-discretionary" (*see id.*), but Wisconsin law is clear that training and supervision are discretionary acts. *See Sheridan v. City of Janesville*, 164

41

Wis.2d 420, 429-430, 474 N.W.2d 799 (Ct. App. 1991); *Liebenstein v. Crowe*, 826 F.Supp. 1174, 1187–88 (E.D.Wis.1992); *Phillips*, 123 F.3d at 599. Therefore, immunity applies.

### D.    Defendant Kenosha County is Entitled to Immunity From Intentional Torts Under Wis. Stat. § 893.80(4).

Section 893.80(4), Wis. Stats., immunizes a governmental entity from liability for intentional torts of its officers and employees. *Envirologix Corp. v. City of Waukesha*, 192 Wis. 2d 277, 288, 531 N.W.2d 357 (Ct. App. 1995). Plaintiff has alleged various intentional torts under state law. (Dkt. No. 1, ¶ 171, 189, 195.) To the extent that Plaintiff has asserted these claims against Kenosha County, they fail under Wis. Stat. § 893.80(4) and must be dismissed as to Kenosha County.

### E.    Defendant Kenosha County Is Not Liable For Discretionary Acts of its Officers

In Count XIV, Plaintiff has alleged that the City of Kenosha and Kenosha County are liable under the theory of respondeat superior for the actions of their employees. (Dkt. No. 1, ¶ 197-198.) However, where the employees are entitled to discretionary immunity, so too is the governmental employer. *See Phillips*, 123 F.3d at 599; *Barillari*, 194 Wis.2d at 262. Because any individual County Defendants are entitled to discretionary immunity for the claims of negligence, negligent hiring and supervision, and negligent infliction of emotional distress, Kenosha County is also entitled to

42

immunity from liability for Count IX, Count X, and Count XI. As such, Kenosha County is entitled to immunity for all of Plaintiff's state law claims[4].

## VIII. KYLE RITTENHOUSE IS A NECESSARY PARTY TO THIS ACTION

Should the Court determine that any causes of action survive this Motion, Plaintiff failed to join a necessary party, Kyle Rittenhouse, to this lawsuit as required by Federal Rule of Civil Procedure 19. Dismissal under Rule 12(b)(7) for failure to join a party under Rule 19 requires a two-step inquiry. First, a court considers whether the absent party is a necessary party. *Davis Co. v. Emerald Casino, Inc.*, 268 F.3d 477, 481 (7th Cir. 2001). In determining whether the absent party is necessary under Rule 19(a), the court considers whether 1) complete relief can be accorded without joinder of that party; 2) the party's ability to protect his interest will be impaired; and 3) the existing parties will be subject to a substantial risk of multiple or inconsistent obligations unless the party is joined. *Id.* If the court deems the absent party "necessary" to the litigation, but the party cannot be joined in the action (because, for example, the party is beyond the personal jurisdiction of the court), the court then proceeds to the second part of the inquiry. *Id.*

Here, Kyle Rittenhouse is a necessary party to the lawsuit and there is no reason he could not have been joined in the action. His conduct is central to the allegations of

---

[4] The only other state law claim is for statutory indemnification pursuant to Wis. Stat. § 895.46. However, Wis. Stat. § 895.46 "does not provide a private cause of action for indemnification" against the County, but instead "provides for the [municipality] to pay the damages[, if any,] on behalf of" the public officer or employee. *Jackson v. Graves*, No. 14-cv-1206-pp, 2015 WL 5577527, at *4 (E.D. Wis. Sep. 22, 2015).

43

the Complaint and he is alleged to have killed Mr. Huber. He is currently being criminally prosecuted for that killing. (*See* Kenosha County Circuit Court case no. 20-CF-983.) Mr. Rittenhouse's conduct is implicated in each claim, but it is particularly relevant to the allegations of a conspiracy because he is alleged to have conspired with Defendants to deprive Mr. Huber of his constitutional rights.

The allegations in the Complaint clearly render Mr. Rittenhouse a necessary party to this lawsuit. His absence from this action would be extremely prejudicial to County Defendants because it would create unnecessary difficulties in accessing relevant discovery, both testimony and documents. In turn, this would increase defense costs and would unduly frustrate the preparation of a defense, especially if Mr. Rittenhouse refuses to comply with third-party subpoenas due to the ongoing criminal proceedings. The conduct of Mr. Rittenhouse also needs to be included in any verdict formulation, particularly because liability for any claim of conspiracy under 42 U.S.C. § 1983 is joint and several. *See McKinnon v. City of Berwyn*, 750 F.2d 1383, 1387 (7th Cir. 1984). Even awards of attorney's fees and costs under 42 U.S.C. § 1988 can be subject to joint and several liability. *See Shakman v. Democratic Org. of Cook County*, 634 F.Supp. 895, 904 (N.D.Ill.1986); *U.S. ex rel. Howard v. Urban Inv. Trust, Inc.*, 2014 WL862749 (N.D. Ill. 2014).

Indeed, judgement against the County Defendants in the absence of Mr. Rittenhouse would result in a miscarriage of justice, as the culpability of conduct lies with him even based on a plain reading of the Complaint. Therefore, the Court must

either dismiss the lawsuit without prejudice to allow Plaintiff to refile with Mr. Rittenhouse as a named defendant, or it can require Mr. Rittenhouse to be joined to this lawsuit.

## CONCLUSION

For the reasons stated herein, the County Defendants respectfully request that the Court enter an Order dismissing Plaintiff's claims against them in their entirety.

Dated this 22nd day of October, 2021.

By: /s        Sara C. Mills
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
MICAELA E. HAGGENJOS
State Bar No. 1118840
Attorneys for Defendants, David G. Beth and Kenosha County
CRIVELLO CARLSON, S.C.
710 N. Plankinton Avenue, Suite 500
Milwaukee, WI 53203
Phone: (414) 271-7722
Fax: (414) 271-4438
E-mail: shall@crivellocarlson.com
smills@crivellocarlson.com
mhaggenjos@crivellocarlson.com

45