**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | | |
|---|---|---|
| JOHN HUBER, in his individual capacity and as Personal Representative of the ESTATE OF ANTHONY HUBER, | ) ) ) | |
| | ) | No. 2:21-cv-00969-LA |
| Plaintiff, | ) | |
| | ) | Hon. Lynn Adelman, |
| v. | ) | District Judge |
| | ) | |
| DAVID G. BETH, et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |
| | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT RITTENHOUSE'S**
**MOTION TO QUASH SERVICE AND MOTION TO DISMISS**

# INTRODUCTION

Armed with an assault rifle, Defendant Kyle Rittenhouse[1] drove from Illinois to Wisconsin with the purpose of joining with other armed people to confront a group of people protesting police violence. Rittenhouse, along with other members of this group, coordinated with the Law Enforcement Defendants in carrying out their shared objective: confront the protestors with a heavily-armed militia and engage in acts of violence against them. As part of this group, Rittenhouse shot and killed Anthony Huber. Rittenhouse then fled back to Illinois with the acquiescence of the Law Enforcement Defendants. There is no mystery what this case is about, and there is no doubt that these acts give rise to plausible legal claims against Rittenhouse.

Yet, Rittenhouse asks this Court to dismiss Plaintiff's First Amended Complaint ("Complaint"). His arguments all lack merit. The Complaint provides a detailed recitation of the facts alleged against Rittenhouse. There can be no serious doubt that the Complaint gives him adequate notice of what Plaintiff is claiming Rittenhouse did.

Further, Plaintiff's detailed allegations state plausible claims against Rittenhouse. At the heart of Plaintiff's Complaint, Plaintiff alleges that Rittenhouse is liable for violating Huber's constitutional rights. Plaintiff plausibly alleges that Rittenhouse became a state actor by joining a conspiracy with the Law Enforcement Defendants and other all-white, pro-police, armed individuals to confront the group protesting police violence. Having joined this conspiracy and taken the ultimate act in furtherance of it, Rittenhouse is liable for the violations of Huber's constitutional rights. Rittenhouse attempts to avoid this liability by arguing that Huber has no constitutional rights because he is not a member of a protected class. But the Complaint alleges

---

[1] Plaintiff refers to Defendant Kyle Rittenhouse as "Rittenhouse," except for a few instances in the discussion of Plaintiff's service of process where he is referred to as "Kyle" for clarity to distinguish him from his mother Wendy Rittenhouse and his sister Faith Rittenhouse.

1

that the group Rittenhouse joined (the pro-police militia) had a clear racial animus against the group Huber joined (the police protestors). Rittenhouse's other attacks on the legal plausibility of Plaintiff's claims likewise fail.

Finally, Rittenhouse asks this Court to allow him to continue to evade service. Plaintiff's investigators have spent more than 100 hours chasing Rittenhouse across the country. Eventually, Plaintiff determined Rittenhouse was likely living with his mother and sister in Florida. When Plaintiff attempted service there, Rittenhouse's sister stated she would accept the summons and give it to him, confirming Plaintiff's conclusion that Rittenhouse was living there. Rittenhouse's current attempt to avoid that service—all without actually telling this Court where he lives and can be served—should not be allowed. The Court should deny Rittenhouse's motion to quash service.

## LEGAL STANDARDS

Rule 8 only requires "a short and plain statement of the claim" to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a). The federal rules "do not require a plaintiff to include much factual detail in a complaint." *Doe v. Purdue Univ.*, 928 F.3d 652, 665 (7th Cir. 2019); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (the plaintiff is not required to make "detailed factual allegations"). Dismissal is appropriate only if the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

At this stage, "the court must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor." *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Twombly*, 550 U.S. at 555 ("[A]ll the allegations in the complaint are

2

[assumed] true (even if doubtful in fact)"). It is not the Court's role to determine if Huber's account will ultimately hold up:

> "Plausibility" . . . does not imply that the district court should decide whose version to believe, or which version is more likely than not. . . . [T]he Court is saying instead that the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself could these things have happened, not did they happen.

*Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Huber's Complaint far exceeds these standards.

## FACTS[2]

On August 23, 2020, Jacob Blake, a Black resident of Kenosha, Wisconsin, was shot in the back seven times by a Kenosha police officer. Dkt. 27 ¶¶33, 113. The shooting sparked public outrage, leading to protests against police violence joined by a racially diverse group of community members, including Anthony Huber. *Id.* ¶¶2, 34, 114. Local law enforcement was antagonistic towards these demonstrators—a curfew was enacted and selectively enforced against demonstrators, and many were arrested. *Id.* ¶¶35-40.

On August 25, 2020, as the protests continued, an all-white group of armed individuals, with avowedly pro-police and racist views, descended on Kenosha to patrol the city's streets, openly brandishing weapons and terrorizing the protestors and other Kenosha residents. *Id.* ¶¶47-48, 115-122. Kyle Rittenhouse, a 17-year-old from out-of-state brandishing an assault rifle in violation of Wisconsin law, was part of this group of armed antagonists. *Id.* ¶¶58-63.

The Law Enforcement Defendants were aware of this group's planned arrival but did nothing to dissuade them. *Id.* ¶¶49-57. Once the group arrived, rather than enforcing the curfew

---

[2] Plaintiff summarizes some of the relevant facts here to provide general context for his arguments, and discusses others in the course of his specific arguments below. Plaintiff expressly incorporates and relies on all of the allegations in his Complaint, Dkt. 27, in opposition to Rittenhouse's motion to dismiss.

3

against them, or doing anything to stop the group members' armed and menacing behavior, the Law Enforcement Defendants actively supported and encouraged the lawless actions of this group. *Id.* ¶¶77-99. Beyond support and encouragement, the Law Enforcement coordinated their actions with the armed mob, with police telling group members they would "push" the protestors down towards the part of the city patrolled by the armed pro-police group, leaving them there for group members to "deal with." *Id.* ¶¶93-98. Rittenhouse took part in these conversations with the Law Enforcement Defendants, and was aware both of the planned confrontations with demonstrators and that he had the support of police in his actions. *Id.* ¶¶86-90.

With predictable tragedy, these actions led to a violent confrontation and ultimately the death of Anthony Huber at the hands of Kyle Rittenhouse. *Id.* ¶¶58-76. With the encouragement of the Law Enforcement Defendants, and as part of their joint plan with the armed group for police to funnel protestors towards the armed group for them to "deal with," Rittenhouse violently confronted the protestors, during the course of which he shot and killed Anthony Huber, as well as shooting and killing another protestor and maiming a third. *Id.* ¶¶64-99.

In response, the Law Enforcement Defendants failed to arrest Rittenhouse or take any steps to investigate his violent actions—instead, they let Rittenhouse walk away, because he was white and affiliated with the group of armed individuals who had the Law Enforcement Defendants' explicit support. *Id.* ¶¶100-101.

