# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOHN HUBER, in his individual capacity and
as Personal Representative of the
ESTATE OF ANTHONY HUBER,
        Plaintiff,

      v.                                Case No. 21-C-0969

DAVID G. BETH, in his individual and
official capacity as Kenosha County Sheriff,
et al.,
        Defendants.

## DECISION AND ORDER

Plaintiff John Huber commenced this civil action on behalf of himself and as the personal representative of the estate of his son, Anthony Huber, who was one of three men shot by Kyle Rittenhouse during the protests that occurred in Kenosha, Wisconsin, in the wake of the police shooting of Jacob Blake. Plaintiff seeks damages for wrongful death from Rittenhouse, but in addition he seeks to hold the municipalities and law-enforcement officers involved in the police response to the protests liable for his son's death. Plaintiff brings federal civil-rights claims against these governmental defendants, including claims alleging the existence of a conspiracy to deprive protestors of their civil rights and due-process claims based on the government's exposing protestors to danger at the hands of armed civilians. Plaintiff also alleges that the governmental defendants are liable under state law, and that Rittenhouse is liable under federal civil-rights statutes for conspiring with law enforcement to cause harm to protestors.

The governmental defendants and Rittenhouse have separately moved to dismiss plaintiff's complaint. They contend that plaintiff has failed to properly allege federal civil-

rights claims, and that therefore the complaint should be dismissed on the merits under Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss under this rule challenges the sufficiency of the complaint's factual allegations. When deciding such a motion, I must accept the plaintiff's factual allegations as true, draw all reasonable inferences from those facts in favor of the plaintiff, and ignore any facts that may support the defendants' version of events if those facts are not alleged in the complaint. In other words, I must assume that the story told by the complaint is true. I then ask whether the law would permit the plaintiff to recover damages from the defendants if the plaintiff later proved that it is true. If the plaintiff could not prevail even if all the facts alleged in the complaint were true, then the complaint must be dismissed.

The subject matter of this case is well known. The shooting of Jacob Blake, the resulting protests (which gave way to rioting and arson), and the actions of Kyle Rittenhouse were extensively examined by news outlets. Rittenhouse was charged with crimes, including first-degree intentional homicide, for shooting Huber and the other two men, and his criminal trial was highly publicized. As a result, members of the public may be familiar with the events at issue and believe that plaintiff's allegations, which I describe below, are contrary to the facts reported in the news or leave out important details. For this reason, I again stress that a court confronted with a motion to dismiss a complaint must accept the plaintiff's factual allegations as true and ignore outside evidence that may contradict them. That would include matters reported in the news and evidence presented during Rittenhouse's criminal trial. Moreover, some may find certain of plaintiff's allegations—such as his allegation that law enforcement conspired to have armed civilians use violence against protestors—hard to believe. But this is not the stage of a

2

civil case at which the court weighs evidence or decides whether the plaintiff is likely to be able to prove his allegations. Rather, so long as the facts alleged by the plaintiff are not fantastic or delusional, the court must accept them as true. Deciding whether the allegations are true or false comes later in the case, after all sides have had a chance to present their evidence.

In addition to the motions to dismiss filed by all parties, Kyle Rittenhouse has filed a separate motion to dismiss that raises an issue unique to him: that plaintiff failed to properly serve him with a copy of the summons and complaint. This motion asks whether the place at which plaintiff's process server left copies of these documents was Rittenhouse's residence at the time of service.

I address defendants' motions in this order.

## I. BACKGROUND

### A. Factual Allegations

Plaintiff's complaint alleges the following facts.

On August 23, 2020, a Kenosha police officer shot Jacob Blake, a Black man, in the back seven times. The event, which was recorded on video, sparked public outrage. That evening, hundreds of demonstrators gathered in downtown Kenosha to protest. Officers from the Kenosha Police Department and the Kenosha County Sheriff's Department were dispatched to monitor the demonstrations, police the actions of individuals present, and disperse the crowds. According to the complaint, the officers at the scene "were antagonistic toward the demonstrators, who were voicing their outrage at the racist and systemic violence conducted by the very officers who were policing the demonstrations." (Am. Compl. ¶ 36.)

3

The complaint alleges that, on the evening of August 23, 2020, officials declared an emergency curfew that began at 10:15 p.m. According to plaintiff, the curfew "was aimed at protestors and not actually directed at, or enforced against, others in the City violating the order." (Am. Compl. ¶ 37.) Officers from the police and sheriff's department fired tear gas and rubber bullets into the crowds to break up the demonstrations, and they arrested many demonstrators. On Monday, August 24, 2020, the demonstrations continued, and Sheriff Beth declared that the curfew would take effect at 8:00 p.m. that evening. The demonstrations resumed on August 25, 2020, and again the Sheriff declared a curfew that was to begin at 8 p.m.

The complaint alleges that, on August 25, 2020, municipalities from outside Kenosha County deployed officers and equipment to participate in the response and control of the protests, and that the officers from these municipalities "joined forces with the [Kenosha police department] and [Kenosha County Sheriff] and worked under their coordination and tactical command." (Am. Compl. ¶ 41.) The municipalities that sent officers and equipment were Waukesha County, Racine County, Sauk County, Walworth County, Washington County, the Village of Menomonee Falls, and the City of West Allis.

On the evening of August 25th, "armed individuals" arrived in Kenosha. (Am. Compl. ¶ 48.) According to the complaint, these armed individuals were volunteers who intended to "patrol the demonstration armed, and with the intent to kill." (*Id.* ¶ 50.) The armed individuals had arrived in part based on a Facebook post by Kevin Mathewson on behalf of a militia group he formed called the Kenosha Guard. (*Id.* ¶ 49.) Mathewson "put out a call on Facebook for 'patriots willing to take up arms and defend our City tonight against the evil thugs.'" (*Id.*) He received hundreds of online responses, including many

4

hundreds of people indicating that they would be attending. (*Id.*) Some wrote responses on Mathewson's Facebook post indicating that they intended to use violence. The complaint highlights the following responses:

> "Counter protest? Nah. I fully plan to kill looters and rioters tonight. I have my suppressor on my AR [Assault Rifle], these fools won't even know what hit them."

> "It's about time. Now it's time to switch to real bullets and put a stop to these impetuous children rioting."

> "Use hollow points, they expand on contact."

> "Armed and ready. Shoot to kill tonight."

(*Id.* ¶ 50.) According to the complaint, many of these armed individuals were "avowed racists." (*Id.* ¶ 120.)

The complaint alleges that commanders of the law-enforcement presence in Kenosha "knew about the plans and intentions of the armed individuals, including the social media posts, and the plans and intentions of the pro-militia armed individuals that descended on downtown Kenosha." (Am. Compl. ¶ 51.) This was in part because Mathewson was a former Kenosha alderman who spoke regularly with Daniel Miskinis, the Chief of the Kenosha Police Department at the time. (*Id.* ¶ 52.) Mathewson also sent an email to Chief Miskinis in which he expressed his intentions. The email stated: "Chief Miskinis: As you know, I am the Commander of the Kenosha Guard, a local militia. We are mobilizing tonight and have about 3,000 RSVP's. We have volunteers that will be in Uptown, downtown, and at the entrances to other neighborhoods." (*Id.* ¶ 53.) Matthewson also posted the email as an open letter to the Kenosha Chief of Police on social media. (*Id.*) The complaint alleges that "[n]either Defendant Miskinis nor Defendant Beth made any attempt to dissuade Mathewson or any other armed individuals from showing up in

Kenosha to patrol the streets." (*Id.* ¶ 55.) It further alleges that "Defendants Miskinis and Beth acknowledged that the [Kenosha Police Department] and [Kenosha Sheriff's Department] were aware that pro-militia, armed individuals intended to patrol and then did patrol downtown Kenosha." (*Id.* ¶ 56.) Finally, the complaint alleges that officers of the other municipalities present during the demonstrations observed the armed individuals at the scene and reported their presence to superior officers. (*Id.* ¶ 57.)

On the evening of the 25th, armed individuals "could be seen patrolling the streets in and around the demonstrations, brandishing weapons, threatening residents, and pointing weapons at peaceful demonstrators without provocation." (Am. Compl. ¶ 48.) These armed individuals were all white and "espoused a viewpoint that was avowedly pro-police." (*Id.* ¶¶ 115–16.) One of these armed individuals was defendant Kyle Rittenhouse, a 17-year-old from Antioch, Illinois. (*Id.* ¶¶ 5, 59.) According to the complaint, Rittenhouse is a racist who was once photographed "flashing . . . a symbol of white supremacy/white power." (*Id.* ¶ 122.) He arrived in Kenosha on the evening of the 25th armed with a Smith & Wesson AR-15 style .223 rifle, with a magazine holding 30 rounds of ammunition. (*Id.* ¶ 61.) Rittenhouse "was brandishing his gun openly and conspicuously, strapping it over his shoulder using a tactical sling designed to position the rifle at the center of his chest for rapid elevation and positioning." (*Id.* ¶ 62.) The complaint alleges that, because Rittenhouse appeared to be a minor, law-enforcement officers should have questioned whether he could lawfully possess the rifle in Wisconsin. However, they did not do so, despite observing Rittenhouse with the rifle on multiple occasions. (*Id.* ¶¶ 63–65, 89.)

