IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| JOHN HUBER, in his individual capacity and as Personal Representative of the ESTATE OF ANTHONY HUBER, | ) ) ) ) ) | Case No. 21-cv-00969-LA |
| *Plaintiff*, | ) ) | Hon. Lynn Adelman District Judge |
| v. | ) ) | |
| DAVID G. BETH, in his individual and official capacity as Kenosha County Sheriff, *et al.*, | ) ) ) ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

| | | |
|---|---|---|
| PAUL HENRY PREDIGER, | ) ) | Case No. 21-cv-01192-LA |
| *Plaintiff*, | ) ) ) | (Consolidated with Case No. 21-cv-00969-LA) |
| v. | ) ) | Hon. Lynn Adelman |
| THE CITY OF KENOSHA, *et al.*, | ) ) ) | District Judge |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

**PLAINTIFFS' MOTION TO COMPEL THE CITY OF KENOSHA
TO PRODUCE MISSING SQUAD VEHICLE VIDEOS FROM EVENTS
RELATED TO RITTENHOUSE SHOOTING, AND SUPPLEMENT
<u>INTERROGATORY RESPONSE</u>**

Plaintiffs, by and through their counsel, respectfully moves the Court to order the City of Kenosha ("City"), pursuant to Federal Rule of Civil Procedure 37(a)(3)(B)(iii) & (iv), to complete its production and supplement its answer in response to Request for Production No. 9 and Interrogatory No. 8 related to missing squad vehicles from the events surrounding the Rittenhouse

1

shooting of Plaintiffs.

## INTRODUCTION

Plaintiffs move this Court to order the City to complete its production and supplement its answer in response to their May 23, 2023 discovery requests. Despite several months of conferences, agreements, more conferences, and specific follow-up, the City of Kenosha has neither completed its production in response to Request No. 9 (video/audio recordings), nor provided a responsive answer to Interrogatory No. 8 (lost, discarded, or destroyed videos/audio recordings). The production includes key missing squad vehicle videos from Kenosha police officers between August 24-26, 2020.

While Plaintiffs do not question the integrity of City's counsel, it has become evident that their client, the City, has failed to search for and produce highly relevant materials, or admit that the documents have been lost, discarded, or destroyed. Plaintiffs thus ask the Court to order that within fourteen days the City complete its production of outstanding materials and supplement its response to Plaintiffs interrogatory—*i.e.*, produce any squad vehicle video, or certify that such video has been lost or destroyed, and provide a clear interrogatory response on the issue—and to submit confirmation to Plaintiffs and the Court that it has done so, and order any other such relief as may be appropriate to secure the City's compliance.

## STATEMENT OF FACTS

**A. The Events of August 25, 2020**

On August 25, 2020, Plaintiff Paul Prediger was shot, and Plaintiff John Huber's son, Anthony Huber, was shot and killed by Defendant Kyle Rittenhouse in Kenosha, Wisconsin. *See* Dkt. 27 ¶74.[1] Huber and Prediger were participating in protests against the police shooting of a

---

[1] Plaintiffs Huber and Prediger filed separate complaints, which are now consolidated. For simplicity, this motion describes the complaint in the context of Plaintiff Huber's Complaint.

Black man named Jacob Blake two days earlier. *Id*. ¶2. During the course of the protests, the Law Enforcement Defendants (including Kenosha Police officers), monitored and controlled those protests. They issued a curfew order, they modified it to an earlier time, they arrested demonstrators for violating the curfew order, they used tear gas and rubber bullets to control the protests and disperse demonstrators when and how they saw fit, and they chose which individuals and groups to enforce the curfew against. *Id* ¶¶37-40, 84, 119.

On the night Huber was killed and Prediger was shot, demonstrators had gathered at a park near 56th and Sheridan. *Id* ¶96. The Law Enforcement Defendants forced the demonstrators out of the park, and deliberately funneled them south into a confined area near 60th and Sheridan, where the Law Enforcement Defendants knew that pro-police armed individuals were waiting. *Id.* ¶¶95-97.

