**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

| | | |
|---|---|---|
| JOHN HUBER, in his individual capacity | ) | |
| and as Personal Representative of the | ) | |
| ESTATE OF ANTHONY HUBER, | ) | |
|      Plaintiff, | ) | No. 2:21-cv-00969-LA |
|    v. | ) | |
| | ) | |
| DAVID G. BETH, in his individual and | ) | |
| Official capacity as Kenosha County Sheriff, | ) | |
| et al., | ) | |
|      Defendants. | ) | |

| | | |
|---|---|---|
| PAUL HENRY PREDIGER, | ) | |
|      Plaintiff, | ) | No. 2:21 cv 01192-LA |
|    v. | ) | (Consolidated with |
| | ) | No. 2:21-cv-00969-LA) |
| THE CITY OF KENOSHA, | ) | |
| et al., | ) | |
|      Defendants. | ) | |

**CITY OF KENOSHA'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL
THE CITY OF KENOSHA TO PRODUCE MISSING SQUAD VEHICLE VIDEOS
FROM EVENTS RELATED TO RITTENHOUSE SHOOTING, AND
SUPPLEMENT INTERROGATORY RESPONSE**

City Defendants, Daniel G. Miskinis, Eric Larsen, John Doe Police Officers of the

Kenosha Police Department, Menomonee Falls Police Department, West Allis Police

Department, the City of Kenosha, Village of Menomonee Falls and the City of West Allis,

(collectively the "City Defendants"), by their attorneys, Stafford Rosenbaum LLP, submit

this response in opposition to Plaintiffs' Motion to Compel the City of Kenosha to Produce

1

Missing Squad Vehicle Videos from Events Related to Rittenhouse Shooting, and Supplement Interrogatory Response (ECF 110). In support of this opposition, City of Kenosha states the following:

## INTRODUCTION

The shooting of Jacob Blake, the ensuing protests that escalated into rioting and arson, and Kyle Rittenhouse's actions were extensively covered by the media, quickly generating a significant amount of widely accessible video footage. Amateur videos from social media were also widely shared shortly after the incident. In Rittenhouse's criminal trial, numerous videos of the four-block stretch of Sheridan Road were central to the proceedings, with video streams from that night prominently featured and several livestreamers and reporters testifying.[1] As observed by this Court during the motion to dismiss stage, the facts alleged in the Plaintiffs' amended complaint are "contrary to the facts reported in the news or leav[e] out important details." (ECF 76, p. 2). Furthermore, some of Plaintiffs' claims, such as the assertion that law enforcement conspired to use armed civilians against protesters, may appear "hard to believe" and "unlikely." (ECF 76, p. 2, 29).

Noticeably, the Plaintiffs' motion continues to cite to the allegations in their own complaint – rather than to anything in the record – to assert that further discovery is needed regarding the "missing" squad vehicles. To the contrary, what's "missing" is anything

---

[1] *See e.g.* USA Today, Kyle Rittenhouse Trial: Videos and Evidence in Wisconsin Shootings, https://www.usatoday.com/story/news/nation/2021/11/03/kyle-rittenhouse-trial-wisconsin-shootings-videos-kenosha/6276175001/ (last visited Sept. 13, 2024) (news coverage of the Kyle Rittenhouse trial detailing the use of surveillance videos, social media recordings, and other visual evidence presented.)

from Plaintiffs – in the record, not their complaint – to support their conspiracy theories of multiple law enforcement agencies coordinating with unidentified armed individuals to purposefully funnel and shoot unidentified groups of protesters. The Plaintiffs cite to the numerous arrests identified by City Defendants and the need for production of any and all resulting squad video footage. (ECF 110, p. 6). After all, Plaintiffs argue squad videos, "may show Defendants acting in concert with each other and other co-conspirators, including Rittenhouse, Mathewson, members of the Kenosha Guard, and other armed individuals." (ECF 110, p. 13). However, it makes no sense to discuss an alleged conspiracy to shoot protesters with or in the presence of an arrestee, much less act on such an alleged conspiracy. Either way, where is the evidence of any conspiracy or funneling?

