

LOUISVILLE    LEXINGTON    LONDON    FLORENCE    CINCINNATI    INDIANAPOLIS    ORLANDO    JACKSONVILLE    TAMPA

Case No. 21-cv-00969-LA

JOHN HUBER, in his individual capacity and as Personal

Representative of the ESTATE OF ANTHONY HUBER

vs.

DAVID G. BETH, in his individual and official capacity

as Kenosha County Sheriff, et al.

-----------------------------------

Case No. 21-cv-001192-LA

(Consolidated with Case No. 21-cv-00969-LA)

PAUL HENRY PREDIGER vs. THE CITY OF KENOSHA, et al.

DEPONENT: KEVIN MATHEWSON

DATE: July 24, 2025



✉ schedule@kentuckianareporters.com

☎ 877.808.5856  |  502.589.2273

www.kentuckianareporters.com

```
 1            IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF WISCONSIN
 2                   MILWAUKEE DIVISION
   ------------------------------------------------------
 3  JOHN HUBER, in his individual capacity
    and as Personal Representative of the
 4  ESTATE OF ANTHONY HUBER,

 5           Plaintiff,          Case No. 21-cv-00969-LA

 6      vs.

 7  DAVID G. BETH, in his individual and
    official capacity as Kenosha County
 8  Sheriff, et al.,

 9           Defendants.
   ------------------------------------------------------
10
    PAUL HENRY PREDIGER,
11
             Plaintiff,          Case No. 21-cv-001192-LA
12
        vs.                      (Consolidated with Case No.
13                                21-cv-00969-LA)
    THE CITY OF KENOSHA, et al.,
14
             Defendants.
15
   ------------------------------------------------------
16

17             *    *    *    *    *

18         VIDEO DEPOSITION OF KEVIN MATHEWSON

19         TAKEN ON THE 24TH OF JULY, 2025

20                   VIA ZOOM

21                  10:00 A.M.

22             *    *    *    *    *

23

24      Taken before Kimberly R. Collins, RMR, CRR

25
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



1    So other -- other than that, I'd just be guessing.

2  Q  **Okay.  About how many days did you contact -- ago**

3     **did you contact him?**

4  A  It would have been shortly after I received the

5     subpoena.

6  Q  **Okay.  At any rate, you have the chief's cell phone**

7     **number, is that fair?**

8            MS. UWABERA:  Object to form, foundation.

9     BY MR. RALLINS:

10 Q  **You can answer.**

11 A  Yes.  Yes, I do.

12 Q  **And I know you don't remember whether or not you**

13    **contacted him via cell phone or on the office phone**

14    **when you contacted him in reference to this upcoming**

15    **deposition, but you've called him on the cell phone**

16    **before, correct?**

17           MS. UWABERA:  Form.

18 A  Yes, that's correct.

19    BY MR. RALLINS:

20 Q  **Okay.  And you've exchanged text messages with him**

21    **on the phone before, correct?**

22           MS. UWABERA:  Same objection.

23 A  Yes, sir.

24    BY MR. RALLINS:

25 Q  **Okay.  You were an alderman in the City of Kenosha**



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 3 of 37    Document 148-1

1    previously, correct?

2  A  Yes, sir.

3  Q  Okay.  And can you tell us the time frame by which

4     you were an alderman?

5  A  Yes, sir.  I was -- tell me if my pauses are too

6     long.  I don't want to delay, I just want to make

7     sure.

8  Q  It's slightly long but you're doing excellent, but

9     you don't have to take -- you don't have to wait

10    that long.  I think --

11 A  Okay.

12 Q  -- you can just answer.

13 A  I was elected in 2012 for a two-year term.  I was

14    defeated in 2014, and I rematched in 2016 and

15    secured another two-year term.  And then I moved to

16    a different municipality.

17 Q  Okay.  So you were an alderman between 2012 and 2014

18    for the first term and then you were an alderman

19    between 2016 and 2018 for the second term,

20    correct?

21 A  I believe my second term I left in 2017, but I'm not

22    100 percent sure.  I left earlier than my term would

23    have expired.

24 Q  Okay.  You were -- your second term was between 2016

25    and 2017 or leading up to 2018, correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 4 of 37    Document 148-1

1    A    That sounds right, yes.

2    Q    **Now, as an alderman, can you describe your**

3          **relationship with -- well, strike that.  As an**

4          **alderman, did you have any authority over the**

5          **Chicago -- I mean the Kenosha Police Department?**

6                  MS. UWABERA:  Object to form.

7    A    No direct -- I'm sorry, no direct authority.  The

8          common council, the City Council speaks with one

9          voice so everything we do, whether it controls the

10         police department's budget or change policy has to

11         be done with a majority vote.  So I'm just -- I was

12         one of 17 members.  So I didn't have any direct

13         authority over the police department but indirect

14         as -- as a vote.

15         BY MR. RALLINS:

16    Q    **Sure.  But the City Council had authority over the**

17         **Kenosha Police Department's budget and could change**

18         **policy within the Chicago -- within the Kenosha**

19         **Police Department, correct?**

20                  MS. UWABERA:  Same objection.

21    A    You know, I take that back.  I don't know if we can

22         control -- we could control police department

23         policy; but we could write ordinances and

24         resolutions that govern general city policy; but

25         specific to police department policy, I'm not 100

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 5 of 37    Document 148-1