## ARGUMENT

### I.    Rittenhouse's motion to quash service must be denied.

#### A.    Relevant facts regarding service on Rittenhouse.

Plaintiff amended his complaint and named Rittenhouse as a Defendant on February 2, 2022. Dkt. 27. Over the next several weeks, Plaintiff made intense efforts to locate and serve Rittenhouse. Dkt. 48-1. One of Plaintiff's counsel's investigators attempted service at addresses

4

in Illinois that appeared to be associated with Rittenhouse and his family, but no one associated with Rittenhouse was located there. *Id.* ¶¶6-8. Based on social media posts, Plaintiff's counsel believed Rittenhouse might be relocating to Phoenix, Arizona, and hired a Phoenix-based private investigation firm to locate and serve Rittenhouse. *Id.* ¶¶9-13. Over the next several weeks, that firm used all available methods to locate Rittenhouse, including multiple public records databases, motor vehicle records, and direct contact with other individuals associated with Rittenhouse, but it exhausted all leads and was unable to locate Rittenhouse. *Id.* ¶¶14-16.

In early May, another of Plaintiff's in-house investigators, Mort Smith, was assigned to locate and serve Rittenhouse. Ex. 1 (Smith declaration) ¶¶5-6. Smith, a licensed private investigator since 1991, generated additional potential addresses in locations across the country that appeared from public records to be associated with Rittenhouse. *Id.* ¶7. Over a five-week period in May and June, Smith made 9 service attempts at 7 different locations in 6 different states, none of which was successful. *Id.* ¶8. Upon investigation, only 2 of the 7 locations appeared to be places where Rittenhouse or his family had previously lived. *Id.* ¶9. The other 5 locations, based on the neighborhood demographics and conversations with current residents, appeared to have no actual connection to Rittenhouse, despite appearing in public records databases as an address associated with him. *Id.* ¶¶8-9. In Smith's professional experience, it is highly unusual for one person, particularly someone as young as Rittenhouse, to have so many associated addresses in seemingly random locations, all listed with relatively recent reported activity. *Id.* ¶¶10-11. Smith believes, based on his experience and information learned while attempting to locate Rittenhouse, that someone deliberately "seeded" false locations for Rittenhouse into these databases, possibly to obscure his true location. *Id.* ¶12.

5

Smith learned from his database searches that Rittenhouse had previously appeared to share a residence with his mother Wendy and his sister Faith. *Id.* ¶13. Based on this information, Smith attempted to serve Rittenhouse at 2920 Willow Creek Lane, Kissimmee, Florida ("the Florida address"), which appeared to be a current address for Wendy and Faith. *Id.* ¶¶14-16. Smith knocked on the door of the home and a young woman answered. *Id.* ¶17. Smith asked her if Kyle Rittenhouse was home, and the woman answered "no." *Id.* Smith asked her if Wendy was home, and the woman answered "no, I'm her daughter Faith." *Id.* Smith asked Faith when Kyle would be home, and Faith answered that she was not sure. *Id.* Smith told Faith that he had some court documents for Kyle, and asked her if she would give them to Kyle when he got home. *Id.* Faith agreed and accepted the documents for Kyle. *Id.*

Faith never told Smith that Kyle did not live there, or refused to accept the documents—if she had, Smith would have left with the summons and complaint and continued his previous search for Kyle. *Id.* ¶¶18-20. In total, in May and June 2022, Smith spent more than 100 hours locating and serving Kyle Rittenhouse. *Id.* ¶21. Plaintiff filed his proof of service on Rittenhouse on June 30, 2022, Dkt. 53, and counsel for Rittenhouse filed an appearance on July 20 and 21, 2022, Dkts. 54, 56-57.

### B. Rittenhouse was properly served under Rule 4(e)(2)(B).

Fed. R. Civ. P. 4(e)(2)(B) provides that a defendant may be served by leaving a copy of the summons and complaint "at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." Rittenhouse concedes that Faith resides with her mother at the Florida address where service was made, Dkt. 61-1 ¶2, and does not dispute that she is "of suitable age and discretion." His motion to quash rests entirely on his contention that the Florida address is not his "dwelling or usual place of abode." Dkt. 61 at 6-7.

6

Rittenhouse is correct that Plaintiff bears the burden of establishing proper service. However, when the Court is called upon to decide the issue based on the submission of written materials, Plaintiff "need only make out a *prima facie* case of personal jurisdiction," and "[i]n evaluating whether the *prima facie* standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (quoting *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir.2002) and *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983)).

Moreover, the fact that a defendant receives actual knowledge of the lawsuit, while not independently sufficient to establish valid service, justifies a liberal construction of Rule 4 on the facts of the particular case. Indeed, as noted in *James v. Russell F. Davis, Inc.*, a case relied upon by Rittenhouse, Dkt. 61 at 6, Rule 4 "'should be construed liberally to effectuate service where actual notice of suit has been received by the defendant.'" *James v. Russell F. Davis, Inc.*, 163 F. Supp. 253, 256 (N.D. Ind. 1958) (quoting *Rovinski v. Rowe*, 131 F.2d 687, 689 (6th Cir. 1942)); *see also Veremis v. Interstate Steel Co.*, 163 F.R.D. 543, 545 (N.D. Ill. 1995) ("Rule 4 is a flexible rule which is liberally construed to uphold service as long as defendant receives sufficient notice of the complaint.") (quoting *United Food and Commercial Workers Union, Locals 197, et al. v. Alpha Beta Co.,* 736 F.2d 1371, 1382 (9th Cir. 1984)).[3]

Plaintiff has satisfied his burden of establishing valid service on Rittenhouse, and specifically that the Florida address qualifies as a "dwelling or usual place of abode" for

---

[3] *See also Kitchens v. Bryan Cnty. Nat. Bank*, 825 F.2d 248, 256 (10th Cir. 1987) ("[T]he federal courts generally take a permissive attitude towards the mechanism employed for service of process when defendant actually receives notice."); *Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972) (Rule 4 requirements "are to be liberally construed, to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice."); *Nowell v. Nowell*, 384 F.2d 951, 953 (5th Cir. 1967) (Rule 4 requirements "should be broadly construed where the defendant, as in this case, received notice of the suit.").

7

Rittenhouse. When Plaintiff's investigator asked Faith if Kyle was home, she said "no," and when he asked when he would be home, she said she wasn't sure, which implies that Kyle would return to the home and that he lived there. Ex. 1 ¶17. Faith, knowing that court documents were to be served on Kyle, certainly never said "he doesn't live here." In fact, she did the opposite: when Smith asked Faith to give Kyle the documents when he got home, she *agreed* and took the documents. *Id.* ¶¶17-19. This all made sense, given that Kyle has lived with his mother and sister in other locations. *Id.* ¶13. These facts, and the extensive search conducted over a period of months that did not reveal an alternative place of usual abode for Kyle, *id.* ¶¶6-9, Dkt. 48-1— establish a *prima facie* case of valid service.