6

According to the complaint, "Defendant Rittenhouse and others were subject to a different set of rules and were allowed to move about freely in areas controlled by the Law Enforcement Defendants." (Am. Compl. ¶ 80.) For example, at 9:57 p.m., a Kenosha Police Sergeant sent a message to all officers through the Department's internal messaging system noting the presence of armed individuals patrolling the streets in violation of the curfew order. (*Id.* ¶ 81.) Another sergeant "made clear that the pro-police armed individuals were not to be detained, dissuaded, or disarmed," and he described these individuals as "very friendly." (*Id.* ¶ 83.) Likewise, at 11:26 p.m., callers reported that some of the pro-police armed individuals had slashed tires in a nearby area, but law-enforcement officers did nothing in response. (*Id.* ¶ 84.)

At about 11:30 p.m., several law-enforcement officers were seen talking to Rittenhouse and other armed individuals who had congregated in the parking lot of a private business. (Am. Compl. ¶ 86.) According to the complaint, "the officers and deputies communicated their full support and appreciation for Defendant Rittenhouse and others." (*Id.* ¶ 87.) In video footage taken at the scene, officers can be heard asking armed individuals if they needed water. Defendant Rittenhouse can be seen telling the officers that they did need water. (*Id.* ¶ 88.) Officers "not only provided armed individuals with water, but they voiced their support and appreciation for the actions of Defendant Rittenhouse and others, saying: 'We appreciate you guys, we really do.'" (*Id.* ¶ 90.) While officers were assisting and praising the armed individuals, other officers were broadcasting warnings to protestors from their armored vehicles. The warnings informed protestors that they were trespassing and that they were to immediately disperse. (*Id.* ¶ 91.) No officer ordered the armed individuals to disperse. (*Id.* ¶ 92.)

According to the complaint, law-enforcement officers and the armed individuals formed a plan to "deal with" the protestors. (Am. Compl. ¶¶ 7, 94–95, 97, 143.) The officers and armed individuals understood the phrase "deal with" to mean "collectively use force and state authority against the protestors." (*Id.* ¶ 97.) One of the armed individuals allegedly confirmed the existence of this plan during an interview. He stated: "You know what the cops told us today? They were like, 'We're gonna push 'em down by you, 'cause you can deal with them, and then we're gonna leave.'" (*Id.* ¶ 94.)

Later that evening, law-enforcement officers forced protestors out of a park where they had gathered. (Am Compl. ¶ 96.) The demonstrators, including Anthony Huber (*id.* ¶ 2), constituted "a diverse group of citizens protesting police violence against Black people, which included many Black-Americans and other people of color." (*Id.* ¶ 114.) The park where the demonstrators had gathered was located near the intersection of 56th Street and Sheridan Road. (*Id.* ¶ 96.) At that time, law-enforcement officers knew that the armed individuals were gathered at an area around 60th Street and Sheridan, four blocks south of the park. (*Id.*) Although law-enforcement officers knew that the armed individuals had expressed hostility towards the protestors, the officers decided to "funnel" the protestors out of the park and south on Sheridan Road, towards the armed individuals. (*Id.*) This funneling forced the protestors into a "confined area" with the armed individuals. (*Id.*)

The complaint alleges that, after the police funneled protestors towards the armed individuals, defendant Rittenhouse shot and killed protestors. (Am. Compl. ¶ 95.) At about 11:45 p.m., he encountered Joseph Rosenbaum and shot him dead. (*Id.* ¶ 68.) After killing Rosenbaum, Rittenhouse called a friend, told him that he had just killed someone, and

8

ran. (*Id.* ¶ 69.) As Rittenhouse fled, he held his rifle in a "ready position." (*Id.* ¶ 70.) People were yelling that Rittenhouse had just shot someone. (*Id.*) As he was fleeing, Rittenhouse fell to the ground, and several citizens approached and attempted to disarm him. (*Id.*) Anthony Huber was one of those citizens. He approached Rittenhouse "to disarm him, stop the shooting, and save the lives of others." (*Id.* ¶ 72.) As Huber was reaching for Rittenhouse's rifle to pull it away, Rittenhouse shot him in the chest and killed him. (*Id.* ¶¶ 74, 76.) The complaint alleges that after Rittenhouse shot Huber, another person, Gage Grosskreutz, approached Rittenhouse with his hands up, pleading with him to stop his shooting rampage. (*Id.* ¶ 75.) Rittenhouse then shot Grosskreutz from point-blank range, hitting him in the arm. (*Id.*) Grosskreutz survived.

The complaint alleges that, when Huber and Grosskreutz were shot, law-enforcement officers were at the scene. (Am. Compl. ¶ 100.) Protestors yelled to the officers that Rittenhouse had just shot people, but the officers did not stop him. Instead, officers spoke to Rittenhouse and then let him walk away. (*Id.*) According to the complaint, the only reason Rittenhouse was allowed to walk away after shooting three people was because he was white and because he was affiliated with the armed individuals. (*Id.* ¶ 101.)

In the days after the protests began, the police arrested more than 150 protestors for violating the curfew order. No armed individuals were arrested. (Am. Compl. ¶ 119.)

## B. Procedural Background

The plaintiff in this action is John Huber, who is Anthony Huber's father and the personal representative of his estate. He brings claims for damages against the defendants under federal civil-rights statutes and state tort law. The named defendants

9

are David Beth, the Kenosha County Sheriff (in both his official and individual capacities); Daniel Miskinis, the Chief of the Kenosha Police Department at the time of the events giving rise to this suit (in his individual capacity); Eric Larsen, the current Chief of the Kenosha Police Department (in his official capacity[1]); Kyle Rittenhouse; and the various municipalities that deployed law-enforcement officers to the scene of the demonstrations. Those municipalities are the City of Kenosha, Kenosha County, Waukesha County, Racine County, Sauk County, Walworth County, Washington County, the Village of Menomonee Falls, and the City of West Allis. In addition, the complaint names as defendants "John Doe Police Officers" who were deployed to respond to the protests on August 25, 2020. (Am. Compl. ¶ 19.)

The plaintiff's civil-rights claims generally allege that the law-enforcement defendants conspired with Rittenhouse and the other armed individuals to inflict violence on protestors based on their race and/or their alignment with racial minorities and based on their protesting racial injustice and law enforcement's use of unnecessary force against minorities. These claims are brought under 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. § 1986. In connection with the claims brought under § 1983, plaintiff alleges constitutional violations of the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Plaintiff's First Amendment and Equal Protection Claims are similar to his conspiracy claims, in that he contends that the

---

[1] Larsen was not the Chief of the Kenosha Police Department at the time of the events giving rise to this suit, and the official-capacity claim against him is simply a redundant way of bringing a claim against the City of Kenosha. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006). Thus, in this opinion, I will generally ignore Larsen.

defendants conspired to retaliate against protestors based on race and the content of their speech. Plaintiff's due-process claim alleges that Huber was killed by a state-created danger, namely, law-enforcement's decision to funnel protestors into a confined area with the hostile armed individuals. Plaintiff alleges that the municipal defendants are liable for the constitutional violations under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Plaintiff's state-law claims are for intentional and negligent infliction of emotional distress; general negligence; negligent hiring, supervision, and training; survival; and wrongful death.

Before me now are three motions to dismiss the amended complaint. First, Sheriff Beth and the County municipalities have filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). Second, former Chief Miskinis, current Chief Larsen, the City of Kenosha, the City of West Allis, and the Village of Menomonee Falls have filed a separate motion to dismiss the complaint for failure to state a claim. These motions raise a variety of issues, but the primary issues are whether plaintiff has adequately pleaded the existence of a conspiracy that is actionable under the civil-rights statutes and whether the law-enforcement defendants' actions caused Huber's death.

The third motion to dismiss is Kyle Rittenhouse's. He first seeks dismissal for insufficient service of process on the ground that plaintiff failed to properly serve him with the summons and complaint. *See* Fed. R. Civ. P. 12(b)(5). Alternatively, Rittenhouse contends that the complaint fails to state a claim for relief against him. Here, Rittenhouse raises many of the arguments raised by the law-enforcement defendants. In addition, he

11

contends that he cannot be liable under the civil-rights statutes because he is a private citizen, not a state actor.

Below, I will first address the motions to dismiss filed by the governmental defendants. I will then turn to Rittenhouse's motion.

## II. DISCUSSION

### A.    Governmental Defendants' Motion to Dismiss

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In evaluating a motion to dismiss under Rule 12(b)(6), I must "accept the well-pleaded facts in the complaint as true"; however, "legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago,* 671 F.3d 611, 616 (7th Cir. 2011).