Anthony and Paul were demonstrators, *see id.* ¶2, and Rittenhouse was one of the armed individuals patrolling the streets of Kenosha. *Id.* ¶58. So, the Law Enforcement Defendants forced Plaintiffs and other demonstrators toward Rittenhouse, causing the fatal confrontation.

By that time, the Law Enforcement Defendants had already authorized the armed individuals to patrol the streets and coordinated with them about the funneling of protestors toward the armed individuals. That night, a Kenosha Police Sergeant sent a message to all officers noting the presence of armed individuals patrolling the streets in violation of the curfew. An additional message was sent instructing that the armed individuals were "very friendly" and were not to be detained or dissuaded. *Id.* ¶¶81, 83. When the Law Enforcement Defendants learned that armed individuals had slashed tires in the area, they not only failed to investigate, they condoned the behavior: one of the Law Enforcement Defendants quipped to his colleagues "Gotta love counter protestors. Slashing tires." *Id.* ¶¶84, 85.

The Law Enforcement Defendants not only authorized the armed individuals to patrol the streets, they directly coordinated with them in funneling the protestors to the armed individuals with the express purpose of creating a confrontation between unarmed demonstrators against police violence and armed individuals supportive of the police. *Before the shootings*, one of the armed individuals revealed the thrust of the communications and coordination between the Law Enforcement Defendants and the armed individuals supporting them: "You know what the cops told us today? They were like, 'We're gonna push 'em down by you, 'cause you can deal with them, and then we're gonna leave." *Id.* ¶94. Indeed, Law Enforcement Defendants could be seen talking to Rittenhouse and other armed individuals; the officers communicated their full support to Rittenhouse and the other armed individuals, thanked them, and offered them water and other supplies. *Id.* ¶¶86-90. Fifteen minutes later, after the demonstrators had been pushed out of the park and forced south down Sheridan toward Rittenhouse and the other armed individuals, just as the plan had been, Huber was dead and Prediger was wounded. *See Id.* ¶¶86, 95-98.

The deadly consequences of the confrontation the Law Enforcement Defendants deliberately orchestrated were entirely foreseeable. In fact, not only were the consequences obvious, but they had also been made clear in social media posts responding to a "call to arms" by Kevin Mathewson of the Kenosha Guard. In response to Mathewson's request for "patriots willing to take up arms . . . against the evil thugs," responders made clear their intention to show up and shoot demonstrators. *Id.* ¶¶49 -50. The Law Enforcement Defendants knew about the plans and intentions of the armed individuals and have admitted as much. *Id.* ¶¶51, 56.

B. **City's Squad Vehicle Video Preservation Policy**

On the night that Anthony was killed and Prediger was shot, "all City of Kenosha officers who were available for duty during the disturbances in Kenosha participated in the response to

4

the disturbances." Exh. A at 11, City 9.27.23 Interrogatory Response. The City's police officers did not have body cameras, but they did have squad vehicle video recordings. *Id*. at 12. The City had a fleet of squad vehicles. Exh. B, Vehicle Fleet. Kenosha Police Department's squad vehicles were equipped with video and audio recordings, also known as "mobile recording equipment." Exh. C at 1, City's Mobile Video/Audio Equipment Policy 41.14 (effective 2.1.18). The video and audio recording were crucial for capturing interactions between citizens and law enforcement leading up to the shooting of Huber and Prediger, including police interactions with protestors (confrontational) and armed counter-protestors (friendly, coordinated). *Id*.

The mobile recording equipment was installed in the vehicle for capturing audio, video, or both. *Id*. The equipment included the vehicle mounted cameras, the vehicle mounted microphones, the officer worn wireless transmitter, and the vehicle computer that contained the software for the system. *Id*.

To ensure public confidence, the mobile recording equipment had to be functional while officers were operating the vehicle. *Id* at 2. The equipment was required to be checked by the officers for proper operation by activating the vehicle's emergency lights and then ensuring that the audio and video has been recorded and that the wireless transmitter was synchronized. *Id*. The mobile recording equipment was required to be running on the vehicle for the officers' entire tour. *Id*.