Despite months of discovery—during which the City has provided tens of thousands of emails, texts, chats, radio dispatch, reports, hundreds of hours of audio and video recordings from its police department and agencies like the FBI and ATF—Plaintiffs have failed to identify any specific missing squad videos or demonstrate their relevance. Instead, they are requesting a search of a server for footage not shown to be pertinent and/or seeking an unsupported admission from the City about the supposed loss of relevant squad videos.

As explained in further detail below, the City has met its discovery obligations, and respectfully request the Court reel in the Plaintiffs' ongoing fishing expedition. For the reasons explained below, the City's objections to Request No. 9 and Interrogatory No. 8 should be sustained and Plaintiffs' Motion should be denied.

## BACKGROUND ON COMPLETED DISCOVERY

On August 25, 2020, downtown Kenosha was under an 8:00 p.m. curfew due to

escalating protests that had turned into rioting and arson. That night, Kyle Rittenhouse, a private citizen, shot and killed Joseph Rosenbaum and, while fleeing, shot and killed Anthony Huber and injured Paul Prediger, all of whom had attempted to disarm him. Huber's estate and Prediger have since filed a lawsuit against the County and City Defendants, as well as Rittenhouse.

The Plaintiffs have been provided significant discovery to this point. In regard to document (only) production, between October 2, 2023 and July 26, 2024, City Defendants have produced 74,817 pages to Plaintiffs. (Declaration of Kyle W. Engelke in Support Response to Plaintiffs' Motion to Compel (hereinafter KWE Decl.) ¶ 3).[2] The City Defendants' document production included:

1. The 678 pages of the Rittenhouse investigatory police report,

2. Thousands of MDC chat messages exchanged by police during the unrest,

3. Thousands of pages of email correspondence from Menomonee Falls and West Allis Police Department,

4. Tens of thousands of pages of email correspondence from the City of Kenosha and Kenosha Police Department, and

5. Cell phone data was provided from both Kenosha and West Allis Police Department phones.

(KWE Decl. ¶3).

---

[2] As with the other Declarations cited herein, they are filed in conjunction with this memorandum.

The foregoing productions were made upon review of hundreds of thousands of documents, including, but not limited to, an extensive ESI review and production. (KWE Decl. ¶4).

The City Defendants also produced thousands of radio clips comprising the dispatch communications during the unrest in August 2020. (KWE Decl. ¶5).

In regard to audio and video production, between October 2, 2023 and July 15, 2024, City Defendants have produced the following numerous video files including:

1. Kenosha squad videos including 18 folders (40.3 GB) produced on October 6, 2023;

2. West Allis Swat Officers body-cam footage included 30 videos (13.5 GB) produced on October 2, 2023; and

3. Fixed wing aerial video captured during the unrest included 9 files (29.4 GB) produced on October 3, 2023.

(KWE Decl. ¶6).

City Defendants also produced a hard drive of ATF audio and video files. The audio and video files were collected by the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") as part of the ATF's investigation into the arson events that occurred in Kenosha between August 23 and 25, 2020. The City of Kenosha produced the entire collection of ATF audio and video files on July 26, 2024. (KWE Decl. ¶7)

This ATF folder contains 555 GB of audio and video data, as well as two Leica scans, consisting of 17,613 files, organized into 210 folders. The ATF video files consist

of a wide variety of video footage from drone footage, to security cameras from business, to cell phone videos of individuals on the streets in Kenosha that captures the events that unfolded in Kenosha between August 23 and 25, 2020. Because the drone videos and photographs consist of 150 files containing 9 GB of data, the remaining 539 GB, consisting of more than 17,000 files, is split roughly evenly between security camera video and cell phone video from individuals on the street. It is difficult to estimate the total hours of footage, but it is safe to say the cell phone and security camera videos contain hundreds of hours of footage. To illustrate, one 4.67 GB file containing cell phone video captures over 9 hours of events. (KWE Decl. ¶¶8-9).