```
 1    percent sure if we had that authority.
 2    BY MR. RALLINS:
 3  Q You don't recall voting about any ordinances related
 4    to the Kenosha Police Department?
 5  A Specifically, no.  I know that I brought forward,
 6    for example, a resolution to place money in the
 7    budget for body worn cameras back in 2014, I
 8    believe.  I don't know if that would be considered a
 9    policy.  It would have just been a budget amendment
10    to fund the body worn cameras.
11  Q Okay.  At any rate, the City Council had approved
12    the budget for the Kenosha Police Department,
13    correct?
14          MS. UWABERA:  Object to form.
15  A That is correct.
16    BY MR. RALLINS:
17  Q Why did you move for the resolution to create body
18    cameras for officers within the Kenosha Police
19    Department?
20  A I was and still am a very big proponent of holding
21    law enforcement officers accountable.  While I
22    support them, I think that more oversight and
23    transparency is a -- is a good thing.
24  Q And when you proposed the resolution, do you recall
25    any position the Kenosha Police Department took on
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 6 of 37    Document 148-1

```
 1        the proposal for body cameras?
 2               MS. UWABERA:  Object to form.
 3   A    That's a good question.  I believe it was
 4        universally rejected by all of my colleagues.  I
 5        think the police chief at the time was John
 6        Morrissey.  He completely was against them.  The
 7        mayor at that time was against them.  He kept moving
 8        them later into the budget over and over.  I think I
 9        was on an island as far as I remember.
10        BY MR. RALLINS:
11   Q    And at any point prior to the Kenosha Protest, do
12        you recall -- strike that.  At any point prior to
13        the Kenosha Protest, do you recall Chief Miskinis
14        becoming a proponent of body worn cameras?
15               MS. UWABERA:  Object to form.
16        BY MR. RALLINS:
17   Q    You can answer.
18   A    I remember -- I remember having conversations with
19        him about body worn cameras and I believe -- I -- I
20        interpreted his comments as political.  In other
21        words, I didn't think he was being candid.  He said
22        something like I support the idea of body cameras
23        but they're just too expensive or something.  I
24        looked at it as an excuse not to have them.
25   Q    All right.  And you are aware officers weren't
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 7 of 37    Document 148-1

```
 1      questions.  Spoken on the phone dozens of times and
 2      had maybe a handful of -- of meetings in person
 3      outside of the police department, it was just me --
 4      him and I.
 5  Q   Okay.  And similar to the current chief, you have
 6      spoken to Chief Miskinis on his cell phone, correct?
 7              MS. UWABERA:  Object to form, foundation.
 8  A   Yes, I have.
 9      BY MR. RALLINS:
10  Q   Okay.  And you -- you've exchanged text messages
11      with him on his cell phone, just like you've
12      exchanged text messages with the current chief,
13      correct?
14              MS. UWABERA:  Same objections.
15  A   Yes, that is correct.  Although it wasn't very -- it
16      wasn't very often.
17      BY MR. RALLINS:
18  Q   Okay.
19  A   It was kind of a -- he was kind of a drier guy, no
20      offense.  He was just very methodic and an
21      introvert.
22  Q   Okay.  Tell me about your in-person meetings with
23      Chief Miskinis where it was just you and him.
24  A   Usually --
25              MS. UWABERA:  Form.
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 8 of 37    Document 148-1

```
 1   A   I'm sorry.
 2             MS. UWABERA:  Go ahead.
 3   A   There's a little delay.  Sorry I'm talking over you.
 4       They usually would have been about cops doing stupid
 5       stuff and me trying to figure out what he's going to
 6       do about it.
 7       BY MR. RALLINS:
 8   Q   Okay.  And where would you meet with Chief
 9       Miskinis?
10   A   I believe most of our meetings were at McDonald's in
11       Somers, Washington and Green Bay Road.
12   Q   Okay.  And would you say you -- you met with Chief
13       Miskinis at the McDonald's more than five times?
14   A   I would say about five times.
15   Q   Okay.
16   A   It could be one more, it could be one or two less.
17   Q   Okay.  And were all of these meetings before the
18       Kenosha Protest?
19   A   Yes, sir.
20   Q   Okay.  And when you'd complain to -- or strike that.
21       When you questioned Chief Miskinis about police
22       misconduct at these meetings, what was his
23       response?
24             MS. UWABERA:  Object to form, foundation,
25         misstates prior testimony.
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA   Filed 08/12/25   Page 9 of 37   Document 148-1

1    BY MR. RALLINS:

2  Q  **You can answer.**

3            MS. UWABERA:  You can answer.

4  A  I believe usually -- usually there would be

5     justification excuses.  Sometimes he'd -- you know,

6     there was a couple of times where I really think

7     he -- he made terrible choices as far as personnel,

8     and usually he'd try to tell me his side of things

9     and sometimes he just wouldn't talk about certain

10    cases.

11    BY MR. RALLINS:

12 Q  **Okay.  Do you still have the number you used to**

13    **contact Chief Miskinis?**

14           MS. UWABERA:  Object to form.

15    BY MR. RALLINS:

16 Q  **If you do, I'm just going to ask that during a**

17    **break, if we take a break, rather than sending a**

18    **subpoena, find out whether or not you -- you have**

19    **the number and then -- and then we can go from**

20    **there.**

21 A  So actually -- oops.

22 Q  **No, go ahead.**

23 A  Actually, the number that I had for the chief then

24    was transferred to the next chief.

25 Q  **Okay.**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 10 of 37    Document 148-1

1   A   That was Eric Larsen.  I actually looked recently

2       and -- so yeah, I do have the number that I used to

3       text him, I believe.

4   Q   **Okay.  During a break I'm going to ask that you --**

5       **you give that number and you can just state it over**

6       **the record confidentially and we'll mark it as**

7       **confidential.**

8               MS. UWABERA:  Quinn, I'm going to

9           object.

10              MR. RALLINS:  I understand.

11              MS. UWABERA:  You didn't --

12              MR. RALLINS:  I understand.

13              MS. UWABERA:  You didn't duces tecum him

14          so this is testimony.  So if he doesn't have

15          the records present in front of him and you

16          didn't ask him to produce it, I would object.

17              MR. RALLINS:  I understand your objection.

18          I'm going to ask him to do it and we'll mark it

19          as confidential.

20  BY MR. RALLINS:

21  Q   **You -- you -- you are familiar with Joe Nosalik who**

22      **served -- who was over internal affairs at the**

23      **Kenosha Police Department?**

24  A   Yes.  And there's a lot of hard -- there's a lot of

25      interesting names.  Joe Nosalik, yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 11 of 37    Document 148-1

1  A   Okay.  So I'm -- I found it easily yesterday and now

2      I'm having trouble, but just give me one second.

3  Q   **No problem.**

4  A   Okay.  Now -- I guess just to be blunt with you,

5      Attorney Rallins, I'm doing this just to -- just to

6      save time later, otherwise I'd probably tell you the

7      same thing, that I'm not going to look for

8      something; but I'm hoping you show me some grace

9      later on.  I don't want to get in huge --

10 Q   **Sure.  I want to -- yeah, sure.  The -- I don't --**

11     **you know, I don't want to have to call the judge.**

12     **So I'd just rather --**

13 A   No, no, I know.  So this is, I believe, a Kenosha

14     Police Department issued phone and I have it listed

15     as Chief Larsen, which I believe it was Miskinis's

16     before, and that phone number when you are ready.

17 Q   **Okay.  Go ahead.**

18 A   262 --

19 Q   **Okay.**

20 A   -- 220-8199.

21 Q   **262-220-8199?**

22 A   That is correct, yes.

23 Q   **Okay.  All right.  We can move on.  And this is the**

24     **phone number that you recall communicating with**

25     **Chief Miskinis on prior to the Kenosha Protest,**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 12 of 37    Document 148-1