To the extent that there are conflicts between Plaintiff's investigator's declaration and the declarations submitted by Faith and Kyle Rittenhouse, those disputes must be resolved in Plaintiff's favor. *Purdue*, 338 F.3d at 782. That can and should end the Court's inquiry. However, a few additional points are worth noting. First, Kyle's declaration is remarkably cagey. He claims to "maintain a residence in a State other than Florida," Dkt. 61-2 ¶4, but offers zero corroborating information to back up this assertion, not even naming the state in which he purportedly resides. Whether as evidence that Kyle does not have a strong factual case that he resides elsewhere, or as evidence that Kyle is attempting to evade service, or both, the Court should take note of this reticence in deciding his motion to quash service.

Second, while Kyle emphasizes that he has only spent between 20 and 30 nights at the Florida address, Dkt. 61-2 ¶¶5-6, the case law makes clear that the concept of "usual abode" is flexible, and that an individual may have multiple locations that qualify as a place of usual abode. "Our highly mobile and affluent society has relegated to history the days when an individual had but a single residence," and "'it is unrealistic to interpret Rule 4(e) so that a

person to be served has only one dwelling house or usual place of abode at which process may be left.'" *PopSockets, LLC v. Hueffner*, No. 17-CV-827-PP, 2018 WL 4568823, at *12 (E.D. Wis. Sept. 24, 2018) (quoting *Jaffe and Asher v. Van Brunt*, 158 F.R.D. 278 (S.D.N.Y. 1994)). Even taking Rittenhouse's claims at face value, other courts have found that stays of similar short duration support a finding that a place qualifies as one of multiple places of "usual abode" for purposes of Rule 4. *See, e.g.*, *In re Xacur*, 219 B.R. 956, 960, 966 (Bankr. S.D. Tex. 1998) (valid service at condo where respondent spent approximately 10% of the year); *In re Premium Sales Corp.*, 182 B.R. 349, 352 (Bankr. S.D. Fla. 1995) (valid service at condo where respondent stayed at "sporadic intervals throughout the year" for periods of "approximately one to four weeks" at a time); *Jaffe & Asher*, 158 F.R.D. at 279 (valid service on defendant at his parents' home, where defendant admitted to staying "at various times" during the year but claimed "on each occasion he was there solely to visit his parents"); *Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 255-56 (2d Cir. 1991) (valid service at condo where defendant had stayed for 34 days during the year).

### C. In the alternative, the Court should order Rittenhouse to submit to discovery and disclose the addresses where he contends he resides.

In the event this Court concludes that Plaintiff has not made a *prima facie* showing that Rittenhouse was properly served, this Court should allow Plaintiff to discover where Rittenhouse resides and serve him there. Substantial resources have already been expended by Plaintiff in serving Rittenhouse, *see* Dkt. 48-1 (documenting efforts from February to May), Ex. 1 (more than 100 hours spent by investigator in May and June attempting to locate Rittenhouse), and those efforts have achieved their purpose—Rittenhouse has notice of the claims against him. This is *not* a case where the long-term ability of this Court to attain personal jurisdiction over Rittenhouse is in question, such as a foreign corporation contending it lacks minimum contacts

9

with the forum state—it is simply a question of assuring that Rittenhouse is delivered the documents notifying him of the claims against him and the need to appear, which he indisputably already has. If the Court is not yet satisfied that the procedural requirements of the rule have been met, it should act to facilitate swift and simple completion of that requirement. Particularly given the strong circumstantial evidence that Rittenhouse has undertaken a calculated effort to make his whereabouts difficult to attain, Ex. 1 ¶¶9-12, this Court should not enable further dilatory tactics which would only serve to delay the resolution of this matter on the merits. Fed. R. Civ. P. 1 (federal rules should be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action"); *cf. Swaim v. Moltan Co.*, 73 F.3d 711, 721 (7th Cir. 1996) (describing as "rotten" defendant's "continued effort to avoid service of process and frustrate the efficient administration of justice"); *Veremis v. Interstate Steel Co.*, 163 F.R.D. 543, 544 (N.D. Ill. 1995) (emphasizing liberal construction of Rule 4, and expressing disfavor towards procedural gamesmanship regarding service, since "a suit at law is not a children's game, but a serious effort on the part of adult human beings to administer justice; and the purpose of process is to bring parties into court."). If there is any doubt remaining about whether service has been accomplished, this Court should order Rittenhouse to provide information regarding the addresses where he contends he *does* reside. At a minimum, this discovery would substantiate his claim that the Florida address is not one of his places of usual abode. "The decision to consider affidavits, allow discovery, or hold an evidentiary hearing to determine jurisdictional facts is left to the discretion of the trial court." *craigslist, Inc. v. Hubert*, 278 F.R.D. 510, 513 (N.D. Cal. 2011); *see also* Wright & Miller, 5B Fed. Prac. & Proc. Civ. (3d ed.), § 1351 Motions to Dismiss—Lack of Jurisdiction Over the Person (court may defer ruling on personal jurisdiction to "enable the parties to employ

10

discovery on the jurisdictional issue"). But it would also serve the purpose of allowing Plaintiff and the Court to know where, exactly, Rittenhouse contends he can be served, and thereafter allow Plaintiff to seek leave from this Court to extend the time to effectuate formal service.

## II. Plaintiff's detailed Complaint gives ample notice to Rittenhouse of the claims against him.

Rittenhouse argues that Plaintiff's Complaint violates Rule 8 and Rule 10 because it engages in "shotgun" pleading and group pleading, and in doing so it fails to provide Rittenhouse with adequate notice of the claims against him. Dkt. 61 at 12-15. Rittenhouse fails to account for the detailed allegations describing his involvement in the events leading to Anthony Huber's death, which more than suffice to give him notice of Plaintiff's claims against him.

### A. Plaintiff's Amended Complaint

Over 44 pages and 229 paragraphs, the Complaint sets out Plaintiff's allegations against Rittenhouse. The Complaint first describes the relevant background, with the shooting of Jacob Blake leading to protests against police violence, Dkt. 27 ¶¶33-40, triggering a massive, coordinated and antagonistic response from law enforcement, *id.* ¶¶41-46. Next, the Complaint describes the planned arrival of groups of armed individuals who came to Kenosha with the intent to patrol the streets, confront the protestors, and ultimately engage in acts of armed violence against the protestors—all of which was known to the Law Enforcement Defendants, who did nothing to discourage this takeover of the city. *Id.* ¶¶47-57. The Complaint then details Rittenhouse's actions as part of this militia—just 17 years old, armed and openly brandishing an assault rifle in violation of Wisconsin law, Rittenhouse's flagrant lawbreaking was not just ignored by police, but fostered, encouraged, invited, and ratified by them. *Id.* ¶¶58-65.