As explained above, the motions to dismiss filed by the governmental defendants raise a variety of issues, but the issues of conspiracy and causation are predominant.  I will begin by putting the issue of conspiracy to one side and focusing on plaintiff's due-process claim alleging that that Huber was killed by a state-created danger. Although plaintiff's conspiracy allegations are relevant to this claim, plaintiff could state a claim based on a state-created danger without proving the existence of a conspiracy between law enforcement and the armed individuals. Further, the due-process claim provides a

12

vehicle to address defendants' causation arguments, which apply to many of plaintiff's other claims. After discussing the due-process claim, I will turn to plaintiff's conspiracy claims, and then finally his state-law claims.

### 1. Due Process/State-Created Danger/Causation

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." Here, plaintiff contends that the governmental defendants violated Anthony Huber's due process rights when they forced him and other protestors into a "confined area" with Kyle Rittenhouse and the other armed individuals and then failed to protect them from the resulting danger. (Am Compl. ¶ 95.)

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court recognized that the Due Process Clause is a limitation on the government's power to act, not a guarantee of certain minimal levels of safety and security to private citizens. 489 U.S. 189, 195 (1989). The Court reasoned that "[i]f the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 196–97. *DeShaney* thus stands for the proposition that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. As applied to the present case, *DeShaney* prevents plaintiff from bringing a due-process claim based on the governmental defendants' mere failure to protect Anthony Huber from violence perpetrated by the armed individuals. For example, plaintiff could not bring a due-process claim based solely on defendants' failure to arrest Rittenhouse and the other

armed individuals for curfew violations, or solely on their failure to prevent the armed individuals from arriving in Kenosha in the first place. *See Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 597 (7th Cir. 2008).

However, *DeShaney* does not block constitutional claims alleging that the state, by its affirmative conduct, placed a citizen into a dangerous situation that resulted in his suffering harm at the hands of a private party. The cases refer to the principle that the government can be liable for injuries that result from the government's placing a citizen in danger as the "state-created danger exception" to *DeShaney*. *See, e.g., Estate of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019); *Weiland v. Loomis*, 938 F.3d 917, 918–19 (7th Cir. 2019). Cases from the Seventh Circuit describe the contours of this exception in different ways. Some cases define the exception using a three-part test that requires proof of the following elements: (1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question "shocks the conscience." *Estate of Her*, 939 F.3d at 876; *see also Johnson v. Rimmer*, 936 F.3d 695, 708 (7th Cir. 2019); *King ex rel. King v. E. St. Louis School Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007). Other cases eschew this test and focus on "whether the state has impaired the plaintiff's powers of self-help or ability to obtain help from others." *Weiland*, 938 F.3d at 921; *see also Sandage*, 548 F.3d at 598; *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1177 (7th Cir. 1997). The latter cases hold that the state violates the due-process clause if "before the police or other public authorities act, the plaintiff is safe," but the state takes action that endangers the plaintiff and prevents him from protecting

14

himself and fails to "supply the sort of defenses that the person could have provided on his own." *Sandage*, 548 F.3d at 598.

In the present case, the governmental defendants contend that plaintiff's due-process claim must be assessed under the cases holding that the government violates the Due Process Clause only if it prevents the plaintiff from protecting himself. Plaintiff, in turn, relies on the three-part test. However, as explained below, even under defendants' interpretation of the law, plaintiff has stated a claim based on state-created danger.

The complaint alleges that the law-enforcement defendants increased the danger to protestors such as Huber while cutting off avenues of self-help. According to the complaint, before Rittenhouse killed Huber, Huber and the other protestors were demonstrating in the city park located at 56th and Sheridan, where they were safe from the armed individuals, who had congregated near 60th and Sheridan—four blocks south of the park. The commanders of the law-enforcement presence at the scene of the demonstration then decided to disperse the protest by "funneling" the demonstrators south on Sheridan Road, in the direction of the armed individuals.[2] Such funneling forced the protestors into a "confined area" with the armed individuals, including defendant Rittenhouse. (Am. Compl. ¶ 95.) The allegation of forcing protestors into a confined area with the armed individuals creates a reasonable inference that protestors could not disperse without passing through the area patrolled by the armed individuals and that, once they were in that area, their ability to flee was limited. Due to law enforcement's

---

[2] The complaint does not expressly allege that this decision was made by commanders, but that is a reasonable inference to draw from the complaint, as it is unlikely that a coordinated effort to move a large bloc of protestors would be initiated by anyone other than an officer holding a position of command.

having observed the armed individuals' location earlier in the evening, it is reasonable to infer that the commanders would have known that the armed individuals had gathered near 60th and Sheridan. Further, because Sheriff Beth and Chief Miskinis are alleged to have known that the armed individuals had expressed intentions to harm protestors, it is reasonable to infer that the commanders knew that they were creating a dangerous situation by forcing the protestors and armed individuals to confront each other in a confined area. The risk that members of these antagonistic groups would engage in violence was high, and once violence erupted it would be difficult for protestors to escape or otherwise protect themselves.

This was the situation in the moments before Rittenhouse used his rifle. Once the protestors were in the confined area, Rittenhouse encountered Rosenbaum and shot him dead. Witnesses yelled that Rittenhouse had just shot someone, which caused Huber and others to pursue Rittenhouse and attempt to disarm him so that he could not hurt others in the confined area. (Am. Compl. ¶ 72.) Rittenhouse then killed Huber and wounded Grosskreutz. These acts of violence were a foreseeable result of the defendants' decision to create an explosive situation by forcing protestors into a confined area with hostile armed individuals.[3]

---

[3] Kenosha County and its codefendants represented by the same counsel contend that the complaint does not allege that Huber was a "funneled protestor" or that Rittenhouse was one of the armed individuals awaiting the funneled protestors. However, the complaint alleges that Huber was a protestor on the night he was killed (Am. Compl. ¶¶ 2, 103), and that Rittenhouse was one of the armed individuals who "met" the funneled protestors in the confined area, including Huber (*id.* ¶¶ 70–74, 95). These allegations are sufficient to establish both that Huber was a funneled protestor and that Rittenhouse was one of the awaiting armed individuals.

This case is analogous to *Paine v. Cason*, 678 F.3d 500 (7th Cir. 2012). There, the police arrested a mentally unstable woman for disorderly conduct while she was safely located at Chicago's Midway Airport. The woman spent the night in jail before police released her just before sunset the next day. The police released her into an unfamiliar, high-crime area in which she was likely to attract unwelcome attention. The police did not return her cell phone, so she was unable to easily summon aid. The woman wandered through the neighborhood until she entered a housing project, where she was raped. After being raped, the woman fell from a seven-story window, either because she was trying to escape or was pushed by her attacker. The Seventh Circuit held that the police's decision to both release the woman in a dangerous place while she was unable to protect herself and do nothing to mitigate her risk of harm violated the Due Process Clause. *Id.* at 510. The court observed that the police "might as well have released her into the lions' den at the Brookfield Zoo." *Id.* Thus, the police could be found liable for the woman's harm even though the harm was ultimately perpetrated by a private individual rather than a state actor.

The police conduct alleged in the present case likewise involved placing citizens into a dangerous situation and disabling their ability to protect themselves from private violence. Again, the protestors were safe before the police forced them south on Sheridan, into a confined area with armed individuals who were antagonistic and had expressed the intent to use their rifles on protestors. The protestors had no apparent means of protecting themselves from the armed individuals, and, as alleged in the complaint, their ability to flee was limited. Moreover, the complaint alleges that the law-enforcement officers on the street did not protect protestors from the dangerous situation

17

they created. (Am. Compl. ¶¶ 78–94, 100–06.) Accordingly, I conclude that the complaint states a claim for a due-process violation based on state-created danger.

Defendants resist this conclusion for several reasons. First, they contend that Huber placed himself in danger by remaining on the streets in violation of the emergency curfew that defendants were trying to enforce. However, as discussed above, the complaint alleges facts from which it can reasonably be inferred that, because the police had funneled protestors into a confined area with the armed individuals, Huber had no choice but to enter that confined area. Once he was there, the shooting began, and Huber's ability to flee was limited. The fact that Huber could have left the scene of the demonstrations before the police made the decision to funnel protestors out of the park does not absolve the defendants of liability for what happened as a result of their decision.