The video recordings were required to be documented for potential of litigation. Officers were required to document in their investigative report any audio or video recording that could be used as evidence in a case. *Id*. Officers were required to upload the mobile recording data from the vehicle recording system. *Id.* Ultimately, any time an encounter resulted in an arrest, the video recording was required to be uploaded and preserved.

5

On the nights at issue in this case, including the night Huber and Prediger were shot, there were numerous arrests, and thus all video recordings were required to be preserved. Exh. D, City's Arrests. Those recordings are clearly relevant evidence: the lead detective in the City's investigation into the shootings, Defendant Antaramian, knew that squad vehicle videos were available for officers, and made some requests. *See, e.g.* Exh. E., Antaramian Squad Vehicle Video Request.

**C. The Missing Squad Vehicle Videos and the City's Shifting Explanations**

On December 3, 2020, less than four months after Anthony's death, Plaintiff Huber sent a notice of claims to the City of Kenosha and Defendant Chief of Police Daniel Miskinis. Exh. F, Notice of Claims. Huber's lawsuit was filed on August 17, 2021. Dkt. 1.

On December 5, 2023, Plaintiff Huber served discovery requests related to the squad vehicle videos.[2]

> **Request No. 9** asked for all "video or audio recordings, tape recordings, radio transmissions, or electronic audio or visual communications (or Documents memorializing the same) relating to the Protests or the events described in Plaintiff's Complaint. This request specifically includes but is not limited to helicopter or drone footage, body-worn camera footage, and hand-held video footage. The request for video and audio recordings is for the time period of August 23, 2020 through August 26, 2020."
>
> **Interrogatory No. 8** asked for any "[d]ocument (which includes any body-worn camera footage, or other video or audio recording) requested in Plaintiff's discovery requests that has been lost, discarded or destroyed, please identify each such document as completely as possible and state the approximate date it was lost, discarded or destroyed; the circumstances and manner in which it was lost, discarded or destroyed, including the identities of all persons involved; the reasons for disposing of the Document; the identity of any persons with knowledge of its content; and the identity of the last person known to have seen it."

---

[2] Plaintiff Prediger, whose case was filed and then consolidated with Plaintiff Huber's case many months later, then sent identical discovery requests, subject to the same set of objections and conferrals. For simplicity, this motion again describes the timeline in the context of Plaintiff Huber's requests.

6

In response, the City failed to identify any squad vehicle videos and stated that, "The City of Kenosha squad vehicle videos are typically retained 120 days from the date of an incident; however, if the particular incident does not result in an arrest those video records are typically purged from the system." Exh. A at 12-13; Exh. G at 12, City 9.27.23 Response to Request No. 9. Importantly, Plaintiff Huber sent his notice of claim before the end of the 120-day retention period. This, along with immense national news attention and investigations into the shootings and their aftermath, provided the City with unequivocal notice of the need to preserve the squad vehicle video.

In response, Plaintiff sent the City correspondence pursuant to Federal Rule of Civil Procedure 37 and Civil Local Rule 37. Exh. H, Plaintiff's 4.19.24 Rule 37 Letter. In the correspondence, Plaintiffs explained that the City's response to Interrogatory No. 8 failed to provide the requested information. The City's response failed to identify (1) which videos that had been lost or destroyed (including those videos that were purged from the system within 120 days); (2) who had knowledge of the content of the videos; and (3) who was the last person to have seen the videos. *Id.* at 4. Plaintiffs further asked the City to confirm that it had provided all responsive videos and audio recordings, and had no additional documents in response to Request No. 9. *Id.* at 7.

On May 17, 2024, the parties conferred, and Plaintiffs expressed concern that the Kenosha Police Officer's squad vehicles were purged given the notice of claim, the criminal investigation and prosecution, and the high-profile nature of the events following the Rittenhouse shootings. Furthermore, Plaintiffs expressed that there were dozens of arrests made within 120 days of the incident, including the arrest of Rittenhouse. The City agreed to review the deficient answers and supplement responses. However, the City's supplemental response nearly two

7

weeks later merely stated that it will "continue to review for responsive documents." Exh. I at 11, City 5.29.24 Supplemental Response to Interrogatory No. 8.