Setting aside the City Defendants' productions, the County Defendants similarly produced documents, communications and video to the Plaintiffs. (KWE Decl. ¶10) Defendant Rittenhouse also made productions to the Plaintiffs, including, but not limited to, extensive materials and video from the criminal trial. (*Id.*).

All of which begs the question – why is none of it cited in the Plaintiffs' motion to substantiate any of their claims?

## BACKGROUND ON SQUAD VIDEOS

As noted above, the City Defendants have produced all the squad videos in evidence at the City of Kenosha from August 23-26, 2020, and are not withholding any such videos. (KWE Decl. ¶6). Plaintiffs, unsatisfied with the City's response to Interrogatory No. 9 (which requests any body-worn camera footage or other video or audio recordings requested in Plaintiffs' discovery requests that have been lost, discarded, or destroyed), moved for a better response, seeking supplemental information and production of the squad

videos from the Arbitrator Server.

Multiple meet and confers have occurred to address this matter. In these discussions and subsequent verified supplemental responses, the City confirmed that it has supplied all relevant videos related to the Rittenhouse and Blake incidents. The City also indicated that any additional videos on the server, deemed irrelevant and automatically purged in consistent with the City's retention policy.

After all, one of the lead detectives from the Rittenhouse investigation – Ben Antaramian – reviewed the reports and otherwise followed up with responding officers related to the shootings to identify if there were any squad videos (or other files) beneficial for evidence. (Declaration of Ben Antaramian in Support Response to Plaintiffs' Motion to Compel (hereinafter Antaramian Decl.), ¶¶3-13). In his review, Det. Antaramian located only one squad video relevant to this investigation which related to the interaction between Mr. Rittenhouse and Officers Moretti and Krueger when Mr. Rittenhouse was pepper sprayed at the window of their squad vehicle as the officers responded to the scene of the shootings. (Antaramian Decl., ¶10). As noted in the police report, there were no other patrol vehicles on scene yet. (*Id.*) Det. Antaramian was not aware of any other squad videos of evidentiary value. (*Id.* ¶13).

From the very beginning of discovery back in September 2023, the City of Kenosha flagged that the City had a policy and practice of purging squad videos after 120 days. (ECF No. 110-1 at 12). There was no real follow up on this until much later as after the significant production in the Fall of 2023, the parties worked towards an ESI Agreement and agreed upon custodians and search terms which culminated in the agreement filed with

7

the Court on January 16, 2024 (Dkt. 107). (KWE Decl. ¶11). However, the Plaintiffs then served notice of video depositions for 18 witnesses (including 10 for City Defendants) on February 2, 2024 and scheduling and preparation began in earnest. At first, the deposition of Mayor Antaramian was sought but that was ultimately called off before an official notice was sent. Then the deposition of Officer Krueger was sought as the first deposition and a specific notice was sent for his deposition on February 22, 2024 but then this deposition was cancelled the day before it was set to take place. (KWE Decl. ¶12). The Plaintiffs then sought that the ESI review and production be completed before any depositions take place. This was a significant undertaking across multiple agencies. In the interim, the parties jointly moved to extend discovery in April. (Dkt. 108). The City Defendants would ultimate complete their collection, review and production of ESI materials on June 28, 2024. (KWE Decl. ¶13). The foregoing was jointly accomplished in a professional manner.

To assist the court in resolving the dispute over the allegedly "missing squad videos," the City provides the following background on the squad video upload process and retention policy, along with details regarding the manner in which squad videos from August 23 to August 26, 2020 were uploaded to the server during the unrest.