```
 1        correct?
 2   A    I believe so, although I only have text messages
 3        with Chief Larsen because I believe I got a new
 4        phone in that time period.
 5   Q    Okay.  And --
 6   A    So the last message I have -- or the oldest message
 7        I have was from September 21, 2022.
 8   Q    Okay.  That's the oldest message you have with Chief
 9        Larsen?
10   A    That's correct.
11   Q    Okay.  Do any of these messages that you still have
12        with Chief Larsen relate to the Kenosha Protest?
13   A    No.
14   Q    Okay.
15   A    Not to my knowledge, no.
16   Q    Okay.  Like I said --
17   A    I'm sorry.
18   Q    I don't need you to look right now.
19   A    Okay.
20   Q    But thank you.  All right.  So I want to talk about
21        August 23, 2020, the day of the Jacob Blake
22        shooting, okay?
23   A    Okay.
24   Q    When did you first learn of the Jacob Blake
25        shooting?  Or strike that.  How did you first learn
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA   Filed 08/12/25   Page 13 of 37   Document 148-1

 1      arrive?

 2              MS. UWABERA:  Object to form, foundation.

 3   A  I know it was -- it was light out and I know it was

 4      later in the afternoon or early in the evening.

 5      BY MR. RALLINS:

 6   Q  Okay.

 7   A  And I was home well before any of the continued

 8      rioting, looting and arson started back up.

 9   Q  Did you go to the civic center with anyone else?

10   A  Yeah, I went with a friend of mine.

11   Q  Okay.  Who did you go to the civic center with?

12   A  His name is Aaron Petroski, A-a-r-o-n.  It was a

13      male.

14   Q  And how do you spell Petroski?

15   A  I would just be guessing.  I'm sorry.  I believe it

16      was P-e-t-r-o-s-k-i.

17   Q  Okay.  And how do you know Aaron?

18   A  He was a constituent of mine.  When I was an

19      alderman, he ran for local office at one point.

20   Q  Okay.

21   A  We became friends in that capacity and kept in

22      touch.

23   Q  When you went to the civic center on August 25th,

24      were you armed?

25   A  Yes, sir.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 14 of 37    Document 148-1

1  Q   And what type of gun did you have?

2  A   I had a Glock 22, which is a .40 caliber, and I had

3      an AR-15 semiautomatic sporting rifle.

4  Q   And was Aaron armed as well?

5  A   Yes, he was.

6  Q   Do you remember what type of gun he had?

7  A   I believe it was an old -- an older -- I want -- I

8      mean, it was -- it was an older firearm.  It was a

9      rifle.  I can't be more specific.

10 Q   Okay.  And you were openly carrying your firearms,

11     correct?