Predictably, the presence of a heavily armed militia mob in Kenosha, hostile to the racial justice and anti-police-violence message of the largely peaceful and unarmed protestors, was a

recipe for violence. *Id.* ¶¶66-76. Rittenhouse was at the center of it. *Id.* Rittenhouse shot and killed Joseph Rosenbaum, then ran from the scene, still brandishing his assault rifle. *Id.* ¶¶68-70. A group of individuals, including Anthony Huber, approached Rittenhouse to try to disarm him, and Rittenhouse shot and killed Huber without provocation or lawful justification. *Id.* ¶¶71-76.

The Complaint explains how Rittenhouse's actions were authorized by the Law Enforcement Defendants. *Id.* ¶¶77-99. The Law Enforcement Defendants enforced the city's curfew orders only against the anti-police-violence protestors and not the pro-police armed individuals, provided direct support and encouragement to these individuals, and coordinated with them to instigate a conflict between the protestors and the armed mob. *Id.* After Rittenhouse shot and killed two protestors, and shot and maimed another, the Law Enforcement Defendants didn't arrest Rittenhouse, or even question him—they simply let him walk away, because Rittenhouse was white and affiliated with the group of armed individuals who had the Law Enforcement Defendants' explicit support. *Id.* ¶¶100-101.

Rittenhouse may disagree with these allegations, but he cannot claim to lack understanding of the nature of the claims against him. He was a member of an all-white, heavily-armed, pro-police militia that was authorized by the Law Enforcement Defendants to patrol the city in open violation of the curfew, and that was deputized to enact lethal violence on the racially-diverse, unarmed anti-police-violence protestors. *Id.* ¶¶47-65, 77-99. When Rittenhouse repeatedly pulled his trigger, first killing Rosenbaum, then Huber, this was the entirely predictable culmination of the deadly role that Rittenhouse eagerly agreed to play at the behest of the Law Enforcement Defendants. *Id.* ¶¶66-76.

12

### B. There is no impermissible "shotgun" pleading.

Rittenhouse argues that the Complaint violates the rule against "shotgun" pleading, relying on *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990 (N.D. Ill. 2011). Dkt. 61 at 13. The argument is misplaced and provides no basis for dismissal.

First, Plaintiff's Complaint does not use shotgun pleading. "Shotgun" pleading involves a complaint where "each count incorporates by reference all preceding paragraphs and counts of the complaint *notwithstanding that many of the facts alleged are not material to the claim*." *CustomGuide*, 813 F. Supp. 2d at 1001 (emphasis added). That was the case in *CustomGuide*, which alleged a complex series of intellectual property claims, one of which might be pre-empted by federal law depending on the precise nature of alleged conduct underlying that one claim. *Id.* Because the pleading style made it impossible to determine what alleged misconduct was intended to support that claim, the court dismissed that claim (though not the entire complaint), with leave to replead to clarify the basis for it. *Id.* Unlike in *CustomGuide*, with its various complex intellectual property theories implicating different subsets of the factual narrative, Plaintiff's allegations in this case involve a single factual narrative—describing the interplay between the Law Enforcement Defendants and the group of armed individuals who descended on the city, and how they precipitated the tragic events where Rittenhouse killed Anthony Huber—which underlies each of Plaintiff's claims. Since the full factual narrative is equally material to every claim, the incorporation of the full set of facts into each legal count is entirely appropriate.

Second, even if there were "shotgun" pleading, dismissal would not be warranted because the facts make it perfectly clear what Rittenhouse is alleged to have done. *See, e.g.*, *Douglas v. Alfasigma USA, Inc.*, No. 19-CV-2272, 2021 WL 2473790, at *9 (N.D. Ill. June 17, 2021) (denying motion to dismiss based on shotgun pleading because "incorporating prior allegations

13

by reference isn't particularly problematic when everyone understands what the plaintiff is alleging" and "[t]he key question is whether the complaint puts the defendants on notice of the claim and gives defendants a fair opportunity to respond, without creating confusion or hiding the ball"); *Damian v. Courtright*, No. 21 C 1694, 2021 WL 3144447, at *5 (N.D. Ill. July 26, 2021) ("[E]ven if the complaint did excessively incorporate via reference—such pleading is only insufficient if it fails to put Defendants on notice.").

### C.    There is no impermissible "group" pleading.

Rittenhouse also challenges the Complaint based on its use of "group" pleading, Dkt. 61 at 14-15, although it is unclear what precisely he is arguing as it relates to *his* ability to respond to the Complaint. Rittenhouse complains that "the FAC makes little to no effort to distinguish among the 40 different individual, municipal, city, and law enforcement defendants named and their conduct that is claimed to give rise to liability under the various legal theories." *Id.* at 14. To the extent Rittenhouse complains about grouping the Law Enforcement Defendants (or sub-sets thereof) together in the Complaint, he lacks standing to do so since it does not impact his ability to respond to the Complaint, and he is also wrong. *See* Dkt. 47 at 8-11 (Plaintiff's response to the group pleading argument advanced by the Law Enforcement Defendants).

As it relates to Rittenhouse, there is simply no group pleading in the factual narrative underlying Plaintiff's Complaint. Whether from the specific identification of Rittenhouse by name, or by obvious context (most often both), the Complaint clearly delineates between the factual conduct that is alleged against Rittenhouse and the conduct alleged against the Law Enforcement Defendants. Moreover, while Rittenhouse gripes that "in just the individual counts" Plaintiff groups him together with other individuals simply as "Defendants", Dkt. 61 at 14, this demonstrates a failure to understand the structure of Plaintiff's Complaint: over 128 paragraphs of factual allegations, Plaintiff clearly delineates the conduct alleged against each Defendant or

14

group of Defendants, Dkt. 17 ¶¶1-128, and then the legal counts set forth legal theories alleging claims against all of the Defendants, *id.* ¶¶129-229, based on their particular conduct as alleged earlier in the Complaint. *See, e.g., Spring v. Schwarz*, 2017 WL 4130504, at *3 (N.D. Ill. Sep. 9, 2017) ("Group pleading that refers to 'Defendants' collectively is sufficient under Rule 8 when a plaintiff provides enough detail about the nature of the allegations to put each defendant on fair notice of the claims."). Again, Rittenhouse cannot credibly claim there is any lack of clarity about the nature and extent of the allegations against him.

**III.     Plaintiff plausibly alleges that Rittenhouse acted under color of state law.**

Rittenhouse argues that Plaintiff fails to establish that he acted under color of law as required to make out the constitutional claims against him,[4] thereby rendering legally infirm Counts I-V. The argument fails. Plaintiff's Complaint plausibly alleges that Rittenhouse was "a willful participant in joint activity with the State or its agents." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970).