Second, defendants contend that they are not liable for Huber's death because they did not force Huber to attempt to disarm Rittenhouse. The defendants essentially contend that Huber's decision to intervene in the shootings was a superseding cause that breaks the chain of causation between their creating a dangerous situation and Huber's death. However, the complaint alleges that Huber attempted to disarm Rittenhouse to prevent him from shooting additional protestors, *i.e.,* that he attempted to avert the very danger that the state allegedly created. (Am. Compl. ¶¶ 72–73.) Having forced the protestors and armed individuals together, blocked means of escape, and withdrawn police protection, the defendants left the protestors no choice but to try and defend themselves. The defendants' alleged failure to protect Huber from the danger they created can thus be viewed as a proximate cause of his death. *See King*, 496 F.3d at 818 (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1209 n. 22 (3d Cir.1996) for the proposition that

18

the state is liable when "the plaintiff was a foreseeable victim of a defendant's acts in a tort sense").[4]

The City of Kenosha and its co-defendants represented by the same counsel also contend that, under *Martinez v. California*, 444 U.S. 277, 284–85 (1980), Huber's injury was too remote or attenuated from their own actions to result in liability under § 1983. In *Martinez*, a 15-year-old girl was murdered by a parolee. Her survivors brought an action against the state officials responsible for the parole-release decision and alleged that the defendants violated the Due Process Clause by releasing the parolee five months before he murdered the girl. The Court held that, "under the particular circumstances of this parole decision," the girl's death was "too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law." *Id.* at 285.

In the present case, however, Huber's death was not so attenuated from defendants' conduct as to relieve them of liability. Huber was killed while the dangerous situation created by defendants was ongoing, not five months later. *See Reed v. Gibson*, 986 F.2d 1122, 1127 (7th Cir. 1993) (finding that two-hour time lapse between creation of dangerous situation and plaintiff's injury was not so attenuated as to fall within the

---

[4] I note that, in an ordinary tort case, the "rescue doctrine" would likely protect a person like Huber from the claim that his act of intervention was a superseding cause of his own injuries. This doctrine applies "when a plaintiff brings a negligence action against a defendant whose actions have placed a third party or the defendant himself or herself in a position of peril." *Karahodzic v. JBS Carriers, Inc.*, 881 F.3d 1009, 1020 (7th Cir. 2018). A rescuer who voluntarily attempts to save the life or secure the safety of another person in peril is protected by the rescue doctrine from a claim of contributory negligence unless the rescuer has acted rashly or recklessly. *Id.* A plaintiff who is injured in a rescue attempt is also allowed to negate a presumption that his intentional act of rescue is the superseding cause of his injuries, thereby allowing him to prove that the defendant's negligence is the proximate cause of his injuries. *Id.*

19

*Martinez* rule). Moreover, in the present case, the defendants played a more significant role in creating the danger than did the parole board in *Martinez*. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1521 (7th Cir. 1990) (finding *Martinez* distinguishable where "the police department played a more significant role in creating the potential danger"). As discussed above, their conduct, as alleged in the complaint, involved forcing protestors into a confined area with hostile, armed individuals, and then failing to protect the protestors from violence perpetrated by the armed individuals. This conduct created a situation akin to the state-crated danger in *Paine*, and in *Paine* the Seventh Circuit did not deem the woman's injuries at the hands of a private party remote from the police's decision to release her into the high-crime neighborhood. If the woman's injuries in *Paine* were not too attenuated from state conduct to relieve the defendants of liability, then neither were Huber's.

What I have said so far is sufficient to permit plaintiff's due-process claim to proceed against the defendants that are municipalities.[5] However, the defendants sued in their personal rather than official capacities, *i.e.*, Sheriff Beth, former Chief Miskinis, and any John Doe defendants who may have created the danger, claim that they are entitled to qualified immunity.

_____

[5] The municipalities do not argue that the due-process claim should be dismissed because the conditions for municipal liability stated in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), are not satisfied. To be sure, the municipalities contend that there can be no *Monell* liability in the absence of a constitutional violation, but I have already found that the complaint adequately alleges a due-process violation based on the decision to funnel protestors. Defendants do not contend that the complaint fails to adequately plead that this decision represented the official policy of the municipalities, and therefore the claims under *Monell* may proceed to discovery.

20

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The doctrine is an affirmative defense. *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). Whether qualified immunity applies turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam). "If either inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted).

Issues of qualified immunity are ordinarily resolved at summary judgment, not on a motion to dismiss. *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022). The Seventh Circuit has made clear that "the motion-to-dismiss stage is rarely 'the most suitable procedural setting to determine whether an official is qualifiedly immune.'" *Id.* (quoting *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020)). That is so because it is often impossible to tell from a complaint whether qualified immunity applies. *Id.* To state a claim for relief, a plaintiff need only include enough facts about their claim "to present 'a story that holds together.'" *Id.* (quoting *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018)). Qualified immunity, by contrast, is a defense that "often depend[s] on the particular facts of a given case." *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000). A plaintiff is not required to anticipate and overcome the defense of qualified immunity by pleading facts that go beyond the short-and-plain statement required by federal notice-

21

pleading standards. *Roldan*, 52 F.4th at 339. Thus, when a defendant asserts a qualified immunity defense via a Rule 12(b)(6) motion, he or she faces "a more challenging standard of review than would apply on summary judgment." *Reed*, 906 F.3d at 549. "Ultimately, dismissal under Rule 12(b)(6) is appropriate based on qualified immunity only when the plaintiffs' well-pleaded allegations, taken as true, do not 'state a claim of violation of clearly established law.'" *Hanson*, 967 F.3d at 590 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)).

A constitutional right is clearly established if "the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). "[T]he clearly established right must be defined with specificity." *City of Escondido v. Emmons*, __ U.S.__, 139 S. Ct. 500, 503 (2019). This means that the court "analyze[s] whether precedent squarely governs the facts at issue, mindful that [a court] cannot define clearly established law at too high a level of generality." *Strand v. Minchuk*, 910 F.3d 909, 917 (7th Cir. 2018).

In the present case, the right at issue is the due-process right to be protected from state-created dangers. The Seventh Circuit has held that this right is clearly established. *Paine*, 678 F.3d at 510 ("It is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution.") The individual defendants contend that they are nevertheless entitled to qualified immunity because the Seventh Circuit, in *Weiland v. Loomis,* criticized some of its own cases in this area. *See* 938 F.3d at 920–21. However, *Weiland* does not question the basic right to be free from state conduct that both endangers a person and disables or undermines "self-help or sources of private assistance." *Id.* at 921. At most, *Weiland* questions whether the Circuit's three-

22

part test is an appropriate tool to use when evaluating a due-process claim based on state-created danger. *Id.* In the present case, I have not employed the three-part test and have instead found that the complaint states a claim based on defendants' creating a danger and then undermining protestors' ability to avoid that danger. This claim falls squarely within the scope of clearly established law as stated in *Paine*, which was not called into question by *Weiland. See Weiland*, 938 F.3d at 921 (recognizing that cases such as *Paine* are more consistent with *DeShaney* than those that use the three-part test).

The individual defendants also contend that events in Kenosha on the night in question were chaotic, and that officers were faced with difficult decisions about how to best control and maneuver the protestors. They contend that plaintiff cannot point to a case that clearly establishes how they were supposed to respond to the specific circumstances they faced. However, this argument is not appropriate at the pleading stage, when the facts about the specific circumstances that the officers faced are not yet established. *Roldan*, 52 F.4th at 339. Moreover, the facts alleged in the complaint create at least a plausible inference that the defendants would have known that their conduct violated the Due Process Clause. The complaint alleges that the individual defendants knowingly funneled protestors into a confined area with hostile armed individuals that had threatened to harm protestors. As far as the complaint reveals, the defendants could have easily funneled protestors in a different direction, such as north on Sheridan Road, to avoid creating this obviously dangerous situation. Thus, as alleged in the complaint, the defendants needlessly and knowingly endangered protestors. Cases such as *Paine* put

23

the individual defendants on notice that their alleged actions were unconstitutional. 678 F.3d at 510.

For the above reasons alone, defendants are not entitled to a Rule 12(b)(6) dismissal on qualified-immunity grounds. However, the complaint also alleges that defendants intentionally sent the protestors into the path of the armed individuals to "deal with" (*i.e.*, use force against) them, because they were hostile to the protestors' social-justice message and racial makeup. (Am. Compl. ¶¶ 7, 94–95, 97, 101, 114, 143, 160.) Because I must accept these allegations as true, I must assume when assessing qualified immunity that the defendants intended to cause unnecessary harm to protestors. It is, of course, clearly established that officers cannot intentionally harm members of the public for no reason (or for malicious reasons). *See, e.g., Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009) ("it is clearly established that officers may not, without provocation, start beating, pepper-spraying, kicking, and otherwise mistreating people standing around a restaurant parking lot"); *Chelios v. Heavener*, 520 F.3d 678, 691–92 (7th Cir. 2008) ("Our prior cases indicate that [i]t is clear . . . that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.'"). Therefore, plaintif's allegations that the individual defendants intended to harm protestors—which I discuss in more detail below—provide an additional reason for denying qualified immunity at this stage of the case.