In an effort to avoid court intervention, Plaintiffs continued to confer with the City. On July 12, 2024, the City provided a new explanation for the missing videos:

> "In August 2020, the **Kenosha Police Department utilized the Arbitrator system to store squad video recordings**. While the Kenosha Police Department has since discontinued the use of the Arbitrator system, the **City of Kenosha does still have custody of the Arbitrator server**. After some investigation, **we believe we will be able to** identify a log of what video files were on the Arbitrator server, and to **assess what, if any, videos are recoverable** from the server (we are pressing for an answer on how long that data investigation will take)."

Exh. J, City's 7.12.24 email (emphasis added)

On July 16, 2024, the City supplemented its response to Interrogatory No. 8, stating a more nuanced explanation for the missing squad vehicle videos:

> "Pursuant to retention period specified in the Wisconsin Statutes and the State of Wisconsin Department of Administration Public Records Board's Records Retention/Disposition Authorization date March 31, 2017 (CITYDEF073167), squad video recordings that do no document enforcement contacts and incidents are purged from the server hosting the Arbitrator camera system after 121 days."

Exh. K at 16, City's 7.16.24 Supplemental Response.

The City further stated that, "access to any squad video recording on the Arbitrary server" is either "impossible or unreasonably burdensome and costly for the City of Kenosha" even though the "City of Kenosha does still have custody of the Arbitrator server". *Id*. The City stated that, "it would need to be individually reviewed to locate the relevant case file and time period." *Id*.

The City also raised new objections, arguing that the resources to get the squad vehicle videos "far outweigh[s] any potential benefit to the case" and suggested that Plaintiffs rely on "other documents and records previously produced," without identifying the allegedly sufficient

8

documents. *Id*. Finally, the City stated that it was "unable to confirm or deny that any squad video was actually lost, discarded or destroyed." *Id*.

Given these shifting explanations, the parties conferred yet again on July 18, 2024, and discussed the City's system for storing squad vehicle videos. In particular, Plaintiffs asked the City for the name of the City employee with control over or access to the server, but the City's counsel was unaware. Plaintiffs also expressed concern that, after nearly four years following the Rittenhouse shootings, the City was still unaware of what squad vehicles had been purged, given Plaintiff's notice of claims and the litigation following the Rittenhouse shooting. Counsel stated that he was still attempting to gather information from the City, but that it would take "a couple weeks" to investigate the matter. Plaintiffs made clear that, after months of conferring, Plaintiffs would need to raise the matter with the Court if the matter was not resolved in short order.

On July 26, the City's counsel stated that it would need to engage a third-party vendor to access the Arbitrator server to investigate whether video recordings still existed. Exh. L at 2, City's 7.26.24 correspondence. The City anticipated sharing the results of its investigation and that it would provide a supplemental response to Interrogatory No. 8 within two weeks. *Id*.

That did not occur. In fact, to date, the City still has not shared the results of its purported investigation into the questions Plaintiffs raised about knowledge and access to the contents of the videos. Moreover, the City still has not provided a clear answer on whether the squad video exists or has been purged. The City still has not confirmed that if the squad video still exists, it will commit to producing it. And likewise the City has not confirmed that if the squad video does not exist, that it will identify which videos have been lost or destroyed. Put simply, after months of conferring over a series of shifting explanations, Plaintiffs have many questions, but no answers.

9

Undersigned counsel certifies that Plaintiffs made a good faith effort to resolve the discovery dispute with the City without court action pursuant to Fed.R.Civ.P. 37(a)(1). To ensure that Plaintiff receives substantial compliance in time for oral discovery, Plaintiffs move for relief.

## LEGAL STANDARD

A party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things...." Fed.R.Civ.P. 26(b)(1). "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." *Id.* The scope of relevancy under Rule 26 is broad. "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.; see also Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 350–51, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) (holding that relevant information "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter [sic] that could bear on, any issue that is or may be in the case").