Prior to August 23, 2020, videos from memory cards were downloaded to the Arbitrator server via Wi-Fi points in the Public Safety Building (PSB) basement or through plug-in cables at two locations in the PSB basement and two locations near the gas pumps behind the PSB. (Declaration of Joshua Hecker in Support Response to Plaintiffs' Motion to Compel (hereinafter Hecker Decl.) ¶ 3), ¶7). The process of downloading video from the squad cars to the server was time-consuming, especially when memory cards were nearing

capacity. As a result, officers often deferred downloads to the 3rd shift patrol division, which historically had more downtime than the 1st and 2nd shifts. (Hecker Decl. ¶8).

Videos were downloaded and logged into evidence upon request. (Hecker Decl. ¶¶10-11). When a Squad Video Recording Request Form was received, Kenosha Police Officers would search the Arbitrator system, download the requested video, save it on a disc if available, log it into evidence, and provide a disc copy to the requestor. (*Id.*)

During the unrest in Kenosha, the squad vehicle upload process was modified. Following the Jacob Blake incident, the Arbitrator upload service was deactivated, and connection cords were disconnected from the Public Safety Building's basement ports to prevent accidental uploads. (Hecker Decl. ¶¶12-14). This action was taken at the request of the Division of Criminal Investigation (DCI), which required all memory cards from squad cars involved in or responding to the Blake shooting investigation. (*Id.*) Existing memory cards were surrendered, and new ones were installed in each squad car. Former Officer Elizabeth Williams, who had the sole key to unlock the Arbitrator box in the trunk of the squad car, facilitated the collection and replacement of SD cards. (Hecker Decl. ¶¶15-19).

This interruption in typical practice was due to safety concerns and the impracticality of transporting marked patrol cars to the Public Safety Building for video downloads amid civil unrest, which could have endangered officer safety and increased the risk of squad damage by rioters. (Hecker Decl. ¶¶15-19). The Kenosha Police Department did its best to maintain normal service to the City during the unrest in August 2020, particularly to those areas less directly affected by protests, looting and arson. City of

Kenosha squad vehicles were routinely dispatched in response to calls for service outside the uptown and downtown riot areas during the unrest. (Hecker Decl. ¶22).

Officer Elizabeth Williams, who was responsible for collecting memory cards from squad vehicles and manually uploading videos to the Arbitrator server, managed this process under challenging conditions. (*Id.*) To mitigate safety risks, squad vehicles were not sent to the PSB; instead, she retrieved SD cards from Bradford High School or coordinated with officers to ensure their safe collection and upload. (Hecker Decl. ¶15-19). The City of Kenosha kept a log detailing squad videos downloaded from the Arbitrator server and preserved as evidence during the relevant time period from August 23, 2020 until December 29, 2020. (Hecker Decl. ¶20, Ex. A).

The Arbitrator server system was discontinued in 2022, but the City retains custody of the server. (Hecker Decl.¶24). Despite its compliance with the obligation to provide all available information, the City engaged a third party – ComSys – to conduct a search of the server. Filed in conjunction with this motion is the log of squad video files previously held on the server. (Declaration of Kathy McAuliffe, ¶6, Ex. A). ComSys was unable to recover squad video data or metadata identifying the squad that recorded a video or the associated case number. (McAuliffe Decl. ¶11). ComSys was unsure if anything could be recovered by recommended further forensic search of the server to determine what might be recoverable. (*Id.*).

It is very difficult to track down and pinpoint what City of Kenosha squads were where at any given time during the unrest, whether there was any squad video captured, especially in light of the need to swap out SD cards due to the unprecedented circumstances

of the unrest and interruption of normal business caused by the unrest. (Hecker Decl. ¶23).

Even if any video could be retrieved from the Arbitrator server, it would necessitate individual review of any video file in attempt to identify and locate the relevant case files and time periods shown in the video (mostly likely from areas not near the unrest) because the video was not originally kept and/or marked evidentiary value (as compared to the squad videos that did have evidentiary value from that time period which have already been produced). (Hecker Decl. ¶26).