12 A   Yes, sir.

13 Q   And Aaron was as well, correct?

14 A   Yes, sir.

15 Q   Why did you go to the civic center on August 25th?

16 A   Because that is where I encouraged people to meet.

17 Q   And what method did you use to encourage people to

18     meet at the civic center?

19 A   Facebook.

20 Q   And when you encouraged people to meet on Facebook,

21     you used the Kenosha Guard Facebook page, correct?

22 A   Yes.

23 Q   After you asked people to assemble at the civic

24     center, approximately how many people -- well,

25     approximately how many people were there when you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 15 of 37    Document 148-1

|    |   |                                                           |
|----|---|-----------------------------------------------------------|
| 1  |   | arrived?                                                  |
| 2  | A | How many total people, period?                            |
| 3  | Q | **Yes. When you first arrived.**                          |
| 4  | A | Oh, man, numerous. I wouldn't be surprised if it          |
| 5  |   | was 100 or more, but it was a long time ago.              |
| 6  | Q | **Okay. And at the peak while you were at the civic**     |
| 7  |   | **center, would you say it was a few hundred people**     |
| 8  |   | **who had assembled there?**                              |
| 9  | A | Yeah, within -- within visual distance for myself,        |
| 10 |   | several hundred for sure. Some people were kind of        |
| 11 |   | outside the geographical limits of the park but --        |
| 12 | Q | **Okay.**                                                 |
| 13 | A | Hundreds.                                                 |
| 14 | Q | **And when you were in the -- at the -- at Civic**        |
| 15 |   | **Center Park, did -- when you say civic center, we're**  |
| 16 |   | **talking about Civic Center Park, correct?**             |
| 17 | A | Correct. It's directly south of the courthouse.           |
| 18 | Q | **Okay. And while you were in -- at Civic Center**        |
| 19 |   | **Park, did any officers from the Kenosha Police**        |
| 20 |   | **Department communicate with you?**                      |
| 21 | A | Not to my knowledge, no. I really don't remember          |
| 22 |   | seeing any officers other than I may have seen one        |
| 23 |   | or two, like, on the roof of the courthouse but --        |
| 24 | Q | **Okay.**                                                 |
| 25 | A | I certainly wasn't -- didn't communicate with any         |

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 16 of 37    Document 148-1

```
 1        officers and I don't even believe I saw any -- if I
 2        did, it would have been one or two on top of the
 3        courthouse.
 4   Q    Okay.  But no law enforcement officers came up to
 5        you and spoke to you while you were at the civic
 6        center, to your knowledge?
 7   A    To my knowledge, no.  I know there was -- you know,
 8        that's why I say to my knowledge, because I know
 9        there was undercover police officers --
10   Q    Right.
11   A    -- and federal agents.  So was it possible that I
12        did with not knowing, yeah; but I -- I -- certainly
13        not any uniformed police officers.
14   Q    Okay.  No law enforcement officers to your
15        knowledge -- strike that.  No law enforcement
16        officers tried to arrest you for encouraging people
17        to go to the civic center?
18                MS. UWABERA:  Object to form.
19   A    No.  Never.  Nor would I have expected it.  I didn't
20        do anything illegal.
21        BY MR. RALLINS:
22   Q    Sure.  Did you observe any law enforcement officers
23        make arrests of anyone at the Civic Center Park
24        while you were there on August 25th?
25   A    No, sir.
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

COURT REPORTERS

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 17 of 37    Document 148-1

1    A    That's correct.

2    Q    On the night of -- well, strike that.  When you were

3         traveling in the City of Kenosha during the

4         restricted hours of the curfew order, did you

5         believe that you were in violation of the curfew

6         order?

7    A    I know that the curfew order was judicially deemed

8         to not be valid.  I know that now.  I didn't know

9         that then.  Does that answer your question?

10   Q    Sure.  At the time -- during the time of the -- I'm

11        not trying to ask a trick question.

12   A    Sure.

13   Q    You're not a defendant in this case, you know that,

14        correct?

15   A    Sure, sure, sure.  Yeah.

16   Q    At the time of the -- and I've asked this question

17        of many folks who have been -- or witness -- were

18        deposed in this case.

19   A    Sure.

20   Q    During the time of the curfew order -- strike that.

21        You knew there was a curfew order and because there

22        were things that you sought to do, including

23        protecting the -- the pawnshop, you were out

24        although there may -- it was -- you knew it was in

25        violation of the hour -- restricted hours of the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 18 of 37    Document 148-1

```
 1        curfew order, fair?
 2                MS. UWABERA:  Object as to form.
 3    A   I'll answer it this way.  Let me know if you need me
 4        to explain.  I know that there were -- there were
 5        officials that had made a curfew order; but I
 6        wasn't -- I wasn't explicitly clear on the details
 7        of who was exempt, who was not.  So I -- I don't
 8        know if -- if I can tell you if I violated anything
 9        as we sit here; but I was out in public during the
10        time when certain government officials said we could
11        not be out in public.  Does that answer your
12        question?
13        BY MR. RALLINS:
14    Q   Sure.
15    A   Okay.
16    Q   And do you recall -- strike that.  Nosalik was also
17        the public information officer, correct?
18    A   Correct.  He was the public information officer and
19        the commander of the internal affairs division.
20    Q   Okay.  Do you recall anyone from the Kenosha Police
21        Department or Kenosha sheriff's office making it
22        plain to you any exemptions for the curfew order?
23    A   No, sir.
24    Q   That includes public statements and the news, is
25        that correct?
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 19 of 37    Document 148-1