**A.     Factual allegations of Rittenhouse's joint activity with the State.**

Plaintiff alleges that Rittenhouse was one member of a large group of white, armed, pro-police individuals who descended on Kenosha to patrol the streets in response to widespread protests by anti-police-violence protestors, and with the express purpose of fomenting confrontations with and engaging in violence against those protestors. Dkt. 27 ¶¶48-50, 58, 113-116. The impending arrival of this armed group was known to the Law Enforcement Defendants, who did nothing to dissuade their activities. *Id.* ¶¶52-57. Indeed, far from dissuading them, the Law Enforcement Defendants took numerous active steps to coordinate with, direct and encourage the armed group, ultimately with the purpose of facilitating the armed group's

---

[4] Plaintiff does not seek to advance a failure to intervene claim against Rittenhouse, and therefore offers no response to Rittenhouse's arguments directed against that claim.

intended purpose of a dangerous confrontation with the protestors. *See, e.g.*, *id.* ¶¶79-80 (declined to enforce curfew order against the armed group); *id.* ¶¶83-85 (expressed support for the armed group, including their acts of vandalism); *id.* ¶¶86-88 (communicated support and offered assistance to Rittenhouse and other members of the armed group); *id.* ¶¶91-92 (ordered protestors, but not armed group, to disperse); *id.* ¶¶93-94 (communicated, implicitly and explicitly, with armed group that they should confront the protestors); *id.* ¶¶95-98 (directed protestors' movements to funnel them towards confrontation with the armed group); *id.* ¶¶100-101 (ratified Rittenhouse's violence by failing to question or arrest him after the shootings).

Rittenhouse personally participated in the acts of this armed group, *id.* ¶¶58-62, 67-76, and his open lawbreaking was ignored by numerous of the Law Enforcement Defendants, *id.* ¶¶63-65. Rittenhouse directly communicated with several members of the Law Enforcement Defendants, during which conversations those Defendants communicated their support for and offered assistance with Rittenhouse's and the armed group's actions. *Id.* ¶¶86-90. And after Rittenhouse shot and killed Anthony Huber, the Law Enforcement Defendants communicated their support for what he had done, failing to arrest or even question him despite being told that Rittenhouse had just shot someone. *Id.* ¶¶100-101.

**B.**  **Plaintiff's allegations far surpass the pleadings-stage threshold to plausibly allege state action by way of a conspiracy with state actors.**

It is well established that "[t]o act 'under color' of law does not require that the accused be an officer of the State," and that "[i]t is enough that he is a willful participant in joint activity with the State or its agents." *Adickes*, 398 U.S. 144 at 152. This is known as "the 'conspiracy theory' of § 1983 liability." *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019).

Allegations of conspiracy are rarely appropriately dismissed at the pleadings stage, and only the most barebones and conclusory allegations, devoid of any supporting facts, are

candidates for dismissal. *See, e.g.*, *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (holding that "[u]nder *Twombly,* all plaintiff needed to allege was a plausible account of a conspiracy[,]" reversing dismissal of conspiracy claim even though "the complaint makes only rather conclusory direct allegations of conspiracy" because the factual allegations supported the plausible inference of a conspiracy, and contrasting case with prior case affirming dismissal of conspiracy claim which contained "not a whiff of a conspiratorial agreement."); *Mendoza v. City of Chicago*, 2012 WL 3206602, at *3 (N.D. Ill. July 31, 2012) (complaint alleging simply that the "Defendants' conspiracy is evidenced by the insufficient investigation into the incident" and that the "Defendants made false statements to cover up" misconduct stated a plausible conspiracy claim); *cf. Stinson v. City of Milwaukee*, No. 09-C-1033, 2013 WL 5447916, at *13 (E.D. Wis. Sept. 30, 2013) (noting that "[p]roof of a conspiracy is rarely direct," that "conspiracy is often proved by circumstantial evidence," and that "a meeting of minds 'may need to be inferred even after an opportunity for discovery, for conspirators rarely sign contracts'") (quoting *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir.2003)).

The Seventh Circuit has explicitly rejected the existence of a heightened pleading standard for conspiracy claims, holding instead that it is sufficient "merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with.'" *Boothe v. Sherman*, 66 F. Supp. 3d 1069, 1078 (N.D. Ill. 2014) (quoting *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002)) (noting "that remains the rule even after" *Twombly* and *Iqbal*); *Cooney v. Rossiter*, 583 F.3d 967, 970-71 (7th Cir. 2009).

Rittenhouse relies on *Spiegel*, 916 F.3d at 616, to argue that Plaintiff must provide "evidence of a *concerted effort* between a state actor and that individual," and that "mere allegations of joint action or a conspiracy do not demonstrate that the defendant[] acted under

17

color of state law and are not sufficient to survive a motion to dismiss." Dkt. 61 at 16. Plaintiff's

allegations far surpass this standard, and the threadbare facts alleged in *Spiegel*. In *Spiegel*, the

plaintiff alleged claims against his neighbor under § 1983 because she filed allegedly false police

reports against him, in response to which the police warned plaintiff not to persist in his course

of conduct (photographing and videotaping his neighbor). 916 F.3d at 614-15. The Seventh

Circuit affirmed the dismissal of the § 1983 claims, holding that "'the mere act of furnishing

information to law enforcement officers' does not constitute joint activity in an unconstitutional

arrest," and noting that the police decision *not* to arrest plaintiff cut against any finding of a

conspiracy. *Id.* at 617. The key distinction recognized in *Spiegel* is between "an alleged

agreement between the police and the private citizens" on the one hand, which suffices to

plausibly allege state action by a private citizen, and situations where "the private individuals

acted independently from the government," which does not. *Id.* (quoting *Brokaw v. Mercer

Cnty.*, 235 F.3d 1000, 1016 (7th Cir. 2000)).

Plaintiff's allegations fall squarely on the right side of this line. The allegations bear no

resemblance to cases like *Spiegel* where private actors have engaged in "the mere act of

furnishing information" to police. *Id.* Here, Plaintiff alleges that Rittenhouse in particular, and

the armed group in general, had an agreement with the Law Enforcement Defendants that they

would be permitted to engage in armed patrols of Kenosha in violation of the curfew and other

applicable laws, that they would be permitted to confront the anti-police-violence protestors, and

that the Law Enforcement Defendants would actively facilitate that engagement for the purpose

of fomenting a violent confrontation. *See supra* Arg III.A. Importantly,

> [a] plaintiff seeking redress need not prove that each participant in a conspiracy
> knew the "exact limits of the illegal plan or the identity of all participants
> therein." *Hoffman-LaRoche, Inc., supra,* 447 F.2d [872 (7th Cir.1971) ] at 875.
> An express agreement among all the conspirators is not a necessary element of a

civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was "a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences." *Id.*

*Lenard v. Argento*, 699 F.2d 874, 882–83 (7th Cir. 1983). With this standard in mind, Plaintiff could have discharged his burden of plausibly alleging that Rittenhouse acted under color of law without *any* allegations of direct contact between Rittenhouse and any of the Law Enforcement Defendants at all—it would have been enough to allege Rittenhouse's membership in the conspiracy by way of his status as one of the members of the armed group, with enough facts to plausibly allege contact between other group members and the police such that all members of the armed group could plausibly be part of an *implicit* agreement between the armed group and law enforcement, and that they understood the "essential nature and general scope" of that plan. Here, Plaintiff alleges more—direct contact between Rittenhouse and the Law Enforcement Defendants, during which those Law Enforcement Defendants communicated their support for and agreement with (in words and in their conduct) the actions of Rittenhouse and the rest of the armed group. Dkt. 27 ¶¶86-88. But even absent these specific allegations, the detailed and specific allegations of coordination between other armed group members and the Law Enforcement Defendants would suffice.