### 2.    Conspiracy Claims

The plaintiff's remaining federal claims allege violations of 42 U.S.C. §§ 1983, 1985, and 1986. Section 1983 provides a federal damages remedy against state actors who deprive others of federal rights. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675

24

(7th Cir. 2022). Here, the federal rights at issue are the right to equal protection of the laws and the right to be free from governmental retaliation for the exercise of First Amendment rights. As is relevant here, § 1985 provides a damages remedy against public and private parties who conspire to deprive a person or class of persons of equal protection of the laws. 42 U.S.C. § 1985(3); *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1024 (7th Cir. 2000). Section 1986, in turn, provides a remedy against those who fail to intervene to prevent a violation of § 1985.

Plaintiff's claims under these statutes depend on his allegation that law-enforcement officers conspired with the armed individuals at the scene of the protests to use force against demonstrators. The general story told by the complaint is that the law-enforcement officers, motivated by racial animus and dislike for the demonstrators' anti-police message, reached an understanding with the armed individuals that law enforcement would funnel the demonstrators into a confined area with the armed individuals and allow the armed individuals to "deal with" the protestors. The complaint alleges that the conspirators understood "deal with" to mean "collectively use force and state authority against the protestors." (Am. Compl. ¶ 97.) In other words, the alleged conspiracy was to have law-enforcement officers compel the demonstrators and the armed individuals to confront each other in a confined area and to have the armed individuals use force on the protestors. The complaint alleges that, when this conspiracy was carried out, Anthony Huber was one of the protestors and Kyle Rittenhouse was one of the armed individuals. (*Id.* ¶¶ 2, 95 & 97.) The complaint further alleges that the violence perpetrated by Rittenhouse against protestors, including Huber, was the result of this conspiracy. (*Id.* ¶¶ 95, 97.)

25

A conspiracy such as the one alleged in the complaint would violate the Equal Protection Clause of the Fourteenth Amendment because, under that Clause, state officials generally may not engage in racial discrimination or cause harm to a class of persons for reasons unrelated to a legitimate state interest. *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000–01 (7th Cir. 2006). Likewise, the conspiracy would violate the First Amendment, which forbids state retaliation for the exercise of First Amendment freedoms such as the right to free speech and association. *Jones v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). These constitutional violations would be actionable under § 1983. Such a conspiracy would also violate § 1985(3) because its purpose would be to deny a class of persons equal protection of the laws. And any official who knew about the conspiracy but failed to intervene to prevent its members from violating § 1985 would be liable under § 1986.

Defendants move to dismiss these claims for various reasons. Initially, they argue that the complaint fails to adequately allege that the conspiracy existed. Here, defendants contend that the conspiracy allegations do not satisfy Federal Rule of Civil Procedure 8(a) and the plausibility standard of *Twombly* and *Iqbal*. To satisfy these requirements, a complaint must provide defendants with "fair notice of what [they] must defend [themselves] against" and show that "there is some reason to believe [that defendants] could be found liable at the end of the case." *Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020). Importantly, the complaint does not need to include "detailed factual allegations." *Twombly*, 550 U.S. at 555. "Indeed, the allegations do not even need to establish the probability of the plaintiff's recovery." *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 586–87 (2022). Rather, "[t]hey need only present 'enough fact to raise a reasonable

26

expectation that discovery will reveal evidence' of illegal acts." *Id.* (quoting *Twombly*, 550 U.S. at 556).

When alleging the existence of a conspiracy, the plaintiff generally states a claim if he identifies "the parties, the general purpose, and the approximate date of the conspiracy." *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006). However, the complaint's factual allegations must also give rise to a plausible inference that the conspiracy existed—"mere suspicion" is not enough. *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009). To satisfy this plausibility requirement, a plaintiff may plead: (1) "direct allegations of an agreement, like an admission by a defendant that the parties conspired"; or (2) "more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed." *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019).

In the present case, the complaint identifies the parties, the general purpose, and the approximate date of the conspiracy. The parties were the armed individuals and the law-enforcement officers present at the scene, all of whom were under the tactical command of the Kenosha Police Department and the Kenosha County Sheriff's Department. (Am. Compl. ¶¶ 41–46.) As noted, the general purpose was to have the armed individuals use force on protestors after officers funneled the protestors into a confined area with the armed individuals. Finally, the alleged date of the conspiracy was August 25, 2020. (*Id.* ¶ 47.)

The complaint also alleges enough fact to give rise to a plausible inference that the conspiracy existed. The complaint alleges that, prior to the shootings, law-enforcement officers on the scene communicated with the armed individuals, praised their

27

actions, and offered them assistance, such as water. (Am. Compl. ¶¶ 81–83, 86–90.) These allegations suggest that law-enforcement officers at the scene had the opportunity to coordinate their actions with the armed individuals. Further, the complaint alleges that one of the armed individuals admitted to coordination with law enforcement. According to the complaint, this individual was interviewed and said that law-enforcement officers told the armed individuals that officers intended to "push" protestors in their direction and allow them to "deal with" the protestors. (*Id.* ¶ 94.) For purposes of deciding the motion to dismiss, I must accept this allegation as true. Moreover, because at the pleading stage plaintiff is entitled to have all reasonable inferences drawn in his favor, *e.g., Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022), I must assume that this individual was telling the truth, and that the officer or officers who spoke to this armed individual had expressed the actual intentions of the law-enforcement agencies. Finally, because funneling large numbers of protestors requires coordination, it is reasonable to infer that the commanders of the law-enforcement presence at the scene were involved in the conspiracy. This means that the complaint alleges enough fact to render plausible the idea that Sheriff Beth and Chief Miskinis were involved, and that they were implementing the official policy of their respective municipalities.[6]

Defendants describe as "absurd" the idea that law enforcement would conspire to drive protestors to harm at the hands of armed civilians. (ECF No. 42 at 10.) While I agree

---

[6] A municipality is liable for a constitutional violation when it is committed by an individual with final policymaking authority. *See, e.g., Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022). Here, Sheriff Beth and former Chief Miskinis are alleged to have been policymakers (Am. Compl. ¶¶ 16–17), and therefore their involvement in the conspiracy would establish liability for the City of Kenosha and Kenosha County.

28

that such a conspiracy is unlikely, I cannot say that these allegations are so fantastic that I may ignore the complaint's factual allegations and dismiss the conspiracy allegations as frivolous or entirely implausible. *See Twombly*, 550 U.S. at 556 ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely'"); *Loubser*, 440 F.3d at 441 (refusing to dismiss conspiracy allegations even though it was "highly improbable" that they had merit). Plaintiff has pleaded some evidence that the conspiracy existed, such as the admission by one of the alleged conspirators that it did. This is more than most plaintiffs can allege, as the details of a conspiracy are usually kept secret, leaving the plaintiff to rely on circumstantial evidence. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010); *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985). Accordingly, I must accept the conspiracy allegations for now. In later stages of this case, defendants will have the opportunity to marshal their own evidence and to show that plaintiff cannot prove his conspiracy allegations.

Defendants also raise the causation argument that they raised in the context of the due-process claim. They contend that because the conspirators did not plan for Anthony Huber to attempt to disarm Rittenhouse, and for Rittenhouse to respond by shooting him, the conspiracy did not cause Huber's death. But as I explained above, it was foreseeable that forcing protestors and armed individuals together in a confined area would lead to confrontations, and that if such confrontations erupted demonstrators would attempt to defend themselves. Moreover, the conspiracy allegations go further than the due-process allegations, in that they allege that the express purpose of the funneling was to foment a violent confrontation between protestors and armed individuals. Thus, as alleged, Huber's

death was directly caused by the conspiracy, in that it occurred while Rittenhouse was "dealing with" the protestors in the confined area. (Am. Compl. ¶¶ 94–95.)

Because the complaint adequately alleges that defendants conspired to harm protestors for illegitimate reasons, it states a claim for violation of the Equal Protection Clause. Defendants raise the issue of whether plaintiff may proceed with an Equal Protection claim based on membership in a definable class or as a "class of one." (ECF No. 40 at 9–11.) However, "the number of individuals in a class is immaterial for equal protection analysis." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 n.* (2000). Here, the important point is that the complaint adequately alleges that law enforcement and the armed individuals conspired to treat a class of which Anthony Huber was a member (the funneled demonstrators) unfavorably for reasons unrelated to a legitimate state interest. Thus, Sheriff Beth, former Chief Miskinis, and the municipalities, all of whom were acting under color of state law, may be liable for this equal-protection violation under § 1983.

Plaintiff's remaining conspiracy claims are for First Amendment retaliation and violation of § 1985. To succeed on the retaliation claim, plaintiff must ultimately prove the following: (1) Anthony Huber engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) causation—specifically, that "the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *FKFJ, Inc. v. Vill. Of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) (quoting *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020)). Here, there is no dispute that Huber engaged in protected activity by "participating in protests against police violence." (Am. Compl. ¶ 2.) Moreover, the complaint pleads that he suffered a deprivation that would likely deter First

30

Amendment activity in the future, namely, being forced into a confined area with armed counter-protestors who had conspired with law enforcement to harm demonstrators. (*Id.* ¶ 160.) Finally, the complaint alleges that one of defendants' motivations for taking this action was retaliation against the protestors for expressing "viewpoints critical of police." (*Id.*) Thus, the complaint states a claim for First Amendment retaliation.