A party may seek an order to compel discovery if an opposing party fails to respond to discovery requests or has provided evasive or incomplete responses. Fed.R.Civ.P. 37(a)(1)-(4). The party objecting to a discovery request bears the burden of showing why the request is improper. *Dauska v. Green Bay Packaging Inc*., 291 F.R.D. 251, 257 (E.D. Wis. 2013). In ruling on a discovery motion, courts consider "the totality of the circumstances, weighing the value of material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 681 (7th Cir.2002) (internal quotation omitted).

# DISCUSSION

### A. The City's Undue Burden Objection is Waived

The City has attempted to raise a belated objection that the costs of producing the missing squad vehicle would be unduly burdensome on the City. This argument has been waived, and the City has not shown good cause otherwise.

To be clear, the City has never objected that the missing squad vehicle videos are irrelevant. Instead, the City initially made **boiler objections** that Plaintiff's discovery requests are "vague, burdensome, and not proportional to the needs of the case," without any explanation or further development in the parties' conferrals. Ex. A, at 11; Ex. G at 11-12. Then, after months of conferences, the City raised a **belated objection** that responding to Plaintiff's Interrogatory No. 8 (asking the City to identifying lost, discarded, or destroyed videos and audio recordings) was unduly burdensome because it would cost the city too much to engage a third-party vendor. Exh. K at 16-17. Notably, the City never raised any new objection to Plaintiff's Request for Documents No. 9 (audio and video recordings) as unduly burdensome because of costs at all, and continued to rely on the same boilerplate objection ('vague, burdensome, and not proportional to the needs of the case"). Exh. M at 9, City's 7.16.24 Supplemental Response.

The discovery rules require the objecting party to state their objections with specificity. Rule 34(b)(2)(B) ("state with specificity the grounds for objecting to the request, including the reasons"); Rule 33(b)(4) ("grounds for objecting to an interrogatory must be stated with specificity"). If they are not, the objection is deemed waived. *Id.* see also *Fond Du Lac Plaza, Inc. v. Reid*, 47 F.R.D. 221 (E.D.Wis.1969).

The objecting party bears the burden of proving that a discovery request is proper. *Raab v. Wendel*, No. 16-CV-1396, 2018 WL 11408277, at *1 (E.D. Wis. Feb. 15, 2018) General

objections to discovery requests that merely recite boilerplate language without explanation do not meet this burden, and courts within the Seventh Circuit consistently overrule them or entirely disregard such objections. *Id*. ("[t]hey are empty and unhelpful"); *Odongo v. City of Indianapolis*, No. 1:14-cv-00710-TWP-MJD, 2015 U.S. Dist. LEXIS 11559, at *4 (S.D. Ind. Jan. 30, 2015); *Cunningham v. Smithkline Beecham*, 255 F.R.D. 474, 478 (N.D. Ind. 2009); *Novelty, Inc. v. Mountain View Mktg., Inc.*, 265 F.R.D. 370, 375 (S.D. Ind. 2009) (" 'general objections' made without elaboration, whether placed in a separate section or repeated by rote in response to each requested category, are not 'objections' at all—and will not be considered"); *Burkybile v. Mitsubishi Motors Corp.*, No. 04 C 4932, 2006 U.S. Dist. LEXIS 57892, 2006 WL 2325506, at *9 (N.D. Ill. Aug. 2, 2006) (overruling boilerplate objections made generally and without elaboration).

The City's improper objections lacked in specificity from the very beginning and led to months of conferences (or at least confusion) because Plaintiffs did not know if anything was being withheld based on the objections. Further, the City's objection to Plaintiff's interrogatory as unduly burdensome for the City is waived because it was not until ten months after Plaintiff served the request. Finally, the City never raised any specific objections to Plaintiff's discovery request. That too is waived.

### B. The Obvious Relevance of the Squad Vehicle Videos Substantially Outweighs Any Alleged Burden on the City

The City essentially complains that accessing the videos related to Huber's death and Prediger's shooting costs too much, and that the benefits do not outweigh the burden. But the City has not identified any actual costs; just hypothetical costs. And in any event, the obvious relevance of the recordings substantially outweighs any burden on the City.