## LEGAL STANDARD

While the scope of permissible discovery under the Federal Rules of Civil Procedure ("FRCP") is broad, it is not without limits. This Court has wide discretion in matters relating to discovery. "The Court may limit the frequency or extent of discovery if: the discovery is unreasonably cumulative, duplicative, or can be secured from a more convenient and less expensive source; the party seeking discovery has had ample opportunity to conduct discovery; or if the proposed discovery is outside the scope permitted by Rule 26(b)(1)." *Farris v. Kohlrus*, No. 17-CV-3279, 2019 WL 351876, at *3 (C.D. Ill. Jan. 29, 2019)

FRCP 26(b)(1) provides that:

Parties may obtain discovery regarding any **nonprivileged matter that is relevant to any party's claim or defense and <u>proportiona</u>l to the needs of the case**, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable. (emphasis added)

A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. Fed. R. Civ. P. 26(b)(2)(B)

The Court must limit the frequency or extent of discovery if it determines that (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive. Fed. R. Civ. P. 26(b)(2)(C)(i).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401. The burden of demonstrating relevance is on the party seeking discovery. *See Murillo v. Kohl's Corp.*, No. 16-CV-196-JPS, 2016 WL 4705550, at *2 (E.D. Wis. Sept. 8, 2017). Only after the party seeking discovery proves relevance does it become the objecting party's obligation "to show why a particular discovery request is improper." *Id.* (citation and quotations omitted).

By the time a discovery dispute reaches the Court, the "party claiming that a request is important to resolve the [case's] issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." Fed. R. Civ. P. 26 (2015 Amend. Comm. Notes). The party seeking discovery is not entitled to a fishing expedition. "Indeed, [C]ourts must keep in mind that it is … their duty to prevent 'fishing expeditions' or an undirected rummaging … for evidence of some unknown wrongdoing."

*Murillo,* 2016 WL 4705550, at *3 (citation and quotations omitted).

## ARGUMENT

### I.    PLAINTIFFS HAVE NOT DEMOSTRATED THE RELEVANCE OF THE MISSING SQUAD VEHICLE VIDEOS.

Plaintiffs state in a conclusory fashion  that access to squad vehicle videos is necessary to support their due process and conspiracy claims. (ECF No. 110 at 13-14). They contend that the alleged destruction or loss of the videos is relevant to the credibility of witnesses. (*Id.*) They also argue that these videos are crucial for uncovering discrepancies in police treatment, assessing adherence to training and policies, and supporting claims for punitive damages and supervisory liability. (*Id*).

However, Plaintiffs have not met their burden of proof regarding the relevance of these "missing squad videos." See *Sandoval v. Bridge Terminal Trans.*, Inc., No. 14–CV–639, 2015 WL 3650644, at *1 (E.D. Wis. June 10, 2015) (the burden of proving relevance lies with the party seeking discovery)..

Plaintiffs' Request  for Documents No. 9 asked for all "video or audio recordings, tape recordings, radio transmissions, or electronic audio or visual communications (or Documents memorializing the same) relating to the Protests or the events described in Plaintiff's Complaint." The City has set forth above the extensive record already provided to the Plaintiffs – namely tens of thousands of emails, texts, chats, radio dispatch, reports, hundreds of hours of audio and video recordings from its police department and agencies like the FBI and ATF.  In fact, Plaintiffs fail to point to any of it to support their motion,

and instead rely on the allegations of their complaint to substantiate the need for further discovery.

Despite having access to extensive discovery, Plaintiffs have not shown how the requested videos would directly support their clams. *See Chavez v. Daimler Chrysler*, 206 F.R.D. 615, 619 (S.D. Ind. 2002) (discovery relevance is broadly construed to include matters that could lead to information bearing on any issue in the case).

Plaintiffs allege that Municipal Defendants pushed the protesters out of the park on 56th Street and funneled them to a "confined area" with the armed protesters that had allegedly gathered at the intersection of Sheridan and 60th Street. (Compare ECF 27, ¶¶95-96; KWE Decl. ¶14). Notably, the Rosenbaum shooting actually occurred another three City blocks south at the corner of Sheridan Road and 63rd Street. (Antaramian Decl. ¶14).