1  A   As far as I know, I -- I -- I was not contacted or
2      given any information from law enforcement about any
3      exemptions.
4  Q   **Okay.  And you don't recall any exemptions being**
5      **expressed publicly at press conferences or**
6      **statements?**
7  A   Now that you say that, I -- I remember -- I remember
8      there being -- I remember learning from somewhere
9      that there was a media exemption; but, of course, as
10     we established before, I was not a member of the
11     media at that time.
12 Q   **Okay.**
13 A   But I know that media were allowed to be there.
14 Q   **Okay.  Do you recall any other exemptions aside from**
15     **media?**
16 A   No, sir.
17 Q   **Okay.  Now, I know that you -- strike that.  You're**
18     **aware that dozens of people were arrested**
19     **exclusively for violating the curfew order,**
20     **correct?**
21 A   Yes, I'm aware of that.  Yup.  Yes, sir.
22 Q   **Did anyone -- strike that.  Throughout the protest,**
23     **did any law enforcement officer tell you that you**
24     **were breaking the law?**
25 A   No.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 2:21-cv-00969-LA     Filed 08/12/25     Page 20 of 37     Document 148-1

1    made -- she made a complaint to police saying that

2    I -- I was a co-conspirator to murder; and I became

3    aware of her complaint and I asked for a copy of her

4    police report and everything that she gave me and

5    then Nosalik butchered the public records law and

6    said it put her life at risk if he gave me these

7    documents; and after threatening to sue them, they

8    ended up giving me the documents.

9  Q   **And in this letter he denies -- he denies the**

10     **request, correct?**

11 A   Correct, yup.

12 Q   **And prior to denying the request, he gives his**

13     **reasonings, correct?**

14 A   Yeah, he didn't write this.  This was written by an

15     attorney at the City.

16 Q   **And -- but he signs it, correct?**

17 A   Correct.  Yup.

18 Q   **And the letter that he signs, it states, it is my**

19     **understanding that you are the commander of the**

20     **Kenosha Guard, correct?**

21 A   Correct.  That's what it says.

22 Q   **He's referring to -- when he says you, he's**

23     **referring to you, Mr. Mathewson, correct?**

24 A   That's correct.

25 Q   **Okay.  And he states that you have administered at**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

COURT REPORTERS

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 21 of 37    Document 148-1

```
 1        page --
 2   A    Can you go up a little bit more?  I'm sorry.
 3   Q    Sure.  We're going to start right here.
 4   A    Okay.  I don't believe that's mine.  Yeah, that is
 5        me.
 6   Q    All right.  What is -- do you recognize this -- this
 7        document?
 8   A    Actually, I -- I don't know.  I don't recognize it
 9        because it says June 2nd.
10   Q    Sure.  June 2nd, which would be the -- George Floyd
11        died on -- I forget the exact date, but May of '20.
12   A    Okay.
13   Q    So you talked about protest and activity on June
14        2nd, and do you recall starting this Facebook event
15        to assemble people at Civic Center Park on
16        June 2nd?
17   A    Yeah, so I -- I don't recognize this but I also
18        don't dispute it either.
19   Q    Okay.  And here it states this event is being hosted
20        by Kenosha Guard, correct?
21   A    Yes.
22   Q    Do you recognize that -- that image with -- well,
23        let me ask you.  The image of the Kenosha Guard
24        Facebook page, it is a individual who has a finger
25        pointing down, correct?
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA   Filed 08/12/25   Page 22 of 37   Document 148-1

1  A   Yes.

2  Q   Okay.  And that's the same image on this Facebook

3      event posting, correct?

4  A   I believe, yeah.  I believe so, yes.

5  Q   Okay.  At any rate, it states this is our city.

6      Come and peacefully assembly?

7  A   Bad grammar there; but yes, that says that.

8  Q   Okay.  And it says come armed, correct?

9  A   Correct.

10 Q   And it states that we will not let -- I think it

11     means our -- it says we will not let out of state

12     bad guys destroy the city that we love, correct?

13 A   Oh, so that one I did -- yeah, correct.  I guess

14     that one is not grammatically incorrect,

15     fortunately.

16 Q   And you're not going to dispute that you created

17     this Facebook event, do you?

18 A   Right.  I don't -- I don't recognize it but it looks

19     like something that I posted, yes.

20 Q   Okay.  And at the top it has an image of a snake,

21     don't tread on me, correct?

22 A   Yes.

23 Q   And the -- the purpose of the event is to be

24     peaceful but armed --

25 A   Um-hum.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 23 of 37    Document 148-1

```
 1    Q    -- and to assemble to deter looting and rioting,
 2         correct?
 3    A    That's correct.
 4    Q    And according to this Facebook page, it asks people
 5         to assemble between the hours of 4:30 p.m. and
 6         10:00 p.m. at Civic Center Park across from the
 7         courthouse, correct?
 8    A    Correct.
 9    Q    And we have another Facebook post that appears to be
10         a protest for peaceful social disruption in honor of
11         George Floyd entitled it's time to do something,
12         correct?
13    A    Yes, I see that.
14    Q    Okay.  And it is around the same time -- strike
15         that.  It's on the same date, June 2nd within the
16         hours of 5:30 p.m. and 6:00 p.m., according to this
17         Facebook post, correct?
18    A    That is correct, yup.
19              MS. WISCO:  Just for the record, is this
20           2020?  We're talking about June --
21              MR. RALLINS:  Yes.  June 2, 2020.
22              MS. WISCO:  Okay.
23         BY MR. RALLINS:
24    Q    And just to Natalie's point, the Facebook page
25         states that the event is supposed to take place on
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 24 of 37    Document 148-1

1  A    So, again, there's 250 -- around 250 sworn law

2       enforcement officers.  If you asked all of them what

3       they thought of me, you'd probably get half of them

4       that hate my guts and half of them that -- that

5       liked me.