**C.**     **Rittenhouse misperceives the nature of the alleged conspiracy.**

Rittenhouse argues that Plaintiff's allegations are insufficient because the Complaint, "whether taken as a whole or in looking at these individual counts, does not establish that any state official and private citizen defendant reached an agreement or understanding to deprive Huber of his constitutional rights, let alone that Rittenhouse, specifically, reached such an understanding . . . ." Dkt. 61 at 17. But this is a straw man argument. Plaintiff does not, and need

19

not, allege that the Law Enforcement Defendants and Rittenhouse (along with the rest of the armed group) reached an agreement to deprive Anthony Huber *in particular* of his constitutional rights. Instead, Plaintiff alleges that the conspiracy between the Law Enforcement Defendants and the group of armed, white, pro-police individuals was to deprive *the group* of anti-police-violence protestors of their constitutional rights, of which Anthony Huber was one member, by fomenting a violent confrontation between them and the armed, pro-police group, which predictably caused severe injuries and death, including the death of Anthony Huber.

### D. Plaintiff alleges numerous overt acts in furtherance of the conspiracy.

Rittenhouse contends that Plaintiff's conspiracy claim fails[5] because the Complaint contains only a "threadbare recitation" of any overt acts in furtherance of the conspiracy. Dkt. 61 at 19. Rittenhouse bases this contention on a single paragraph contained within the legal counts section of the Complaint, in which Plaintiff alleges that "[i]n furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity." Dkt. 27 ¶141.[6]

Plaintiff agrees that this sentence, standing alone, does not suffice, but in making this argument Rittenhouse ignores the 100+ paragraphs of detailed factual allegations that preceded Plaintiff's recitation of the legal counts. Dkt. 27 ¶¶1-128. Read comprehensively, the Complaint contains a plethora of "overt acts" in furtherance of the conspiracy, committed specifically by Rittenhouse, *id.* ¶¶58-76, by other members of the armed group, *id.* ¶¶48-54, and by the Law Enforcement Defendants, *id.* ¶¶77-106. There is no credible claim that Plaintiff has failed to plausibly allege overt action in furtherance of the conspiracy.

---

[5] Rittenhouse raises this argument solely in the context of Count II. Dkt. 61 at 19.
[6] Rittenhouse's motion incorrectly cites this statement as ¶143 of the Complaint.

## IV. Rittenhouse's motion improperly seeks dismissal for failure to adequately plead particular legal theories.

The bulk of Rittenhouse's motion is directed towards arguing that various of Plaintiff's claims fail for failure to plead certain elements of particular legal theories. Dkt. 61 at 18-29. This is not a proper basis for dismissal.

Plaintiff is not required to plead particular legal theories at all. The Seventh Circuit has repeatedly warned that plaintiffs are required only to plead facts, not legal theories. *McDonald v. Household Intern., Inc.*, 425 F.3d 424, 427-28 (7th Cir. 2005). Dismissal for failure to plead particular legal theories is improper. *Id.* And a complaint need not point to any statute, let alone particular ones, in order to survive a motion to dismiss. *See, e.g., Shah v. Inter-Cont'l Hotel Chicago Operating Corp.*, 314 F.3d 278, 282 (7th Cir. 2002) (holding that complaint need not "specify the statute or common law principle that the defendant has violated").

As discussed above, Plaintiff has plausibly alleged that Rittenhouse acted as part of a conspiracy with the Law Enforcement Defendants and other members of the armed, white, pro-police group of individuals who were unleashed upon the streets of Kenosha with the purpose of engaging the anti-police-violence protestors, fomenting a confrontation and engaging in acts of deadly violence towards those protestors—as a result of which, Anthony Huber lost his life. The Court can and should end its analysis there, since it is not required to parse the elements of legal claims Plaintiff was under no obligation to set out in his Complaint, and which will have no bearing on the scope and course of fact discovery that will necessarily flow from Plaintiff's core allegations regarding the events that unfolded in Kenosha on August 25, 2020.

To the extent the Court is inclined to address Rittenhouse's remaining arguments, as discussed below, they lack merit.

## V.        Plaintiff plausibly alleges claims under § 1985(3).

Rittenhouse seeks dismissal of Plaintiff's Count II, alleging a conspiracy in violation of § 1985(3), on three grounds. He contends that Plaintiff fails to plausibly allege a conspiracy, including the overt-act element, Dkt. 61 at 19, but he is wrong, as discussed above, *see supra* Arg.III. He contends that Plaintiff fails to allege any underlying constitutional violation, again premised on his claim that Rittenhouse was not a state actor, Dkt. 61 at 20-21, which is also wrong, *see supra* Arg.III. His remaining argument is that this claim fails because Huber was not a member of a protected class. Dkt. 61 at 19-20. This argument also fails.

Section 1985(3) prohibits two or more persons from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the law." Under § 1985(3), "four elements are required: (1) a conspiracy; (2) a purpose of depriving any person of equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) injury to one's person or property or a deprivation of a right or privilege of a citizen of the United States." *Kitchen v. Burge*, 781 F. Supp. 2d 721, 737–38 (N.D. Ill. 2011) (quoting *Malone v. American Friends Service Committee*, 213 Fed.Appx. 490, 494–95 (7th Cir. 2007)).

Rittenhouse challenges the second element based on his assertion that "Huber does not allege he is a member of a protected class." Dkt. 61 at 20. But this assertion stretches the law beyond what is required. To establish this element a plaintiff need only show that there was "some racial, or perhaps otherwise class–based invidiously discriminatory animus behind the conspirators action." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1024 (7th Cir. 2000).

Plaintiff's Complaint pleads exactly what is required. He alleges that the conspiracy between the Law Enforcement Defendants, Rittenhouse, and other members of the white, armed, pro-police group of individuals, and the actions they took in furtherance of that conspiracy, were motivated by racial animus. Dkt. 27 ¶¶107-123, 142-143, 150-151. He alleges that the Law

22

Enforcement Defendants enlisted an all-white group of armed individuals to confront a racially-diverse group of protestors who were advocating against police violence, and specifically against the systemic racially discriminatory use of excessive force, both in Kenosha specifically and across the country, and that the end result of this violent confrontation was that Anthony Huber was killed. *Id.* ¶¶33-36, 142-146, 150-154. That is all that is required.