As for § 1985, plaintiff cites both § 1985(2) and § 1985(3) in his complaint. However, § 1985(2) applies only to conspiracy claims involving the obstruction of justice in a state or federal court. *See Kush v. Rutledge*, 460 U.S. 719, 724–25 (1983). Because plaintiff's complaint contains no allegations of any such conduct, it does not state a claim under § 1985(2). I therefore focus on § 1985(3), which requires a plaintiff to allege "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1024 (7th Cir. 2000).

The analysis above shows that elements (1), (3), and (4) have been alleged. To establish the second element—that the purpose of the conspiracy was to "deprive a person or class of persons of equal protection of the laws"—plaintiff must allege "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102, (1971). Defendants contend that this element is not satisfied because plaintiff does not allege that Anthony Huber was a member of a protected class. (ECF No. 40 at 7–9.) However, this element does not require that the injured party be a member of a racial minority or other protected class. Rather, § 1985(3) extends protection to those who *support* members of the

31

protected class and are injured for that reason. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 n.2 (1993) (noting that "a racial conspiracy against blacks does not lose that character when it targets in addition white supporters of black rights"); *United Bhd. of Carpenters & Joiners, v. Scott*, 463 U.S. 825, 836 (1983) ("The predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes *and their supporters*." (Emphasis added)). Here, the complaint alleges that Huber was protesting "Kenosha's pattern of racist and violent behavior by police officers and other officials" and was targeted for that reason. (Am. Compl. ¶ 2.) Further, the complaint alleges that defendants' conduct was motivated by racial animus. (*Id.* ¶ 150.) These allegations are sufficient to state a claim for violation of § 1985(3).

Before moving on to plaintiff's state-law claims, I briefly address defendants' arguments concerning plaintiff's failure-to-intervene claims and his claims against the unknown (John Doe) defendants. Regarding failure to intervene, defendants initially argued that plaintiff did not state a claim under § 1986 because a claim under that statute is derivative of a claim under § 1985 and plaintiff had failed to state a claim under § 1985. Because I have found that the complaint states a claim under § 1985, defendants' argument for dismissing the § 1986 claim must fail. However, in response to defendants' argument for dismissal of the § 1986 claim, plaintiff noted that he intends to bring a claim for failure to intervene under § 1983. In reply, defendants argue that plaintiff is bound by his citation to § 1986 in the complaint and cannot now assert a failure-to-intervene claim under § 1983. But this is incorrect. A plaintiff is not required to plead legal theories, and even when he does, he can later alter them. *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 540–41 (7th Cir. 2018); *Chessie Logistics Co. v. Krinos Holdings, Inc.*,

32

867 F.3d 852, 859 (7th Cir. 2017). Thus, plaintiff is free to pursue failure-to-intervene claims under either § 1983 or § 1986.

In the context of the failure-to-intervene claims and the claims against the John Does, defendants also contend that the complaint fails to satisfy the "fair notice" requirement of Rule 8(a) because it does not attribute specific conduct to particular defendants. I think that defendants are generally correct on this point insofar as it applies to the Does and the failure-to-intervene claims. The complaint does not narrate a claim for relief against any Doe defendant or show that any specific person had an opportunity to intervene to prevent another person from violating protestors' federal rights. However, at this stage of the case, that is to be expected, as without discovery plaintiff is unable to identify specific officers who committed specific acts in furtherance of the conspiracy or determine whether any officer who did not join the conspiracy had an opportunity to intervene. After plaintiff has had a chance to conduct reasonable discovery, he may be able to amend the complaint to fill in these details. Thus, although at this point the complaint does not state a claim for failure to intervene against anyone or a claim against a John Doe defendant, I understand the complaint's naming Doe defendants and its allegations regarding failure to intervene as mere placeholders for claims that may be asserted after discovery. Because the Seventh Circuit generally permits the practice of naming placeholders, I do not think it is appropriate to dismiss the Does or the failure-to-intervene "claims" until plaintiff has had a chance to conduct reasonable discovery. *See*

*Rodriguez v. McCloughen*, 49 F.4th 1120, 1121 (7th Cir. 2022); *Pain Ctr. of SE Ind. LLC v. Origin Healthcare Solutions LLC*, 893 F.3d 454, 459 (7th Cir. 2018).[7]

### 3.      State Law Claims

Plaintiff's state-law claims generally allege that the governmental defendants and Rittenhouse are liable for Anthony Huber's injuries under state tort law. Plaintiff has organized these claims into counts under headings that reflect specific legal theories, such as negligence, intentional infliction of emotional distress, and wrongful death. Overall, plaintiff's negligence claims against the governmental defendants can be likened to his due-process claim based on state-created danger, in that plaintiff essentially alleges that law enforcement acted negligently or recklessly in funneling protestors into a confined area with hostile armed individuals. Plaintiff's intentional-tort claims can be likened to his federal conspiracy claims, in that plaintiff is seeking recovery for defendants' intentionally creating a dangerous situation that was intended to cause harm to protestors such as Huber.

The governmental defendants raise a variety of grounds for dismissing these claims. First, they contend that Wisconsin's "public policy factors" should be applied to preclude their liability on any tort claim. These are judicial policy considerations that function like a proximate cause analysis. *Burton v. E.I. du Pont de Nemours & Co.*, 994

---

[7] Nothing I have said in this opinion is meant to imply that a claim against a substituted defendant will benefit from the original filing date of this action for purposes of the statute of limitations. *See Rodriguez*, 49 F.4th at 1121 (explaining that "a plaintiff who uses placeholders must take account of the clock: substitution must be completed before the statute of limitations expires").

34

F.3d 791, 829 (7th Cir. 2021).[8] "[W]hen a court precludes liability based on public policy factors, it is essentially concluding that despite the existence of cause-in-fact, the cause of the plaintiff's injuries is not legally sufficient to allow recovery." *Id.* (quoting *Fandrey v. Fandrey ex rel. Connell v. Am. Family Mut. Ins. Co.*, 680 N.W.2d 345, 353 (Wis. 2004)). However, as I explained above when discussing causation in the context of plaintiff's constitutional claims, defendants' funneling protestors into a confined area with hostile armed individuals could be regarded as the proximate cause of Huber's death. Again, it was foreseeable that a protestor would attempt to disarm an armed individual who had apparently opened fire on the crowd. Thus, I will not dismiss any claim based on public policy.

Relatedly, some defendants contend that plaintiff's negligence claims should be dismissed because the complaint establishes that Huber was more negligent than them as a matter of law. This argument again relies on matters raised in connection with the causation elements of plaintiff's federal claims. Defendants argue that because Huber chose to confront and attempt to disarm Rittenhouse, he was more negligent as a matter of law. However, as I noted when discussing the constitutional claims, the rescue doctrine potentially applies to this case. Under that doctrine, conduct which might otherwise be considered contributory negligence may not be so considered when a person is injured while attempting to save others from imminent danger of personal injury or death. *Cords*

---

[8] The factors are: (1) is the injury too remote from the defendant's conduct? (2) is the plaintiff's injury disproportionate to the defendant's culpability? (3) is it too extraordinary, in hindsight, that liability would attach here? (4) is the potential liability too burdensome for the defendant? (5) will imposing liability open the way to fraudulent claims? and (6) is there a sensible or just stopping point to the theory of liability? *Burton*, 994 F.3d at 829.

*v. Anderson*, 80 Wis. 2d 525, 542–43 (1977). Here, the complaint alleges that Huber died while attempting to prevent Rittenhouse from shooting other protestors (Am. Compl. ¶¶ 72–73), so the doctrine may apply. In any event, until the facts regarding the parties' actions are established through further proceedings, the court cannot weigh the parties' respective degrees of fault.

Next, defendants contend that plaintiff's claims for intentional and negligent infliction of emotional distress should be dismissed because John Huber was not present at the scene and the complaint does not allege that Anthony Huber suffered emotional distress before his death. In his brief, plaintiff clarifies that these claims are brought on behalf of Anthony Huber's estate only, and not on behalf of himself. (ECF No. 68 at 30 of 32.) Thus, defendants' first argument is moot. As to the second, the complaint expressly pleads that Anthony Huber suffered emotional distress. (Am. Compl. ¶¶ 205 & 210.) Therefore, I will not dismiss these claims.

Defendants next contend that they are entitled to discretionary immunity under Wis. Stat. § 893.80(4). This is an affirmative defense that plaintiff was not required to anticipate and plead around, so I may dismiss claims on this basis only if the complaint pleads all the ingredients of an impenetrable defense. *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). It does not. State-law immunity is subject to two exceptions that could potentially apply in this case: an exception for intentional conduct, and an exception for failure to address a known danger. *Pries v. McMillon*, 314 Wis. 2d 706, 716–17 (2008). The exception for intentional conduct could apply to plaintiff's intentional-tort claims, and the known-danger exception could apply to plaintiff's

36

negligence claims based on state-created danger. Until the facts are further developed, I cannot determine whether discretionary immunity applies.