12

As this Court noted in denying Defendants' motion to dismiss, Plaintiffs have claims for relief against the governmental defendants for due process - their funneling protestors, including Anthony Huber, into a confined area with the hostile armed individuals and failing to protect them from the resulting dangerous situation, and Dkt 76 at 38. In order to prove Plaintiffs' due process claim, then, he must have access to any squad vehicle videos showing the interactions between officers allowing illegally armed individuals to patrol the streets of downtown Kenosha with deadly weapons, inviting them to use police powers and/or funneling protestors toward them to be "dealt with," deputizing them, or ratifying their actions.

Similarly, Plaintiffs' claims involve Defendants conspiring with armed individuals to endanger protestors in retaliation against protestors based on race and the content of their speech. *Id*. Plaintiffs must have access to videos that may show Defendants acting in concert with each other and other co-conspirators, including Rittenhouse, Mathewson, members of the Kenosha Guard and other armed individuals. Further, Plaintiff must have access to videos to show the officers' discrepant treatment between, on the one hand, the friendly treatment of the all-White armed individuals voicing views favorable to police, and the hostile treatment of the racially diverse group of protestors voicing criticism of police, in violation of free speech and equal protection rights.

In addition, the loss or destruction of the squad vehicle videos would also be highly relevant. The Seventh Circuit has acknowledged that the loss video evidence is probative of the credibility of the witnesses in this case, as parties may tell vastly different versions of the events in August 2020, and the video may have provided insight into facts of consequence surrounding Defendants' unconstitutional actions. *Whitehead v. Bond*, 680 F.3d 919, 933 (7th Cir. 2012) (finding evidence probative of officers' credibility and relevant under Rule 401 as it made one

version of events more believable); *C.f. Schroeder v. City of Waukesha*, No. 13-CV-696-JPS, 2014 WL 1663531, *2 (E.D. Wis. Apr. 25, 2014) (lost evidence was "highly probative of the credibility of the defendants' witnesses," and "the deletion of the video was relevant because it makes the defendants' position and witnesses all the less credible (and may actually make [the plaintiff's] version of events more believable."); *Freese v. Honda Mfg. of Indiana, LLC*, No. 1:18-CV-4016-JMS-MPB, 2020 WL 6820828, at *2 (S.D. Ind. Oct. 8, 2020) (party "offers no explanation for the failure to disclose the video and does not offer any argument that the failure was substantially justified")

In *Burns v. Summers*, which involved a police officer's use of force, Plaintiff filed a motion to compel for against Defendant for missing video footage demonstrating Defendant's constitutional violation. *Burns v. Summers*, No. 21-CV-302-JDP, 2021 WL 4843973, at *1 (W.D. Wis. Oct. 18, 2021). The court granted the motion, directing the Defendant to supplement his response with (2) whether Defendant and other officers had cameras during the events; (3) whether the cameras were turned on; (3); if so, what happened to the videos; (4) if body camera footage existed at one time, what steps the Defendant took to locate the video; and (5) neither Defendant or any other officer had a camera that was turned on, to explain why not, and provide any policies on officers using their cameras. *Id.* In fact, depending on the circumstances of the City's loss or destruction of the records, the City's spoliation of the recordings may provide an independent basis for liability against the City.

Finally, these squad videos may allow Plaintiffs to investigate how officers' actions differed from their training and the policies of the Kenosha department, which could prove relevant to Plaintiff's *Monell* claim, Rule 404(b) allegations, and both punitive damages, and potential supervisor liability.

14

Case 2:21-cv-00969-LA    Filed 08/23/24    Page 14 of 20    Document 110

Put simply, there cannot be any real dispute about the immense relevance of the squad vehicle videos to Plaintiffs' claims, and equally, the relevance of any spoliation of such critical video evidence despite the massive publicity and known risk of liability related to the tragic shootings. Nevertheless, the City is unwilling to conduct the basic investigation necessary to answer simple questions about the extent to which vehicle recordings still exist or not, and why. This is not an issue of burden, but of basic diligence necessary to meet a party's discovery obligations.