(KWE Decl. ¶14).

The Plaintiffs continue to assert that this funneling took place without citation to anything in the record (and in seeming contradiction to the unbarricaded layout of the City).[3] In stark contrast, the actual aerial video footage depicts the hundreds of individuals milling about throughout the City and their scattering in all directions when the shootings took place. (Antaramian Decl. ¶14; KWE Decl. ¶15)[4]



.

---

[3] City Defendants also note that the Notice of Claim dated back in December 2020 (ECF 110-6, Ex. F) makes no mention of coordination and funneling and instead asserts negligence claims (seemingly for failing to prevent shootings). In any case, the City Defendants reject any suggestion that the notice created obligation to keep any and all video recordings from thought the riots and unrest in August 2020.

[4] *See* Exhibit placeholder for video produced as CITYDEF900020 attached to KWE Decl. ¶15, with the relevant video footage playing shortly before and after the hour mark on the video.

Plaintiffs also argue that the loss or destruction of the squad vehicle videos is highly relevant because it impacts the credibility of witnesses since different parties may have conflicting accounts of the August 2020 events, the videos could have offered crucial insights into the facts concerning the Defendants' alleged unconstitutional actions. (ECF No. 110 at 13-14). However, this assertion lacks merit and seems to be a thinly veiled attempt to justify an unjustified fishing expedition for evidence. Plaintiffs' reliance on *Schroeder v. City of Waukesha*, No. 13-CV-696-JPS, 2014 WL 1663531 (E.D. Wis. Apr. 25, 2014) is misplaced and irrelevant. In *Schroeder,* the missing video was indisputably linked to the incident in question and was destroyed in bad faith, contributing to the dismissal of the plaintiff's charges in the criminal proceedings. In contrast, no such finding of bad faith exists in this case, Plaintiffs have the squad videos related to the Rittenhouse investigation that were in evidence, and Plaintiffs are merely speculating about the potential content of the squad videos on the server without evidence of bad faith. *Marker v. Union Fid. Life Ins. Co*., 125 F.R.D. 121, 125 (M.D.N.C. 1989) ("Conclusory claims of bad faith may not be the bases for conducting marginally relevant discovery which is by its nature burdensome." )

Plaintiffs argue that the squad videos could help them examine discrepancies between officers' actions and their training or department policies, which is relevant to their *Monell* claim, Rule 404(b) allegations, punitive damages, potential supervisor liability and that potential spoliation of the recordings may provide an independent basis for liability against the City. (ECF No. 110 at 14). However, Plaintiffs does not provide any citations as support, and to the extent their arguments are underdeveloped, this Court cannot—and

should not—develop those arguments on their behalf. See *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ( As the Seventh Circuit has said time and again, "[w]e repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived ...."); *accord Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 511 (7th Cir. 2020).

Moreover, the City has previously produced all responsive squad videos from August 23, 2020, to August 26, 2020, which were stored in evidence. (KWE Decl. ¶6) . This is confirmed by the squad video review process which involved multiple steps: officers would upload videos, evaluate their relevance, and bookmark them with an incident type and case number if deemed necessary. Relevant recordings were documented in investigative reports. (Hecker Decl.) In this case, the lead Detective reviewed police reports related to the Rittenhouse investigation to identify useful squad videos or recordings, which have already been provided to Plaintiffs. (KWE Decl. ¶6) . Thus, any remaining videos on the server are unlikely to be significantly relevant to the issues at hand.

Given the efforts by the lead detective to review and preserve relevant squad videos, coupled with Plaintiffs' failure to specify missing videos or show their relevance pursuing these video requests is a fruitless endeavor. These requests do not advance the case and instead represent an unproductive pursuit that fails to address the core issues.