6           My -- my relationship with Nosalik was poor.

7       My relationship with the Chief was medium, neutral

8       because, you know, I think -- I think -- you know,

9       like I explained to you a couple days ago, when I

10      was an alderman, I hated nothing more than when cops

11      did -- when they abused their authority.  So I held

12      them accountable.  So that made some cops not like

13      me but it made the good cops happy because their

14      colleagues would get called out for doing bad stuff

15      and making them all essentially look bad.

16      BY MR. RALLINS:

17  Q   **Sure.  Okay.  All right.  I'm pulling up a --**

18      **another exhibit.  It doesn't have a Bates stamp**

19      **number on it either.**

20              (Exhibit Number 5 was marked for

21          identification.)

22      BY MR. RALLINS:

23  Q   **This is another e-mail from Nosalik to you.  The --**

24      **a few days later on June 8, 2020 at 9:40 a.m.,**

25      **correct?  Is that fair?**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

COURT REPORTERS

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 25 of 37    Document 148-1

```
 1   A    Yes.  And I don't remember or recognize this; but I
 2        don't dispute it.  I'm sure it's authentic.
 3   Q    Sure.  According to Nosalik, he asked if you had any
 4        free time today to meet with him and he wanted to
 5        meet somewhere outside other than his office,
 6        correct?
 7   A    Yes.
 8   Q    Okay.  And do you recall that meeting with
 9        Nosalik?
10   A    No, but I'm looking at my Google calendars, we
11        met -- I scheduled a meeting on my calendar for
12        12:30.
13   Q    Okay.  Do you recall where -- does it say where it
14        was?
15   A    It does not say where and I don't remember where.
16   Q    Okay.
17   A    But it probably would have been at a coffee shop in
18        public somewhere.
19   Q    Um-hum.  Okay.
20   A    So it was that same day that we met.
21   Q    Sure.  And during that meeting, did Nosalik bring
22        up -- strike that.  During that meeting, did Nosalik
23        raise the issue of the Kenosha Guard at that
24        point?
25   A    No.  And we met at Common Grounds coffee shop.
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA   Filed 08/12/25   Page 26 of 37   Document 148-1

1    Q    Okay.

2    A    I don't know if that's -- if that's permissible to

3         you but I'm just trying to get you --

4    Q    No, that's fair.  I know it's Coffee Grounds coffee

5         shop.  It's helping me not go through every single

6         exhibit.  Now you do recall it was at Coffee

7         Grounds -- Coffee Grounds coffee shop, correct?

8    A    I don't recall but I'm looking -- just looking at an

9         e-mail that that's where we agreed to meet.

10   Q    Okay.  And if he had brought up the Kenosha Guard at

11        that meeting, you would recall it, correct?

12   A    Absolutely.

13                  MR. RALLINS:  We'll make this Exhibit 6.

14              (Exhibit Number 6 was marked for

15           identification.)

16        BY MR. RALLINS:

17   Q    It's an e-mail from Joseph Nosalik -- it's part of

18        the e-mail exchanges between Joseph Nosalik and you

19        on June 8th and it states that -- according to this

20        e-mail, Nosalik suggests you all meet at Common

21        Grounds coffee shop, correct?

22   A    Yes.  And this is an authentic e-mail.  I just

23        reviewed it on my own.

24   Q    Okay.  You have no reason to dispute this e-mail,

25        correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 27 of 37    Document 148-1