Rittenhouse cites two cases in support of his argument that Huber must have been a member of a protected class, Dkt. 61 at 20, but neither is persuasive. In *Hicks v. Resol. Tr. Corp.*, 767 F. Supp. 167 (N.D. Ill. 1991), the plaintiff argued, based on out-of-circuit precedent, that he was entitled to bring a § 1985(3) claim based on his status as a whistleblower after he was fired from his job for flagging non-compliance with federal fair lending requirements. *Hicks*, 767 F. Supp. at 171. The court rejected the idea of a whistleblower-class-based claim, and observed that if the plaintiff tried to recast his claim as based on his bank employer's animus towards minority customers, he could not show that he had been fired based on such animus. *Id.* This is unlike Plaintiff's case here, where (as alleged) the racial animus was plainly the direct cause of Plaintiff's injuries. Rittenhouse also cites *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711 (9th Cir. 1981), Dkt. 61 at 20, but the statement in that case that the "law of this circuit" requires membership in a protected class conflicts with the broader articulation of the claim in *Brokaw*, and it is Seventh Circuit and not Ninth Circuit case law that this Court must follow.

Indeed, Rittenhouse's narrow conception of the class of persons who may invoke the §1985(3) prohibition on conspiracies to deprive them of their right to equal protection under the law runs counter to more than half-a-century's worth of both factual and legal understanding of how invidious discriminatory animus motivated by anti-Black racism manifests itself against white allies of racial justice movements. In *Adickes*—the Supreme Court's 1970 opinion which

23

Plaintiff cited earlier for its legal discussion of the analysis by which private citizens may act under color of law in conspiracy with agents of the state—the plaintiff brought claims under §1983 that defendant's restaurant in Hattiesburg, Mississippi "deprived her of the right under the Equal Protection Clause of the Fourteenth Amendment not to be discriminated against on the basis of race." *Adickes*, 398 U.S. at 147. But Ms. Adickes was not a member of any disfavored racial group—she was a white schoolteacher from New York teaching at a Mississippi Freedom School, who went to Kress's store to eat lunch with six of her young Black students, and who alleged she was refused service and then arrested "because she was a 'Caucasian in the company of Negroes.'" *Id.* at 146-147. The Court in *Adickes* had no difficulty understanding this as a valid claim "for violation of her equal protection rights." *Id.* at 148.

One year after *Adickes*, the Supreme Court issued its opinion in *Griffin v. Breckenridge*, holding that a claim under §1985(3) requires showing "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action," and that the conspiracy "must aim at a deprivation of the equal enjoyment of rights secured by the law to all," 403 U.S. 88, 102 (1971). It defies logic to contort this straightforward construction and read the Supreme Court's *Griffin* precedent to exclude, without any mention or discussion in the text itself, the very scenario animating the Court's year-old decision in *Adickes* (and the same scenario alleged here)—a conspiracy motivated by anti-Black racism that targets not only Black individuals, but their allies of other racial backgrounds who stand with them in protest against deeply-rooted systemic racism.

## VI. Plaintiff plausibly alleges Equal Protection claims.

Rittenhouse offers two arguments against Plaintiff's Equal Protection claims—that Plaintiff has not pleaded that Rittenhouse acted under color of law, and that Plaintiff has not pleaded that he was treated differently based on actionable discriminatory intent. Dkt. 61 at 21-

24

22. The former argument fails for the reasons previously discussed, *supra* Arg.III, and the latter is also unpersuasive.

To prove a § 1983 Equal Protection Claim, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose. *See Whitford v. Nichol*, 151 F. Supp. 3d 918, 927 (W.D. Wis. 2015) (citing *City of Mobile, Alabama v. Bolden*, 446 U.S. 55, 67–68 (1980)). This discrimination may take a number of forms. An equal protection claim will lie where state actors engage in "singling out members of a vulnerable group, racial or otherwise, for unequal treatment." *See Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995) (citing *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440–41 (1985). A plaintiff who cannot show that he was subject to discrimination motivated by class-based animus triggering strict or heightened scrutiny may still pursue an equal protection claim challenging state actions that have no rational basis. *Esmail*, 53 F.3d at 178; *Baumgardner v. Cnty. of Cook*, 108 F. Supp. 2d 1041, 1054 (N.D. Ill. 2000); *Whitford*, 151 F. Supp. 3d at 927. Further, a plaintiff can pursue an equal protection claim as a "class of one" if he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Swanson v. City of Chetek*, 719 F.3d 780, 783-84 (7th Cir. 2013) (citing *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)). Plaintiff states an equal protection claim under all three theories.

First, Plaintiff has stated a traditional equal protection claim based on race. As discussed above, Plaintiff alleges that Rittenhouse and the other Defendants were motivated by racial animus. Rittenhouse was a state actor, part of a group of all-white armed individuals acting against a group of racially diverse demonstrators, precisely because of the racial makeup of the latter group. Rittenhouse conspired with the Law Enforcement Defendants to unleash violence

25

and terror on the demonstrators—the Law Enforcement Defendants would funnel the demonstrators towards the armed group, then would withdraw, leaving the demonstrators to the mercy of the armed mob. Dkt. 27 ¶¶93-98. Indeed, this "selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) (citing *Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 70, 21 L.Ed. 394 (1872)); *see also supra* Arg.V (discussing longstanding recognition of equal protection claims alleging discriminatory conducted motivated by anti-Black racism targeting white allies of Black racial justice protest movements).

Second, even if the Court determined that Plaintiff was not the victim of discriminatory treatment motivated by racial animus and thus subject to heightened scrutiny, he has still stated an equal protection claim based on his membership in a group of demonstrators against police violence who were treated differently by state actors. Dkt. 127 ¶¶107-120. Looking at legitimate state objectives, Rittenhouse had no greater basis to engage in violence towards or seek confrontation with the demonstrators than he did with fellow members of his armed group of co-conspirators, in that both groups were roaming the streets of Kenosha in violation of the imposed curfew. Yet of course, Rittenhouse did not direct his focus and violence towards members of the all-white armed pro-police group, it was solely directed towards Huber and his fellow demonstrators. These actions bore no rational relationship to a legitimate state objective, *see Baumgardner*, 108 F. Supp. 2d at 1054, and were instead motivated by racial animus and opposition to the views of the protestors.

Finally, Plaintiff satisfies the elements of an equal protection class of one claim for the same reasons. Again, he has alleged that he was treated differently—by both Rittenhouse and the

Law Enforcement Defendants—than the similarly situated pro-police individuals who were also in violation of the curfew.