The defendants who are municipalities seek dismissal of all intentional-tort claims against them under the part of Wis. Stat. § 893.80(4) that grants immunity to municipalities for the intentional torts of their employees. Plaintiff concedes that the municipalities are immune from liability for intentional torts (ECF No. 47 at 43 n.9), and therefore the intentional-tort claims against the municipalities will be dismissed.

Next, the municipal defendants other than Kenosha County seek dismissal of all state-law claims against them based on plaintiff's failure to comply with Wisconsin's notice-of-claim statute, Wis. Stat. § 893.80(1d). This argument depends on facts outside the pleadings—whether plaintiff served a notice-of-claim within the prescribed time—and therefore generally cannot be resolved on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). However, plaintiff concedes that his state-law claims against Racine County, Walworth County, Sauk County, Washington County, Waukesha County, the Village of Menomonee Falls, and the City of West Allis may be dismissed for failure to comply with the notice-of-claim statute. (ECF No. 47 at 46.) I will therefore dismiss the state-law claims against these defendants.

Finally, defendants point out that plaintiff purports to bring a claim for indemnification under Wis. Stat. § 895.46, which requires public entities to pay tort judgments that arise out of their agents' employment, and that this claim cannot proceed because Wisconsin law does not allow an injured party to bring a direct action against the public entity. Plaintiff has not responded to this argument, and therefore I regard him as conceding that dismissal of the indemnification claim is appropriate.

#### 4. Conclusion Regarding Governmental Defendants

In sum, I conclude that, based on the facts alleged in the complaint, plaintiff has stated claims for relief against the governmental defendants under two broad theories: (1) their funneling protestors, including Anthony Huber, into a confined area with the hostile armed individuals and failing to protect them from the resulting dangerous situation, and (2) their entering into a conspiracy with the armed individuals under which the armed individuals were to use force on protestors. Under these theories, Anthony Huber's death could plausibly be regarded as having been proximately caused by the actions of the governmental defendants.

### B. Kyle Rittenhouse's Motion to Dismiss

Kyle Rittenhouse moves to dismiss the complaint on two grounds. First, he contends that service of process was insufficient and that therefore the case should be dismissed (or service should be quashed). *See* Fed. R. Civ. P. 12(b)(5). Second, and in the alternative, he seeks dismissal of the claims against him on the merits under Rule 12(b)(6).

#### 1. Motion to Dismiss for Insufficient Service

The central issue raised by this motion is whether plaintiff satisfied Federal Rule of Civil Procedure 4(e)(2)(B), which provides that a plaintiff may serve a defendant by "leaving a copy [of the summons and complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." More precisely, the issue is whether the place where service was made was Rittenhouse's "dwelling or usual place of abode." (There is no dispute that the summons and complaint were left with someone of suitable age and discretion who resided at the place of service.)

38

The facts surrounding plaintiff's attempts to serve Rittenhouse are as follows. When the case was filed, Rittenhouse was not initially named as a defendant because he was still facing criminal charges for shooting Huber and the other two men. On January 7, 2022, following conclusion of the criminal case, plaintiff sought leave to file an amended complaint naming Rittenhouse as a defendant. I granted such leave, and the amended complaint was filed on February 2, 2022. At that point, plaintiff began investigating Rittenhouse's whereabouts so that personal service could be achieved. Plaintiff's initial efforts were extensive. (*See* ECF Nos. 45-1 & 48-1.) After plaintiff's attorneys learned that Rittenhouse no longer resided in Illinois, they began searching public records to identify his new address and asked a private investigator to get involved. Plaintiff contacted an organization with which Rittenhouse was associated, monitored his social media for clues as to his whereabouts, and, after learning that he might be attending Arizona State University, hired investigators in Arizona to track him down. Despite making extensive efforts, the Arizona investigator was unable to find Rittenhouse.

Plaintiff's counsel then asked another private investigator, Mort Smith, to locate Rittenhouse. Smith describes his efforts in a declaration. (ECF No. 68-1.) After identifying several potential addresses for Rittenhouse in public databases, Smith traveled to seven different locations in the United States. Smith visited homes in Nevada, Iowa, Nebraska, Wisconsin, and Illinois without success. Rittenhouse had never lived at most of these locations, and it appeared to Smith that someone had been deliberately "seeding" incorrect addresses for Rittenhouse in public databases to prevent detection of his true residence. (Smith Decl. ¶ 12.) Between May 3 and June 30, 2022, Smith spent over 100 hours looking for Rittenhouse. (*Id.* ¶ 21.)

39

Eventually, Smith determined that Rittenhouse had at one point lived with his mother, Wendy Rittenhouse, and sister, Faith Rittenhouse. Smith therefore began searching for locations associated with these women and discovered that they lived at an address in Kissimmee, Florida. On June 30, 2022 at 11:00 a.m., Smith arrived at the home in Florida. When he knocked on the door, a woman who appeared to be over 18 answered. This was Faith Rittenhouse, Kyle's sister. Smith asked Faith if Kyle "was home," and she said no. (Smith Decl. ¶ 17.) Smith then asked Faith if Wendy was home, and she said no and identified herself as Wendy's daughter Faith. Smith asked Faith "when Kyle would be home," and Faith said that she was not sure. (*Id.*) Smith told her that he had some court documents for Kyle and asked if she would give them to him "when he returned home." (*Id.*) Smith states that Faith agreed to accept the documents for Kyle, and that she never told him that Kyle did not live at the residence. Smith considered this interaction to have resulted in proper abode service, and plaintiff filed proof of service based on this service attempt later that day. (ECF No. 53.)

Service of process at the Florida residence apparently resulted in Rittenhouse's receiving actual notice of this suit, for on July 20, 2022, Rittenhouse's counsel filed a notice of appearance. (ECF No. 54.) However, in his motion to dismiss, Rittenhouse disputes that the address where service was made was his dwelling or usual place of abode. Although Rittenhouse concedes that the address is the home of his mother and sister, he denies residing there. (Rittenhouse Decl. ¶¶ 2–3, ECF No. 61-2.) He contends that he "maintain[s] a residence in a State other than Florida and did so when service was attempted." (*Id.* ¶ 4.) He does not identify the state in which he contends he now lives, or where he lived at the time of this service attempt. Rittenhouse also states that, during the

40

last year, he visited the residence in Florida and spent roughly 20 to 30 nights sleeping on the couch. He denies having a bed at the home and denies keeping clothes or belongings at the home.

Faith Rittenhouse has submitted declarations in which she disputes Mort Smith's account of his service attempt. (ECF Nos. 61-1 & 75-1.) According to her, when she answered the door, Smith asked her if she was Wendy, and she said no and that she was Wendy's daughter. Faith states that Smith then handed her a stapled document, said "give this to your brother," and walked away. (ECF No. 61-1 ¶ 4.) She states that Smith did not ask her whether Kyle was home or when he would be home. (ECF No. 75-1 ¶ 3.) Faith denies agreeing to give the documents to Kyle. (*Id.* ¶ 6.)

The parties' submissions show that there are factual disputes relating to the service attempt. However, no party has asked that I hold an evidentiary hearing. When a district court is asked to decide questions of personal jurisdiction without holding a hearing, "the plaintiff 'need only make out a *prima facie* case of personal jurisdiction.'" *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (quoting *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir.2002)). "In evaluating whether the prima facie standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Id.* (quoting *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir.1983)). [9]

---

[9] The *Purdue* case involved a motion to dismiss for lack of personal jurisdiction based on a lack of minimum contacts with the forum. 338 F.3d at 780. The present case involves a motion to dismiss for insufficient service of process, which is an aspect of personal jurisdiction. Rittenhouse does not dispute that *Purdue* provides the relevant procedural rules for resolving evidentiary disputes that arise in the context of a motion to dismiss for

41

I conclude that the facts described in Mort Smith's declaration establish a prima facie case that the place of service was Kyle Rittenhouse's dwelling or usual place of abode at the time of service. According to Smith, he asked Faith whether Rittenhouse "was home" and when he "would be home." A reasonable person who answers a door and is asked these questions would think that the questioner is under the impression that the subject of these inquires resides at the location. If the subject does not live at the location, the person who answers the door would usually say so. But according to Smith, Faith did not indicate that Kyle did not live at the residence and instead answered his questions in a way that implied he resided there: she said that Kyle was not home and that she was not sure when he would be home. Faith's responses give rise to a reasonable inference that Faith, at least, believed that Kyle resided at the home. Further, because Faith is Kyle's sister and resides at the home, it is reasonable to infer that, if she thought he lived there, he in fact lived there. Although Kyle Rittenhouse disputes that he resided at the home and Faith disputes Smith's account of their conversation, at this point I must accept plaintiff's witness's version of the facts as true. Thus, plaintiff has made out a prima facie case of valid abode service, and Rittenhouse's motion to dismiss for insufficient service will be denied.