If that requires enlisting a third-party vendor to access the Arbitrator server and determine whether the recordings are there, so be it; the City has not identified any substantial effort in accessing or searching the server for recordings from three specific days. Once that search is conducted, there are only two possibilities: either the videos are there, or they are not. Either way, the burden is non-existent. If the recordings no longer exist, the City must simply state so and explain why. If they are there, they simply need to be copied. To date, the City has not provided any information to suggest that it would be burdensome to simply copy the recordings onto a drive. In fact, to alleviate even that minimal burden, Plaintiffs will agree to provide the drives onto which the recordings can be copied. With that, there is simply no basis to withhold any recordings that still exist. [3]

---

[3] Indeed, these general objections are precisely the kind of "boilerplate objections" the court instructs litigants to avoid. *Raab v. Wendel*, No. 16-CV-1396, 2018 WL 11408277, at *1 (E.D. Wis. Feb. 15, 2018) ("[t]hey are empty and unhelpful"). General objections to discovery requests that merely recite boilerplate language without explanation do not meet this burden, and courts within the Seventh Circuit consistently overrule them or entirely disregard such objections." *Id*. (citing *Janssen v. Howse*, 09-CV-3340, 2011 U.S. Dist. LEXIS 68382, 2011 WL 2533809 (C.D. Ill. June 27, 2011); *Odongo v. City of Indianapolis*, No. 1:14-cv-00710-TWP-MJD, 2015 U.S. Dist. LEXIS 11559, at *4 (S.D. Ind. Jan. 30, 2015); *Cunningham v. Smithkline Beecham*, 255 F.R.D. 474, 478 (N.D. Ind. 2009); *Novelty, Inc. v. Mountain View Mktg., Inc.*, 265 F.R.D. 370, 375 (S.D. Ind. 2009) ("'general objections' made without elaboration, whether placed in a separate section or repeated by rote in response to each requested category, are not 'objections' at all—and will not be considered"); *Burkybile v. Mitsubishi Motors Corp.*, No. 04 C 4932, 2006 U.S. Dist. LEXIS 57892, 2006 WL 2325506, at *9 (N.D. Ill. Aug. 2, 2006) (overruling boilerplate objections made generally and without elaboration)).

### C. The City's Shifting Explanations Are Insufficient and Require an Order Compelling the City to Provide Clear, Sworn Answers

Each of the City's explanations for the missing squad vehicle videos are insufficient. It has been approaching nearly ***ten months since*** Plaintiff Huber served discovery requests related to the squad vehicle videos in December 2023. Rather than conduct a reasonable investigation from the very start, the City punted. After months of promising to follow up while leaving Plaintiffs in the dark, in July the City provided a different (and slightly more plausible) explanation: that the missing videos *might be* on their Arbitrator system. The next step—to now search that system—was obvious. Instead, the City equivocated, and took the position that it would be too costly to access the Arbitrator system to search for squad recordings. Even after that, the last Plaintiffs heard was that the City would need to engage a third-party vendor and that it would get back to Plaintiff in early-August, but that never occurred. To put it simply, the City's shifting explanations fall short.

Instead, the position the City has now taken appears to be strategic and self-serving. If a search reveals that the recordings are present those videos are likely to be damning, and their production is not preferable. If a search reveals that the records no longer exist, that would expose the City to serious consequences including additional liability for spoliation and sanctions for egregious discovery violations. The only way to avoid both bad outcomes is to do nothing. And so that is what it has done. This approach may be clever, but it violates the City's discovery obligations.

***First***, there is no doubt that the squad vehicle recordings should have been preserved the Rittenhouse shootings of Huber and Prediger are, arguably, one of the most high-profile shootings in recent American history. The events were covered by nearly every major news media outlet in the county, resulted in a criminal investigation and prosecution, and were the

16

subject of a notice of claim that made clear a lawsuit was imminent. Unquestionably, the City knew that officers' squad vehicles videos were to be preserved, particularly in preparation for lawsuits. *See, e.g. Schroeder v. Menard, Inc.*, No. 2:13-CV-451-RLM-JEM, 2014 WL 3084725, at *6 (N.D. Ind. July 7, 2014) (Plaintiffs have a need to access video footage and to do so "immediately to prepare the substance of their case, not just to prepare to counter the potential effects of the videos at trial").