## II. PLAINTIFFS HAVE FAILED TO PROVE THAT THEIR NEED FOR THE REQUESTED SQUAD VIDEOS OUTWEIGHS THE BURDEN AND COST OF LOCATING, RETRIEVING AND PRODUCING THE INFORMATION.

Plaintiffs' demands that the City either produce these additional videos or certify their loss). (ECF No. 110 at 2) Plaintiffs are not entitled to such information if it is inaccessible to the City because of undue burden or cost, unless Plaintiffs can prove that their need for the information "outweighs the burdens and costs of locating, retrieving, and producing the information." Fed. R. Civ. Proc. 26(b)(2)(B). Plaintiffs have failed to satisfy this burden.

As set forth in the Declarations of Joshua Hecker and Kathy McAuliffe filed concurrently with response, squad video requested by Plaintiffs is not readily available to Defendant because its production would be both time-consuming and require the retention of a second third party vendor. *See* Declaration of Kathy McAuliffe ("McAuliffe Decl.") at ¶¶ 4-11 (the City has already engaged a third-party vendor for a search of the server, which has only been able to retrieve a log of previously stored files, no meta data or videos); Declaration of Joshaua Hecker ("Hecker Decl.") at ¶ 26 (even if any video could be retrieved from the Arbitrator server, it would necessitate individual review of any video file in attempt to identify and locate the relevant case files and time periods shown in the video); McAuliffe Decl." at ¶11 ( another third-party vendor will need to be retained to conduct a forensic search of the server).

While the City has demonstrated the inaccessibility of the squad video requested by Plaintiffs, Plaintiffs have failed to meet their burden of proving that their need for the

information outweighs the burdens and costs to the City. This is no surprise, as the City has been a willing and good faith participant throughout the discovery process in this case, and continues to produce additional relevant documents on a rolling basis as they are located. Defendant has already incurred significant time and expense in providing Plaintiffs with a vast amount of information they have requested in discovery.

While the scope of permissible discovery under the Federal Rules of Civil Procedure ("FRCP") is broad, it is not without limits. This Court has wide discretion in matters relating to discovery. "The Court may limit the frequency or extent of discovery if: the discovery is unreasonably cumulative, duplicative, or can be secured from a more convenient and less expensive source; the party seeking discovery has had ample opportunity to conduct discovery; or if the proposed discovery is outside the scope permitted by Rule 26(b)(1)." *See* Fed. R. Civ. P. 26(b)(2)(B) (limiting the scope of discovery, especially for ESI); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002) (stating that courts should consider "the totality of the circumstances, weighing the value of the material sought against the burden of providing it," and taking into account society's interest in furthering "the truthseeking function" in the particular case before the court).

In short, Plaintiffs have had no shortage of information provided to them during the course of discovery, and have failed to prove that they are entitled to the squad video data in spite of City showing that locating, retrieving and producing the data would be burdensome. Discovery under Rule 26 is intended to provide information necessary for a fair opportunity to develop a case. *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Murray*

*Sheet Metal Co., Inc.*, 967 F.2d 980, 983 (4th Cir. 1992). However, discovery is not without limits, and the court has the authority to protect parties from undue burden or expense. Fed. R. Civ. P. 26(c).

### III. CITY'S RESPONSE TO PLAINTIFFS' INTERROGATORY NO. 8 AND REQUEST FOR DOCUMENTS NO. 9 CONTAINED OBJECTIONS THAT WERE SPECIFIC AND JUSTIFIED, AND CITY PROVIDED SUBSTANTIVE RESPONSES, SUBJECT TO THOSE OBJECTIONS.