```
 1    A    No, it's a true and accurate depiction of an e-mail
 2         exchange.
 3    Q    Okay.  All right.  And we'll make this Exhibit 6.
 4         Why don't you think Nosalik ever asked you about the
 5         Kenosha Guard?
 6                   MS. UWABERA:  Object to form, foundation.
 7    A    I have no way to know.  I've never -- I've -- he's
 8         never told me why he didn't and I have no guess as
 9         to why.
10                   MR. RALLINS:  This is Exhibit 7, is that
11              where we at?
12                   COURT REPORTER:  Yes.
13                   (Exhibit Number 7 was marked for
14              identification.)
15         BY MR. RALLINS:
16    Q    Here is another e-mail a few days after the
17         coffee -- the meeting at the Coffee Grounds, and
18         according to this it's -- it's an e-mail -- sorry.
19         Let's see.  Share.  Okay.  Okay.  Okay.  According
20         to this, on June 16, 2020 at 8:01 a.m., Nosalik is
21         sending you an e-mail, correct?
22    A    It looks like it, yeah.
23    Q    And according to this e-mail, he is contacting you
24         on his day off, correct?
25    A    That's what it says, yes.
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 28 of 37    Document 148-1

```
 1         situated here in Kenosha County.
 2    Q    Prior to the Kenosha Protest, you had received
 3         direct e-mails from Chief Miskinis, correct?
 4    A    Many times.
 5              MS. UWABERA:  Object to form.
 6    A    I'm sorry.  The answer is yes, many times.
 7              MR. RALLINS:  We'll make the chat message
 8         Exhibit 8.  I'll send that.
 9              (Exhibit Number 8 was marked for
10         identification.)
11              MR. RALLINS:  And then we're on Exhibit 9.
12              (Exhibit Number 9 was marked for
13         identification.)
14    BY MR. RALLINS:
15    Q    All right.  Can you see my -- the document, sir?
16         Can you -- are you able to see this, sir?
17    A    Yeah, I can see it.  Yup.
18    Q    And this is one such e-mail sent from Dan Miskinis
19         to you on June 17, 2020 around noon, correct?
20    A    It looks like it, yes.
21    Q    And from the e-mail tone, he appears to be upset
22         with you, correct?
23    A    Oh, very much, yes.
24              MS. UWABERA:  Form, foundation.
25    A    Very much so, yes.
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 29 of 37    Document 148-1

1          And that's not meant to be a slight but, you

2     know, I've litigated many, many cases pro se dealing

3     with attorneys.  I'm very, very familiar with that

4     law and that's why when I threaten to sue, more

5     times than not they'd just give it to me because

6     they knew they'd win -- or they'd lose, sorry.

7  Q  **At any rate, the day after Miskinis expresses**

8     **discontent with you, Nosalik tells Jeremy DeWitt**

9     **he'll take care of your records -- your request for**

10    **documents, correct?**

11 A  Correct.  And then I -- sorry, there's no question.

12    Sorry.

13 Q  **No.  Go ahead.**

14 A  I was just going to say, and then a few days

15    later -- or that same day I was provided with that

16    e-mail.  So, you know, Miskinis's wild tangent was

17    proven to be false that same day when I was given

18    that report.

19 Q  **Sure.**

20 A  I'm just trying to -- I'm just trying to defend my

21    integrity, that's all.

22 Q  **Sure.  Now, I could go through every e-mail; but**

23    **between June of 2020 and the Kenosha Protest, you**

24    **had engaged in dozens of e-mail exchanges with**

25    **Nosalik and the Chief, correct?**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA     Filed 08/12/25     Page 30 of 37     Document 148-1

1 A    Probably, yeah.

2 Q    **You don't have any reason to dispute that, do you?**

3 A    No, not at all.  I was in constant communication

4      with them.

5                (Exhibit Number 11 was marked for

6           identification.)

7      BY MR. RALLINS:

8 Q    **And you had communications with them up until the**

9      **protest, including on August 21, 2020 according to**

10     **this e-mail exchange, correct?**

11 A   Yup.

12 Q   **And according to this -- according to this e-mail**

13     **exchange, Nosalik is going to go back and work with**

14     **the company to redo a records request for you,**

15     **correct?**

16 A   Yeah.  And this was -- this was me working on behalf

17     of a client and an attorney.

18 Q   **Okay.  Thanks for the clarification.**

19 A   Sure.

20                MR. RALLINS:  I don't expect to go much

21           longer.  Why don't we take a quick five-minute

22           break if that works for everybody.

23                THE WITNESS:  Sure.

24                THE VIDEOGRAPHER:  Sounds good.  Give me a

25           second to get us off the record.  Going off the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 31 of 37    Document 148-1

| | | |
|---|---|---|
| 1 | Q | All right.  All right.  According to -- and this is |
| 2 | | an e-mail that you wrote to Chief Miskinis on |
| 3 | | August 25, 2020 at 5:42 p.m., correct? |
| 4 | A | It looks like it, yes. |
| 5 | Q | Okay.  The e-mail -- according to the e-mail, it |
| 6 | | states, "Chief Miskinis, as you know I am the |
| 7 | | commander of the Kenosha Guard, a local militia.  We |
| 8 | | are mobilizing tonight and have about 3,000 RSVP's. |
| 9 | | We have volunteers that will be in uptown, downtown |
| 10 | | and at the entrances to other neighborhoods.  Our |
| 11 | | effort has made national media."  And it provides |
| 12 | | a -- a -- an -- a website that references an |
| 13 | | article.  Am I reading that right? |
| 14 | A | Yes, you are. |
| 15 | Q | Then it states, "I ask that you do not have your |
| 16 | | officers tell us to go home under threat of arrest |
| 17 | | as you have done in the past.  We are willing to |
| 18 | | talk to KPD and open a discussion.  It is evident |
| 19 | | that no matter how many officers, deputies, and |
| 20 | | other law enforcement officers that are here, you |
| 21 | | still -- you will still be outnumbered.  Thank you. |
| 22 | | Kenosha Guard Commander, Kevin Mathewson", and then |
| 23 | | it provides your cell phone number, fax number and |
| 24 | | e-mail.  Did I read that right? |
| 25 | A | You did. |

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 32 of 37    Document 148-1