Rittenhouse seeks to defeat these claims by focusing solely on the moments surrounding his decision to shoot and kill Anthony Huber—he contends that "Plaintiff concedes that Rittenhouse only had cause to interact with Huber because Huber approached Rittenhouse and tried to forcibly take his firearm." Dkt. 61 at 22.[7] But that is not an accurate reading of Plaintiff's Complaint. Plaintiff does not "concede" that Rittenhouse only interacted with Huber because Huber "tried to forcibly take his firearm." The Complaint, read fairly and fully, lays forth the allegations that Rittenhouse came into contact with Huber as part of the conspiracy between Rittenhouse, other white, armed, pro-police individuals, and the Law Enforcement Defendants, to foment a violent confrontation between the armed group and the anti-police-violence demonstrators. *See supra* Arg.III.A. The violent confrontation that ultimately took place, with Rittenhouse shooting Huber at point blank range, was the tragic and foreseeable result of that conspiracy. In other words, Rittenhouse's shooting of Huber was caused by Rittenhouse joining the group of armed, pro-police individuals and conspiring with the Law Enforcement Defendants to confront the police-violence protestors. Rittenhouse may wish to defend this claim by arguing that Huber caused the shooting, but that is a defense that must be presented at trial, not one that allows this Court to dismiss Plaintiff's Complaint.

---

[7] Rittenhouse also attempts to inject his version of the facts, contradicting or exceeding the allegations in the Complaint, asserting that the Complaint "omits the well-established, publicly known fact that Huber struck Rittenhouse on the head with his skateboard, at full force, using both hands, as he lay in the street." Dkt. 61 at 22. Plaintiff disputes this factual assertion, and as Rittenhouse appears to acknowledge, it is plainly improper and cannot be considered at the motion to dismiss stage.

27

**VII.   Plaintiff plausibly alleges First Amendment retaliation claims.**

Rittenhouse seeks dismissal of Plaintiff's First Amendment retaliation claims because he asserts that (1) Rittenhouse is not a government official or police officer; (2) Plaintiff has conceded that Huber's First Amendment-protected speech was not a factor in Rittenhouse's confrontation with him; and (3) Plaintiff fails to allege that Huber's interaction with Rittenhouse would deter protected speech in the future. Dkt. 61 at 23. These arguments fail.

To the extent that Rittenhouse's first argument is simply a re-hash of prior arguments that he is not a state actor, that argument fails. *See supra* Arg.III. To the extent Rittenhouse contends that, even if he is a state actor for § 1983 purposes by virtue of his conspiracy with the Law Enforcement Defendants, he cannot be held liable for First Amendment retaliation because he is not employed by the government or is not a police officer, that argument is meritless. The cases he cites use the phrase "government official" or "police officer" simply because that was an apt description of the state actor whose conduct was challenged in those cases. Rittenhouse points to no case that heightens the ordinary state actor bar for First Amendment retaliation claims, or a case that precludes a claim against a private citizen engaged in a conspiracy with other state actors. In fact, one case he cites repeatedly points to the opposite conclusion. *See Spiegel*, 916 F.3d at 616 (noting plaintiff's claim that "that the defendants violated his First Amendment rights by conspiring to prosecute him for lawful conduct," and affirming dismissal of claims against private citizen based on failure to adequately allege conspiracy, not because private citizens categorically cannot conspire to engage in First Amendment retaliation).

Rittenhouse's second argument fails for the same reason as his argument against Plaintiff's Equal Protection claims. *See supra* Arg.VI. He casts Plaintiff's allegations too narrowly, and fails to credit the very clear allegations that Rittenhouse's actions that night were motivated by opposition to the anti-police-violence views espoused by the demonstrators.

28

Rittenhouse's third argument is that Plaintiff fails to allege that Rittenhouse's conduct would deter protected speech in the future. Plaintiff respectfully submits that, to the extent it was not specifically alleged, the Court can reasonably infer from the Complaint that being shot and killed for participating in an anti-police-violence protest would tend to deter individuals in the future from engaging in similar protected speech.

## VIII. Plaintiff plausibly alleges state law claims for IIED, NIED, and negligence.

Rittenhouse challenges Plaintiff's claims for Intentional Infliction of Emotional Distress ("IIED") (Count VIII), Negligent Inflection of Emotional Distress ("NIED") (Count IX), and Negligence (Count X), arguing variously that Plaintiff cannot maintain these claims in his individual (as opposed to his representative) capacity, that Plaintiff has failed to allege Rittenhouse's conduct in fact caused Huber any emotional distress, and that Plaintiff has not plausibly alleged any breach of a duty of care that Rittenhouse owed to Plaintiff. Dkt. 61 at 25-29. These arguments fail.

To clarify, Plaintiff asserts these claims as survival claims on behalf of the Estate of Anthony Huber, and not in his individual capacity, therefore Rittenhouse's arguments directed to the latter are moot.

In arguing for the dismissal of these claims because this is a "situation[] where there is a nearly instantaneous death from an alleged wrongful act," such that there was no time for Anthony Huber to experience emotional distress, Dkt. 61 at 27, that argument requires impermissibly construing the Complaint in the light most favorable to Rittenhouse, not to Plaintiff. There are no allegations in the Complaint that Huber died instantaneously or near instantaneously, and thus no basis to dismiss these claims at this early stage based on a finding that Plaintiff could never establish the requisite elements of these claims.

Finally, as to duty, Rittenhouse argues that Plaintiff was required to specifically plead "what duty [Rittenhouse] owed to Huber," "how any such duty was breached," and how such breach harmed Plaintiff. Dkt. 61 at 28-29. First, this argument ignores well established Seventh Circuit pleadings standards, which hold that a plaintiff is *not* required to plead each element of every claim. *Klein v. Cnty. of Lake*, No. 2:18 CV 349, 2019 WL 4597337, at *3 (N.D. Ind. Sept. 20, 2019) ("[I]t is manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each. A plaintiff simply needs to put a defendant on notice of the claims at issue.") (quoting *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017)). Second, to the extent Rittenhouse argues that Plaintiff has not established any legal duty, Wisconsin law is clear that "[e]ach individual is held, at the very least, to a standard of ordinary care in all activities," and (with limited exceptions) "individuals generally owe a duty of ordinary care to all persons." *Rockweit by Donohue v. Senecal*, 197 Wis. 2d 409, 419-421 (1995).

## IX. Plaintiff's survival and wrongful death claims should not be dismissed.

The only argument Rittenhouse advances for dismissal of Plaintiff's survival and wrongful death claims is the absence of an underlying viable state tort claim. Dkt. 61 at 29. Since Plaintiff *has* pleaded viable state law tort claims, *supra* Arg.VIII, this aspect of his motion must be denied.

## CONCLUSION

For the foregoing reasons, Rittenhouse's motion to dismiss should be denied.

30

RESPECTFULLY SUBMITTED,

/s/ Dan Twetten
Attorney for Plaintiff

Jon Loevy
Dan Twetten
Anand Swaminathan
Steve Art
Quinn Rallins
LOEVY & LOEVY
311 N. Aberdeen, Third Fl
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Dan Twetten, an attorney, hereby certify that on October 24, 2022, I caused a copy of

the foregoing motion to be filed via the Court's CM/ECF system and thereby served a copy on

all counsel of record.

/s/ Dan Twetten
Attorney for Plaintiff

31