The fact that plaintiff has made out a prima facie case does not mean that the issue of proper service has been definitively resolved. Rather, the prima facie case merely allows the issue to proceed to discovery. *See Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000).

_____

insufficient service of process. He has not proposed an alternative approach and, as I've said, he has not requested an evidentiary hearing.

Eventually, Rittenhouse may renew his motion to dismiss and demand an evidentiary hearing on the disputed factual issues. However, I wish to make clear that, if at any time it is determined that the service attempt on June 30, 2022 did not result in sufficient service of process, I will grant plaintiff an extension of time to complete service and allow him to make additional service attempts. Rule 4(m) of the Federal Rules, which normally requires service to be completed within 90 days after the complaint is filed, allows me to extend the time for service even if the plaintiff does not show good cause. *See United States v. McLaughlin*, 470 F.3d 698, 700 (7th Cir. 2006). But here, there is undoubtedly good cause for extending the time for service for as long as it takes to properly serve Rittenhouse. Plaintiff has made extensive efforts to serve him. He engaged three professional investigators who have spent more than 100 hours searching for Rittenhouse all over the country. Rittenhouse, in contrast, is almost certainly evading service. The length of time that it has taken professional investigators to complete service is itself evidence of this fact. *See id.* (noting that inability of professional process servers to locate defendant is evidence of evasion). Further, Rittenhouse has been deliberately cagey about his whereabouts. Although he denies living in Florida, he does not identify the place that he deems to be his residence. Instead, he claims only that he maintains a residence "in a State other than Florida." (ECF No. 61-2.) Such a vague statement indicates that Rittenhouse is trying to ensure that plaintiff is not able to locate him. When a defendant is evading service, there is good cause for extending the time to complete service. *Coleman v. Milwaukee Bd. of Sch. Dirs.*, 290 F.3d 932, 934 (7th Cir. 2002).

Moreover, Rittenhouse could not be prejudiced by any delay in completing service. The purpose of the time limit for service is to provide the defendant with notice of the

43

action and allow him to begin investigating his defense while memories of witnesses are fresh. *McLaughlin*, 470 F.3d at 701. It is obvious that the service attempt at the Florida home achieved this purpose, as Rittenhouse entered an appearance in this case within 20 days of that attempt. Rittenhouse was thus able begin his defensive efforts. At this point, proper service is a mere formality, and although it must be achieved, Rittenhouse could not be prejudiced by extending the service window for as long as is necessary to achieve it. Indeed, if Rittenhouse were concerned about a lengthy delay in completing service, he could simply instruct his counsel to accept service on his behalf or to provide an address for service to plaintiff's investigator.

## 2. Motion to Dismiss for Failure to State a Claim

Rittenhouse's motion to dismiss the complaint on the merits raises many of the same issues that I discussed in connection with the motion to dismiss filed by the governmental defendants. I therefore provide only a short discussion of his arguments.

On the federal claims, Rittenhouse's principal argument is that, as a private citizen, he was not acting under color of law for purposes of liability under 42 U.S.C. § 1983. However, as discussed above, the complaint alleges that the police and armed individuals had entered into a conspiracy to funnel protestors into a confined area, at which point the armed individuals would "deal with" the protestors by using force. As explained above, this conspiracy, if it existed, would have deprived the funneled protestors, including Huber, of their rights under the Equal Protection Clause and the First Amendment. If Rittenhouse were a part of this conspiracy, he would face liability under § 1983. *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (private citizen can act under color of law if there is "evidence of a concerted effort between a state actor and that individual"). Here,

44

Rittenhouse claims that the complaint does not adequately plead that he was part of any such conspiracy. But, as discussed above, the conspiracy involving law enforcement and the armed individuals is adequately pleaded. Moreover, because the complaint alleges that Rittenhouse was one of the armed individuals (Am. Compl. ¶¶ 3–5), and that the violence he perpetrated was part of the plan to harm protestors (*id.* ¶¶ 94–95, 97), the complaint adequately pleads that Rittenhouse was part of this conspiracy.

Rittenhouse argues that he shot Huber because Huber attempted to disarm him, not because of any plan to deprive protestors of their constitutional rights. However, the complaint pleads that the violence perpetrated by Rittenhouse was part of the conspiracy. (Am. Compl. ¶¶ 94–95.) Thus, I must assume that, when Rittenhouse opened fire on Rosenbaum, he was carrying out the alleged plan to harm protestors. (*Id.* ¶ 68.) As discussed above in the context of causation, once Rittenhouse began using violence on protestors in the confined area, he should have reasonably expected protestors to defend themselves. The harm to Huber that occurred while he attempted to disarm Rittenhouse could thus be viewed a direct result of the conspiracy.

For these reasons, the claims against Rittenhouse under § 1983 may proceed. Likewise, because the complaint adequately alleges that Rittenhouse was part of a conspiracy with state actors to deprive protestors of their equal-protection rights, plaintiff's claim against him under 42 U.S.C. § 1985(3) may proceed.[10]

---

[10] Plaintiff concedes that he is not pursuing a failure-to-intervene claim against Rittenhouse (ECF No. 68 at 16 n.4), so to the extent that the complaint could be construed as attempting to state such a claim under either § 1983 or § 1986, it will be dismissed.

Rittenhouse also moves to dismiss the state-law claims against him. In general, however, there can be no dispute that the complaint states a valid tort claim. The complaint alleges that Rittenhouse unjustifiably caused Huber's death, which is sufficient to state a claim against him for compensation for causing this harm. A plaintiff is not obligated to organize his complaint into "counts" or to identify legal theories, *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1077–78 (7th Cir. 1992), and, as discussed above, even if a plaintiff chooses to plead legal theories, he is not bound by those theories and may change them later in the case, *BRC Rubber & Plastics, Inc.*, 900 F.3d at 540–41. Thus, it is not necessary to determine the precise legal theory under which plaintiff could recover damages from Rittenhouse. However, it is obvious that plaintiff could seek recovery for wrongful death under a theory of civil battery. The Wisconsin Supreme Court has identified the elements of civil battery as: (1) the unlawful use of force or violence upon another; (2) the intentional direction of such force or violence at the person of another; and (3) the sustaining of bodily harm by the person against whom such force or violence is directed. *Michelle T. v. Crozier*, 173 Wis. 2d 681, 685 n.4 (1993). Rittenhouse will likely raise the affirmative defense of self-defense, but whether he may avoid civil liability based on this defense is not something that may be resolved on the pleadings. *See Xechem*, 372 F.3d at 901; *see also* Wisconsin Jury Instructions–Civil, 2006 (2013) (noting that defendant in a civil case has the burden to prove self-defense).

Rittenhouse notes that the complaint alleges a count for negligence, and it is questionable whether Rittenhouse's intentional conduct could result in liability for negligence. However, at this stage of the case, it is conceivable that the facts will develop in a way that allows a jury to conclude that Rittenhouse acted negligently rather than

46

intentionally.[11] Thus, I will not "dismiss" the negligence "claim," which is only an alternative legal theory for holding Rittenhouse liable for the harm he caused to Huber.

## III. CONCLUSION

To sum up, the complaint adequately pleads federal and state claims against the governmental defendants and Rittenhouse, and for that reason defendants' motions to dismiss under Rule 12(b)(6) will largely be denied. However, I will dismiss the claims under 42 U.S.C. § 1985(2) against all defendants; any failure-to-intervene claims against Rittenhouse; any state-law claim for an intentional tort against a municipality based on Wis. Stat. § 893.80(4); all state-law claims against Racine County, Walworth County, Sauk County, Washington County, Waukesha County, the Village of Menomonee Falls, and the City of West Allis for failure to comply with Wis. Stat. § 893.80(1d); and plaintiff's claim for indemnification. Further, because plaintiff has established a prima facie case of proper service of the summons and complaint on Rittenhouse, Rittenhouse's motion to dismiss under Rule12(b)(5) will be denied.

Accordingly, **IT IS ORDERED** that all defendants' motions to dismiss under Rule 12(b)(6) (ECF Nos. 39 & 41) are **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Rittenhouse's motion to dismiss for insufficient service of process (ECF No. 61) is **DENIED**.

---

[11] Rittenhouse also contends that the complaint does not plead that Rittenhouse owed a "duty" to Huber, but under Wisconsin law every person owes a duty to every other person to use reasonable care. *Megal v. Green Bay Area Visitor & Convention Bureau*, 274 Wis. 2d 162, 178 (2004).

Dated at Milwaukee, Wisconsin, this 1st day of February, 2023.

/s/Lynn Adelman
LYNN ADELMAN
United States District Judge

48