***Second***, they were required to be preserved under City policy. The City was required to preserve the squad vehicle videos per the City's Mobile Video/Audio Equipment Policy 41.14 (effective 2.1.18) because, given the magnitude of the Kenosha protests and Rittenhouse shootings, the videos could be "useful evidence." Exh. C at 2. Pursuant to its policy, The City was required to ensure that the squad vehicle videos could and would be preserved. *Id*. And as discussed above, the policy required numerous safeguards to ensure, before each shift, the recording system was working. *Id*. Furthermore, officers were required to take extra steps when the video recording could be useful as evidence (e.g. document in investigative report, bookmark the recording in the system, upload the data). *Id*.

***Third***, the City admits in its first response to Plaintiff's interrogatory No. 8 that the recordings should have been preserved. The City's response to Plaintiff's interrogatory was that videos are purged within 120 days following an incident if the incident does not result in an arrest. Exh. A at 12-13. Well, the City arrested many people during the events alleged in the Plaintiff's complaint, Exh. D. Perhaps, the most illustrative example is that the City of Kenosha was searching for Defendant Rittenhouse after the shootings, and **Rittenhouse was arrested the next day**. Exh. N, Rittenhouse Arrest Card. Therefore, by the City's own admission, squad vehicle videos were required to be preserved because of the related arrests.

17

***Fourth***, the City's reference in its supplemental to the 120-day retention period specified in the Wisconsin Statutes and the State of Wisconsin Department of Administration Public Records further confirms the recordings should and would have been preserved. Exh. K at 16. The state's retention policy states that "***no records are destroyed if litigation*** or audit involving these records ***has commenced*** or ***is anticipated***." Exh. O, Wisconsin Records Retention/Disposition Authorization (emphasis added). Not only did the Rittenhouse shootings result in arrests, investigations and criminal proceedings, but also Plaintiff's counsel sent a notice of claims to the City of Kenosha and the Chief of Police on December 3, 2020, before the 120-period following Anthony's murder on August 25, 2020.

Put simply, whether pursuant to City policy, Wisconsin statute or plain common sense, the squad vehicle recordings were required to be preserved. They should be on the Arbitrator system (or somewhere), as the City concedes, and so the obvious next step is to search for them and find them. If they are not there, something has gone very wrong. That too, must be disclosed and explored. In a search for the truth, nothing less can be countenanced.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully asks the Court to order City to complete the above-described production of outstanding squad vehicle videos in response to Request No. 8 and supplement its interrogatory response to Interrogatory No. 9 within fourteen days, and to submit confirmation to Plaintiff and the Court that it has done so. Or, to the extent the video was lost or destroyed, Plaintiff respectfully asks the Court to order City to supplement its interrogatory response to make that clear, identifying the lost, discarded, or destroyed videos, and the reason for their destruction so that the appropriate next steps can be determined.

Respectfully submitted,

JOHN HUBER

PAUL PREDIGER

By: /s/ Quinn K. Rallins

*One of Plaintiff's Attorneys*

Jon Loevy
Dan Twetten
Anand Swaminathan
Steven Art
Quinn K. Rallins
Alyssa Martinez
LOEVY + LOEVY
311 N. Aberdeen
Chicago, Illinois 60607
(312) 243-5900
rallins@loevy.com

Kim Motley
Motley Legal Services
PO Box 1433
Matthews, NC 28106
kmotley@motleylegal.com

Edward Milo Schwab
Ascend Counsel, LLC
2401 S. Downing Street
Denver, CO 80210
(303) 888-4407
milo@ascendcounsel.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Quinn Rallins, an attorney, hereby certify that on August 23, 2024, I caused the foregoing Motion to Compel to be served on all counsel of record via the Clerk of the Court's electronic filing system.

/s/ Quinn K. Rallins

*One of Plaintiff's Attorneys*

20

Case 2:21-cv-00969-LA    Filed 08/23/24    Page 20 of 20    Document 110