The City complied with the requirements of Federal Rule of Civil Procedure 33 & 34, particularly with respect to the objections that are the subject of the present motion. Plaintiffs would like the Court to believe that the City objections "lacked in specificity from the very beginning and led to months of conferences (or at least confusion) because Plaintiffs did not know if anything was being withheld based on the objections." (ECF No. 110 at p. 12.) Plaintiffs' assertions are not only a misrepresentation of the City's prior discovery efforts, but also patently ignore that the City, after asserting certain objections, then provided substantive responses to each interrogatory and served substantial data of videos, audio and other recording responsive to their request for documents. (*See*, *e.g.*, ECF No. 110-1 at Resp. to Interrog. No. 8; 110-7 at Resp. to Request for Document No. 8' *see also* Engelke Decl. ¶¶ 3-13) Moreover, the City has an obligation to supplement its discovery response as additional information is discovered, Fed. R. Civ. P. 26(e) which it satisfied on multiple occasions. (*See*, *e.g.*, ECF No. 110-9; 110-11- 12; *see also* Engelke Decl. ¶¶3-13). Thus, the Court should deny Plaintiffs' motion seeking the Court to overrule the City' objections and order the City to provide additional discovery.

Moreover, City's objections contain, where appropriate and necessary, specificity for

20

the objection. For example, the City expanded on its burdensome and not proportional objections by explaining its squad video the retention policy. (ECF No. 110-1 at Resp. to Interrog. No. 8)(explaining that the Kenosha Police Department generally keeps squad vehicle videos for 120 days after an incident. However, if no arrest is made in connection with the incident, the videos are usually deleted from the system.) Although Plaintiffs were dissatisfied with this response, it clearly elaborates on the objections raise by the City.[5]

## CONCLUSION

For the reasons stated herein, the City Defendants respectfully request that the Court enter an Order denying Plaintiff's Plaintiffs' Motion to Compel the City of Kenosha to Produce Missing Squad Vehicle Videos from Events Related to Rittenhouse Shooting, and Supplement Interrogatory Response (ECF 110).

---

[5] Plaintiffs assert that "the City has never objected that the missing squad vehicle videos are irrelevant." (ECF No. 110 at 11) However, this is incorrect; the City did assert this objection in its initial response in its general objections. (ECF No. 110-1 at 5; 110-7 at 6)

Plaintiffs further argues that the City's objections—that Plaintiffs' discovery requests are "vague, burdensome, and not proportional to the needs of the case"—should be overruled as "boiler objections" lacking explanation or further development in the parties' conferrals. (ECF No. 110 at 11). *But see Farris v. Kohlrus*, No. 17-CV-3279, 2019 WL 351876, at *3 (C.D. Ill. Jan. 29, 2019) (citation omitted) (sustaining several "general objections" for vagueness, overbreadth, undue burden, or seeking irrelevant information and tailoring requests to needs of case).

Finally, Plaintiffs contend that the City belatedly objected to Plaintiff's Interrogatory No. 8 as unduly burdensome due to the expense of engaging a third-party vendor but did not raise any new cost-related objections to Plaintiff's Request for Documents No. 9. (ECF No. 110 at 11) However, this undue expense objection was not newly introduced in the supplemental responses; rather, it was initially raised in the City's general objections in its first response. (ECF No. 110-1 at 3-4; 110-7 at 4). Furthermore, the Defendant explicitly reserved the right to modify, supplement, add to, or amend its responses and/or objections as it had "not completed its discovery and investigation." (ECF No. 110-1 at 6; 110-7 at 6).

Dated:  September 13, 2024

STAFFORD ROSENBAUM LLP

*Electronically signed by Clementine Uwabera*
Ted Waskowski (SBN: 1003254)
Kyle W. Engelke (SBN: 1088993)
Clementine Uwabera (SBN: 1114847)
*Attorneys for Defendants Daniel G. Miskinis,*
*Eric Larsen, City of Kenosha, Village of*
*Menomonee Falls, City of West Allis and any*
*John or Jane Doe Police Officers employed by*
*the City of Kenosha, Village of Menomonee*
*Falls or the City of West Allis*

222 West Washington Avenue, Suite 900
Post Office Box 1784
Madison, Wisconsin 53701-1784
Email:        twaskowski@staffordlaw.com
                   kengelke@staffordlaw.com
                   cuwabera@staffordlaw.com
608.256.0226