```
 1        that's fair.
 2   Q    Sorry, just bear with me.
 3              MR. RALLINS:  Are we at Exhibit 16?
 4              COURT REPORTER:  Yes.
 5              MR. RALLINS:  Okay.
 6   BY MR. RALLINS:
 7   Q    All right.  Can you see my screen?
 8   A    Not yet, sir.
 9   Q    There we go.
10              (Exhibit Number 16 was marked for
11         identification.)
12   BY MR. RALLINS:
13   Q    All right.  Can you see my screen?
14   A    Yes, I can.
15   Q    Okay.  Do you recognize this -- the individuals in
16        this photo?
17   A    Yeah.  I don't know -- the guy on the right is me 95
18        pounds ago.  The guy on the left, I don't know him
19        but I -- I spoke with him briefly that night.
20   Q    And this is a photo of you at Civic Center Park on
21        August 25, 2020, is that fair?
22   A    That is fair, yup.
23   Q    And the -- the gun display -- the black gun
24        displayed in front of you is the assault rifle that
25        you mentioned earlier, correct?
```

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 33 of 37    Document 148-1

1  A    I don't use terms like assault rifle.  Those are
2       meant to politicize things.  It's just a sporting
3       rifle.  One pull of the trigger, one bullet, just
4       like any other rifle that people use for hunting or
5       anything.  But it's an AR-15 style semiautomatic
6       rifle.
7  Q    **When people see it, they often refer to it as an**
8       **assault rifle, is that fair?**
9  A    Usually people on the left, but assault rifle would
10      be like a fully automatic.
11 Q    **Sure.**
12 A    Like a machine gun.  One pull of the trigger,
13      several rounds.
14 Q    **Okay.  That's Exhibit 16.**
15              (Exhibit Number 17 was marked for
16          identification.)
17      BY MR. RALLINS:
18 Q    **All right.  Can you see my screen?**
19 A    Yes, I can.
20 Q    **Okay.  This is a document that shows a -- a Facebook**
21      **post by you, this is dated August 25th at 5:32 p.m.,**
22      **correct?**
23 A    Yes.
24 Q    **It states beautiful out tonight.  Stay safe**
25      **everyone?**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 34 of 37    Document 148-1

1    cutter suburban neighborhoods by me, every single

2    entrance had multiple citizens armed and, you know,

3    when I moved in to -- to this neighborhood I'm

4    sitting in right now, some of my democrat friends,

5    you know, texted me and said oh, we got -- we got a

6    conservative in the neighborhood, LOL.  You know, I

7    get along with my democrat friends just as well as

8    my republican friends; but that night there was no

9    democrats and republicans.  There were people that

10   were afraid.

11        So I got text messages and phone calls from my

12   democrat friends saying, you know, we're happy that

13   people were out there watching the entrances to our

14   neighborhoods.  Because our neighborhoods were

15   tip -- were specifically threatened online because

16   they viewed these neighborhoods as where rich people

17   live.  So, you know, we -- we -- we were in a real

18   scary time.  You know, like I said, three blocks

19   from where my kids were born, houses were -- were

20   burnt to the ground.  And so it struck a nerve with

21   me.  I was -- I was ticked off that these people

22   were out there looking to cause harm.

23 Q   Were -- you weren't asked directly by -- strike

24   that.  Throughout the protest, you weren't asked --

25   strike that.  Throughout the Kenosha Protest you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

COURT REPORTERS

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 35 of 37    Document 148-1

1  Q    Would you describe the Kenosha Guard as a militia?

2  A    Not really.  I mean, a militia would be something

3       with organization with members.  This was more of --

4       and I think I said during an interview with like the

5       BBC or one of those the morning after this and I

6       said yeah, it was a militia; but now that I really

7       know what is and what it is not, it was a Facebook

8       event and it was a Facebook page with no leadership,

9       no organization.  It doesn't meet any definition of

10      militia that I've ever seen since.

11 Q    And how would you define militia?

12 A    A militia would be a group of people with a common

13      purpose that has organization, that has meetings,

14      that has structure.  Usually defined as, you know,

15      something like back during the formation of this

16      country to fight against what people believe is a

17      tyrannical government; and that -- obviously that

18      wasn't the intent of the page.  The intent was just

19      to encourage people to defend themselves.

20 Q    Would you describe it as a vigilante group?

21 A    Not even close, no.  And it -- you know, I was very

22      clear when I said, you know, peaceful, peaceful,

23      defense, deter, deterrence.

24 Q    You were asked about a photograph of you in some

25      kind of Army fatigue shorts.  Do you recall that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

COURT REPORTERS

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 36 of 37    Document 148-1

1     line of questioning?

2  A  Yeah, those were just -- they looked Army fatigue

3     but they were just camouflage cargo shorts and the

4     red Chuck Norris shirt that says Chuck Norris uses

5     pepper spray on his steak.  Sorry, I had to get that

6     in there but -- and yeah, I was with my friend Aaron

7     who was a Marine Corps veteran.

8  Q  **Would you say that your dress was somehow indicative**

9     **of some sort of parliamentary organization?**

10  A  Not at all.  It was just a -- just a chubby guy

11    going out in what I had on at the time and that was

12    it.

13  Q  **So you didn't have any written bylaws you testified,**

14    **correct?**

15  A  Nothing -- there was no structured organization.

16    The only thing was the page itself.

17  Q  **The only way to really know who is a member, we'd go**

18    **through your friends list on the group.  Can you at**

19    **least explain to me how the group worked?**

20  A  So the group would work where you can like it.  So

21    it's -- it would be called Kenosha Guard and you

22    click like on it.  Back then it was likes only.  Now

23    they have follow or like or both.  Back then it was

24    just a like.

25       So I think there was four likes at the time

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 2:21-cv-00969-LA    Filed 08/12/25    Page 37 of 37    Document 148-1